YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division
DREW C. ENSIGN
Deputy Assistant Attorney General
ANTHONY P. NICASTRO
Acting Director
Office of Immigration Litigation
JOHN J.W. INKELES
Chief
Affirmative Litigation Unit
HANS H. CHEN
Deputy Chief
Affirmative Litigation Unit
*Attorneys for the United States*

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| THE UNITED STATES OF AMERICA, | No. 2:25-cv-5081 |
| Plaintiff, | |
| v. | **COMPLAINT** |
| CITY OF NEWARK; CITY OF JERSEY CITY; CITY OF PATERSON; CITY OF HOBOKEN; NEWARK CITY COUNCIL; JERSEY CITY CITY COUNCIL; PATERSON CITY COUNCIL; HOBOKEN CITY COUNCIL; C. LAWRENCE CRUMP, Newark City Council President, in his official capacity; JOYCE E. WATTERMAN, Jersey City City Council President, in her official capacity; ALEX MENDEZ, Paterson City Council President, in his official capacity; JAMES DOYLE, Hoboken City Council President, in his official capacity; RAS J. BARAKA, Mayor of Newark, in his official capacity; STEVEN M. FULOP, Mayor of Jersey City, in his official capacity; ANDRÉ SAYEGH, Mayor of Paterson, in his official capacity; RAVINDER S. BHALLA, Mayor of Hoboken, in his official capacity, | |
| Defendants. | |

## INTRODUCTION

1.    The United States is currently facing a crisis of illegal immigration, and the Federal Government is set to put a stop to it. *E.g.*, Proclamation 10,886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8327 (Jan. 20, 2025). While states and local governments are free to stand aside as the United States performs this important work, they cannot stand in the way. And where inaction crosses into obstruction, local governments break federal law. That is what is happening across New Jersey right now. It is past time it ends.

2.    Newark, Jersey City, Paterson, and Hoboken are proud "sanctuary cities." They have all adopted policies for the clear object of making it harder for the United States to enforce federal immigration law. These efforts to shield illegal aliens within the Garden State are unlawful.

3.    Among much else, these cities (along with their elected officials, the "Defendants") deny federal immigration agents access to illegal aliens in local custody; restrict local officers' ability to hand over illegal aliens to federal agents; and bar otherwise willing local officers from providing mission-critical information to federal immigration authorities.

4.    The express purpose and clear effect of these policies (together, and as described below, the "Challenged Policies") is to thwart federal immigration enforcement. That violates the Supremacy Clause of the United States Constitution many ways over. Such policies are preempted, expressly in some instances, and under conflict-preemption principles in all circumstances. They also unlawfully discriminate and regulate the Federal Government, contrary to constitutional command.

5.    These are not academic issues. Defendants' Challenged Policies are working precisely as intended. On the ground, they are impeding the ability of federal officers to do their job, and even where local law enforcement wants to help the United States deal with the nation's

immigration crisis, the Challenged Policies impede them from doing so. This not only puts the safety of officers at risk, but also endangers the broader communities they are sworn to protect.

6.     The Defendants' Challenged Policies are not just misguided; they are unconstitutional. By intent and design, the Challenged Policies are a frontal assault on the federal immigration laws and the federal authorities that administer them. Federal law does not tolerate that sort of obstruction. Nor does the Constitution. The Challenged Policies cannot stand.

## JURISDICTION AND VENUE

7.     The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1345.

8.     Venue is proper in this jurisdiction, because Defendants reside within the District of New Jersey, and a substantial part of the acts or omissions giving rise to this lawsuit occurred within this district. *See* 28 U.S.C. § 1391.

9.     The Court has the authority to provide the relief requested under 28 U.S.C. §§ 1651, 2201, and 2202, and its inherent equitable powers.

## PARTIES

10.     Plaintiff is the United States of America. Plaintiff, also referred to herein as the Federal Government, regulates immigration under its statutory and constitutional authorities and is responsible for enforcing the federal immigration laws through its agencies—including the Departments of Justice, State, Labor, and Homeland Security ("DHS"), along with DHS's component agencies, including Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP").

11.     Defendant City of Newark is a municipality of the state of New Jersey as defined in N.J. Stat. Ann. §§ 40:42-1, 40:69A-32 (West).

12.    Defendant Jersey City is a municipality of the state of New Jersey as defined in N.J. Stat. Ann. §§ 40:42-1, 40:69A-32 (West).

13.    Defendant Paterson is a municipality of the state of New Jersey as defined in N.J. Stat. Ann. §§ 40:42-1, 40:69A-32 (West).

14.    Defendant Hoboken is a municipality of the state of New Jersey as defined in N.J. Stat. Ann. §§ 40:42-1, 40:69A-32 (West).

15.    Defendant Newark City Council is the governing and legislative body of the City of Newark as defined by N.J. Stat. Ann. §§ 40:69A-32, 40:69A-36 (West). It is responsible for setting the City of Newark's policy through ordinances and resolutions and for adopting the City's budget. The Newark City Council legislates by passing ordinances, which become City of Newark laws. The Newark City Council also has the power to amend or remove City of Newark laws.

16.    Defendant Jersey City City Council is the governing and legislative body of the City of Jersey City as defined by N.J. Stat. Ann. §§ 40:69A-32, 40:69A-36 (West). It is responsible for setting the City of Jersey City's policy through ordinances and resolutions and for adopting the City's budget. The Jersey City City Council legislates by passing ordinances, which become City of Jersey City laws. The Jersey City City Council also has the power to amend or remove City of Jersey City laws.

17.    Defendant Paterson City Council is the governing and legislative body of the City of Paterson as defined by N.J. Stat. Ann. §§ 40:69A-32, 40:69A-36 (West). It is responsible for setting the City of Paterson's policy through ordinances and resolutions and for adopting the City's budget. The Paterson City Council legislates by passing ordinances, which become City of Paterson laws. The Paterson City Council also has the power to amend or remove City of Paterson laws.

18.    Defendant Hoboken City Council is the governing and legislative body of the City of Hoboken as defined by N.J. Stat. Ann. §§ 40:69A-32, 40:69A-36 (West). It is responsible for setting the City of Hoboken's policy through ordinances and resolutions and for adopting the City's budget. The Hoboken City Council legislates by passing ordinances, which become City of Hoboken laws. The Hoboken City Council also has the power to amend or remove City of Hoboken laws.

19.    Defendant C. Lawrence Crump is the Council President of the Newark City Council and is being sued in his official capacity.

20.    Defendant Joyce E. Watterman is the Council President of the Jersey City City Council and is being sued in her official capacity.

21.    Defendant Alex Mendez is the Council President of the Paterson City Council and is being sued in his official capacity.

22.    Defendant James Doyle is the Council President of the Hoboken City Council and is being sued in his official capacity.

23.    Defendant Mayor Ras J. Baraka is the Mayor of Newark and is being sued in his official capacity.

24.    Defendant Mayor Steven M. Fulop is the Mayor of Jersey City and is being sued in his official capacity.

25.    Defendant Mayor André Sayegh is the Mayor of Paterson and is being sued in his official capacity.

26.    Defendant Mayor Ravinder S. Bhalla is the Mayor of Hoboken and is being sued in his official capacity.

**LEGAL BACKGROUND**

27.     The Supremacy Clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. A state enactment is thus invalid if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), or if it "discriminate[s] against the United States or those with whom it deals," *South Carolina v. Baker*, 485 U.S. 505, 523 (1988).

28.     "The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). This authority stems from "the National Government's constitutional power to 'establish an uniform Rule of Naturalization,' and its inherent power as sovereign to control and conduct relations with foreign nations." *Id*. (citations omitted). Based on its enumerated constitutional and sovereign powers to control and conduct foreign relations, the Federal Government has preeminent authority to establish immigration laws. *See Arizona*, 567 U.S. at 394–95; *accord North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality); *id.* at 444–47 (Scalia, J., concurring).

29.     Accordingly, "Congress [has] the right, as it may see fit, to expel aliens of a particular class, or to permit them to remain," and "has undoubtedly the right ... to take all proper means to carry out the system which it provides." *Fong Yue Ting v. United States*, 149 U.S. 698, 714 (1893); *see, e.g., Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) (the United States has the "exclusive[]" control over "any policy toward aliens").

30.     Exercising this function, the Federal Government has devised an "extensive and complex" statutory scheme for the "governance of immigration and alien status." *Arizona*, 567

U.S. at 395. This scheme codifies the Executive's authority to inspect, investigate, arrest, detain, and remove aliens who are suspected of being, or are found to be, unlawfully in the United States. *E.g.,* 8 U.S.C. §§ 1182, 1225-1228, 1231.

31.    Within this scheme, Congress codified basic principles of comity between state and local authorities and the Federal Government. For instance, federal law contemplates that removable aliens in state custody who have been convicted of state or local offenses will generally serve their state or local criminal sentences before being subject to removal and that they will be taken into federal custody upon the expiration of their state prison terms. *See* 8 U.S.C. §§ 1226(c), 1231(a)(1)(B)(iii), (a)(4).

32.    The federal immigration laws also provide for basic principles of cooperation between state and local governments and the Federal Government. Federal authorities must "make available" to state and local authorities "investigative resources ... to determine whether individuals arrested by such authorities for aggravated felonies are aliens[.]" 8 U.S.C. § 1226(d)(1)(A). Likewise, federal officials must also "designate and train officers and employees ... to serve as a liaison to" state and local officials "with respect to the arrest, conviction, and release of any alien charged with an aggravated felony[.]" *Id*. § 1226(d)(1)(B); *see id.* §§ 1226(c), 1231(a). Moreover, state and local officials may "cooperate with the [Federal Government] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." *Id.* § 1357(g)(10)(B).

33.    As these provisions make clear, information-sharing across (and within) governments is integral to the proper functioning of the immigration system. *See Arizona*, 567 U.S. at 395, 411. Section 1373 thus requires federal officials to "respond to an inquiry" by state or local officials "seeking to verify or ascertain the citizenship or immigration status of any individual

within the[ir] jurisdiction." *Id.* § 1373(c); *see* 6 U.S.C. § 482(b) (requiring information-sharing among federal agencies). By the same token, state and local government officials "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration authorities] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see id.* §§ 1373(b), 1644 (similar).

34.     Separately, in effectuating the above provisions, DHS may issue an "immigration detainer" that "serves to advise another law enforcement agency that [DHS] seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a); *see* 8 U.S.C. §§ 1103(a)(3), 1226(a), (c), 1231(a), 1357(d). An immigration "detainer is a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody[.]" 8 C.F.R. § 287.7(a).

35.     DHS may also request, but not require, that custody be extended by a period not to exceed 48 hours, "in order to permit assumption of custody by the Department." *Id.* § 287.7(d). And in some instances, DHS is statutorily required—upon request from local authorities—to consider whether to issue a detainer for an alien in local custody. *See* 8 U.S.C. § 1357(d) (addressing violations of laws regulating controlled substances). In other cases, DHS is required to issue a detainer for certain aliens, including any alien who is "charged with, is arrested for, is convicted of, admits having committed, or admits committing acts which constitute the essential elements of any burglary, theft, larceny, shoplifting, or assault of a law enforcement officer offense, or any crime that results in death or serious bodily injury to another person[.]" 8 U.S.C. § 1226(c)(1)(E)(ii). In certain instances, federal immigration authorities have the discretion to detain a given alien based on an administrative warrant of arrest. *Id.* § 1226(a). Such an alien may

be "arrested and detained pending a decision on whether the alien is to be removed from the United States." *Id.*

36.    Federal agents are required to detain illegal aliens who have committed certain offenses upon their release from state custody. On January 29, 2025, President Trump signed into law the Laken Riley Act, named for the nursing student killed by an alien who, after entering the United States illegally, committed additional crimes but was released before immigration authorities could intervene. Through this legislation, Congress not only recently reaffirmed its commitment to this mandate, but augmented the authority of federal agents in this space by adding predicate offenses that trigger this detention requirement. *Id.* §§ 1226(c), (c)(3), 1357(d); *see also* Laken Riley Act, S. 5, 119th Cong. (2025).

37.    Federal immigration authorities also "shall have power without warrant … to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1).

38.    The federal immigration laws affirmatively penalize efforts to obstruct immigration enforcement by, among other things, prohibiting the "conceal[ing], harbor[ing], or shield[ing] from detection, or attempts to" accomplish the same, of any "alien in any place, including any building or any means of transportation." *Id.* § 1324(a)(1)(A)(iii).

## FACTUAL BACKGROUND

39.    Defendants have enacted policies that affirmatively conflict with, and undercut, the cooperative scheme described above.

### A.    NEWARK'S UNLAWFUL POLICY

40.    On June 19, 2017, Newark Mayor Ras J. Baraka issued Executive Order MEO 17-001 ("Newark Executive Order").

41.    The Newark Executive Order states, in pertinent part, as follows:

City of Newark and its agents shall not expend any time, funds, or resources on facilitating the civil enforcement of federal immigration law nor participating in civil immigration enforcement operations, except where legally required to do so by state or federal law or regulation, or New Jersey Attorney General Guidelines, or directive or court order. Specifically, the City of Newark, its employees and agents and its law enforcement agents and employees shall not:

a.      Enter into any contract, agreement or arrangement that would grant federal immigration enforcement authority or power to the city or its agents or local law enforcement officers, including but not limited to agreements created under 8 U.S.C. § 1357(g).

b.      Enter into any contract, agreement, or arrangement to detain immigrants in deportation proceedings, including but not limited to Intergovernmental Service Agreements. …;

c.      Honor immigration detainer requests or [ICE] or [CBP] or United States Citizenship and Immigration Services ("USCIS") administrative warrants or hold any person upon receipt of a detainer request or ICE/CBP/USCIS administrative warrant unless such request or warrant is a valid and properly issued judicial criminal warrant. The Police Division will continue its long existing policy not to accept ICE detainer because such participation is voluntary...;

d.      Participate jointly in or assist in any civil immigration enforcement operations, including but not limited to any immigration enforcement raids, investigations, interrogations, detections, apprehensions, detentions, or requests to establish traffic perimeters….;

e.      Permit ICE/CBP/USCIS officers, agents, or representatives access to municipal facilities, property, equipment, or databases absent a valid and properly issued judicial criminal warrant or court order specifying the information or individuals sought. …"

42.    The Newark Executive Order also states as follows:

No municipal agent, employee or agency shall inquire about or request information about or otherwise investigate the citizenship or immigration status of any person unless such inquiry or investigation is required by state or federal law or regulation or directive or court order. No municipal agent, employee or agency, or police officer will be out in the community seeking information on an individual's immigration status. …

43.    The Newark Executive Order further states as follows:

Municipal agents and employees are not permitted to maintain and/or share confidential personal information, including but not limited to contact information, information about national origin, race, ethnicity, language proficiency, religion, sexual orientation, gender identity, disability, housing status, financial status, marital status, status as a victim of domestic violence, criminal history, release date from incarceration or confinement in a jail, or status as a veteran; except where otherwise required by state or federal law or regulation or directive or court order.

44.    On February 15, 2019, then-Newark Public Safety Director Anthony F. Ambrose issued Newark Police Division General Order 19-01.

45.    Newark Police Division General Order 19-01 states that Newark Police Department personnel shall not "[s]top, question, arrest, or detain any individual based solely on … actual or suspected citizenship or immigration status" or "actual or suspected violations of federal civil immigration law."

46.    Newark Police Division General Order 19-01 also prohibits Newark Police Department personnel from inquiring about the immigration status of any individual, unless doing so is "necessary to the ongoing investigation of an indictable offense by that individual" and "relevant to the offense under investigation."

47.    Newark Police Division General Order 19-01 also creates "[l]imitations on assisting federal immigration authorities in enforcing federal civil immigration law" and restricts Newark Police Department personnel from "[p]articipating in civil immigration enforcement operations," "[p]roviding any non-public personally identifying information regarding any individual," "[p]roviding access to any state, county, or local law enforcement equipment, office space, database, or property not available to the public," "[p]roviding access to a detained individual for an interview" without the detainee's written consent, and "[p]roviding notice of a detained individual's upcoming release from custody" or "[c]ontinuing the detention of an

individual past the time he or she would otherwise be eligible for release from custody based solely on a civil immigration detainer request" absent limited circumstances.

### B.    JERSEY CITY'S UNLAWFUL POLICY

48.    On February 3, 2017, Jersey City Mayor Steven M. Fulop issued E.O. 2017-003, "Executive Order Establishing the City of Jersey City as a Sanctuary City" ("Jersey City Executive Order").

49.    The Jersey City Executive Order states, in pertinent part, as follows:

> The City of Jersey City and its agents shall not expend any time, funds, or resources on facilitating the civil enforcement of federal immigration law nor participating in civil immigration enforcement operations, except where legally required to do so by state or federal law or regulation or directive or court order. Specifically, the City of Jersey City, its employees and agents and its law enforcement agents and employees shall not:

> a.    Enter into any contract, agreement or arrangement that would grant federal immigration enforcement authority or power to the city or its agents or local law enforcement officers, including but not limited to agreements created under 8 U.S.C. § 1357(g).

> b.    Enter into any contract, agreement, or arrangement to detain immigrants in deportation proceedings, including but not limited to Intergovernmental Service Agreements.

> c.    Honor immigration detainer requests or [ICE] or [CBP] or [USCIS] administrative warrants or hold any person upon receipt of a detainer request or ICE/CBP/USCIS administrative warrant unless such request or warrant is a valid and properly issued judicial criminal warrant.

> d.    Participate jointly in or assist in any civil immigration enforcement operations, including but not limited to any immigration enforcement raids, investigations, interrogations, detections, apprehensions, detentions, transfers, or requests to establish traffic perimeters. Any such request for cooperation from ICE/CBP/USCIS officers should be referred to the [CHIEF OF POLICE/HEAD OF PUBLIC SAFETY] or appropriate agency chief who shall deny the request.

e.    Permit ICE/CBP/USCIS officers, agents, or representatives access to municipal facilities, property, equipment, or databases absent a valid and properly issued judicial criminal warrant specifying the information or individuals sought. …

50.    The Jersey City Executive Order also states as follows:

No municipal agent, employee or agency shall ask any individual or request information from any individual information about their citizenship or immigration status unless such inquiry or investigation is required by state or federal law or regulation or directive or court order.

51.    The Jersey City Executive Order further states as follows:

Municipal agents and employees are not permitted to maintain and/or share confidential personal information, including contact information, information about national origin, race, ethnicity, language proficiency, religion, sexual orientation, gender identity, disability, housing status, financial status, marital status, status as a victim of domestic violence, criminal history, release date from incarceration or confinement in a jail, or status as a veteran; except where otherwise required by state or federal law or regulation or directive or court order." The executive further purports that "Nothing in this order shall restrict the maintenance, or communication and exchange between local officials and federal immigration authorities, of information regarding the citizenship or immigration status of an individual, pursuant to 8 U.S.C. 1373 and 8 U.S.C. 1644.

**C.    PATERSON'S UNLAWFUL POLICY**

52.    In 2019, Troy Oswald, then-Chief of the Paterson Police Department, issued Standard Operating Procedures, effective June 12, 2019, titled "Subject: Dealing with the Immigrant Community" ("Paterson SOPs").

53.    The Paterson SOPs state in part that "[u]nder federal and state law, local law enforcement agencies are not required to enforce civil administrative warrants or civil detainers issued by federal immigration officers."

54.    The Paterson SOPs also provide in part that

[N]o officer shall … [i]nquire about the immigration status of any individual, unless doing so is

a.      Necessary to the ongoing investigation of an indictable offense by that individual; and

b.      Relevant to the offense under investigation; or

c.      Necessary to comply with the requirements of the Vienna Convention on Consular Relations …"

55.    The Paterson SOPs further state as follows:

[N]o officer shall provide the following types of assistance to federal immigration authorities when the <u>sole purpose</u> of that assistance is to enforce federal civil immigration law:

1.      Participating in civil immigration enforcement operations;

2.      Providing any non-public personally identifying information …;

3.      Providing access to any state, county, or local law enforcement equipment, office space, database, or property not available to the general public;

4.      Providing access to a detained individual for an interview, unless the detainee signs a written consent form that explains:

    a.      The purpose of the interview;

    b.      That the interview is voluntary;

    c.      That the individual can decline to be interviewed; and

    d.      That the individual can choose to be interviewed only with his legal counsel present."

56.    The Paterson SOPs also prohibit an officer from "[p]roviding notice of a detained individual's upcoming release from custody" or "[c]ontinuing the detention of an individual past the time he or she would otherwise be eligible for release from custody based solely on a civil immigration detainer request," unless the detainee:

> Is currently charged with, has ever been convicted of, or has ever been adjudicated delinquent for a violent or serious offense, …; or
>
> In the past five years, has been convicted of an indictable crime other than a violent or serious offense; or
>
> Is subject to a Final Order of Removal that has been signed by a federal judge and lodged with the county jail or state prison where the detainee is being held."

57.    Even where an officer continues the detention of an individual based solely on an immigration detainer request, the Paterson SOPs provide that "[a]ny such detention can last only until 2359 hrs. on the calendar day on which the person would otherwise have been eligible for release."

58.    The Paterson SOPs further require that "[o]fficers must notify a detained individual, in writing and in a language the individual can understand, when federal civil immigration authorities request" to "interview the detainee," to "be notified of the detainee's upcoming release from custody," and to "continue detaining the detainee past the time he or she would otherwise be eligible for release." "When providing such notification, officers shall provide the detainee a copy of any documents provided by immigration authorities in connection with the request."

59.    The Paterson SOPs state that the Paterson Police Department "shall not enter into, modify, renew, or extend any agreement to exercise federal immigration authority pursuant to Section 287(g) of the Immigration and Nationality Act, 8 U.S.C. § 1357(g), unless … The New Jersey Attorney General grants written approval" or "The agreement is necessary to address threats to the public safety or welfare of New Jersey residents arising out of a declaration of a state or national emergency."

60.    The Paterson SOPs state that the Paterson Police Department "shall not otherwise exercise federal civil immigration authority outside the context of Section 287(g)."

### D.    HOBOKEN'S UNLAWFUL POLICY

61.    On January 1, 2018, Hoboken Mayor Ravinder S. Bhalla issued "Executive Order

Declaring Hoboken a Fair and Welcoming City" ("Hoboken Executive Order").

62.    That executive order states, in pertinent part, as follows:

> Hoboken, its employees and agents and its law enforcement agents and employees shall not …
>
> a.    Enter into any contract, agreement or arrangement that would grant federal immigration enforcement authority or power to the city or its agents or local law enforcement officers, including but not limited to agreements created under 8 U.S.C. § 1357(g).
>
> b.    Enter into any contract, agreement, or arrangement to detain individuals in deportation proceedings, including but not limited to Intergovernmental Service Agreements. …;
>
> c.    Honor immigration detainer requests or [ICE] or [CBP] or [USCIS] administrative warrants or hold any person upon receipt of a detainer request or ICE/CBP/USCIS administrative warrant unless such request or warrant is a valid and properly issued judicial criminal warrant;
>
> d.    Participate jointly in or assist in any civil immigration enforcement operations, including but not limited to any immigration enforcement raids, investigations, interrogations, detections, apprehensions, detentions, transfers, or requests to establish traffic perimeters. Any such request for cooperation from ICE/CBP/USCIS officers should be referred to the Chief of Police or appropriate agency chief who shall deny the request;
>
> e.    Permit ICE/CBP/USCIS officers, agents, or representatives access to municipal facilities, property, equipment, or databases absent a valid and properly issued judicial criminal warrant specifying the information or individuals sought. Any attempts or requests for access to such facilities, property, equipment, or databases shall be immediately sent to the agency chief that controls the appropriate facility, property, database or equipment pertinent. No permission to access any such facility, property, equipment, or database shall be provided without the express, written approval of the appropriate agency chief. Should the appropriate agency chief approve access, such access shall be limited in scope and time to the parameters and targets prescribed in the valid and properly issued judicial criminal warrant.

63. The Hoboken Executive Order also states as follows:

> No municipal agent, employee or agency shall ask any individual or request information from any individual information about their citizenship or immigration status unless such inquiry or investigation is required by state or federal law or regulation or directive or court order.

> Nothing in this Order shall restrict a municipal agent, employee, or agency from maintaining, requesting, sending, receiving, or exchanging information regarding an individual's citizenship or immigration status, lawful or unlawful, with any Federal, State, or local government entity, as governed by 8 U.S.C. 1373 and 8 U.S.C. 1644.

64. The Hoboken Executive Order further states as follows:

> Municipal agents and employees are not permitted to maintain and/or share confidential personal information, including contact information, information about citizenship or immigration status, national origin, race, ethnicity, language proficiency, religion, sexual orientation, gender identity, disability, housing status, financial status, marital status, status as a victim of domestic violence, criminal history, release date from incarceration or confinement in a jail, or status as a veteran; except where otherwise permitted by 8 U.S.C. § 1373 or 8 U.S.C. § 1644 or required by state law, regulation, or directive, or by federal law or regulation.

65. Mayor Bhalla recently confirmed his commitment to these obstructive sanctuary policies: "I want to assure you that the Hoboken Police Department remains committed to the guidance provided by the New Jersey Attorney General: HPD will not cooperate with ICE if they come to our city without warrants signed by a federal judge." *See* John Heinis, *Bhalla: Hoboken PD won't work with ICE if they try to execute warrantless raids*, HUDSON COUNTY VIEW, Jan. 25, 2025, *at* https://hudsoncountyview.com/bhalla-hoboken-pd-wont-work-with-ice-if-they-try-to-execute-warrantless-raids/.

### THE IMPACT OF THE CHALLENGED POLICIES
### ON FEDERAL IMMIGRATION ENFORCEMENT

66.    The United States' immigration agencies, in particular CBP and ICE, conduct immigration enforcement in Newark, Jersey City, Paterson, and Hoboken.

67.    CBP, in particular, is responsible for enforcing the immigration laws at international ports of entry, including the Newark Liberty International Airport.

68.    Defendants' Challenged Policies create serious operational consequences and hinder the ability of the Federal Government to enforce the nation's immigration laws.

69.    For instance, because of the Challenged Policies, the United States lacks the ability to readily obtain from local law enforcement the release date of aliens whom DHS has reason to believe are removable from the United States, and DHS lacks access to such aliens to facilitate the transfer of custody, even where DHS presents a Congressionally authorized civil administrative warrant of arrest or removal, *see id.* §§ 1226(a), 1231(a), or has transferred those aliens to local law enforcement in the first instance to permit their prosecution for a state crime.

70.    Further, Defendants will not notify ICE when they have made a criminal arrest of an alien likely subject to immigration enforcement, even though doing so would allow ICE to detain and, if the alien is removable, for ICE to take that alien off the streets. By restricting basic information sharing and barring DHS access to aliens in state or local custody upon their release as provided by federal law (*e.g.*, an administrative warrant), the Challenged Policies require federal immigration officers to either (1) engage in difficult and dangerous efforts to re-arrest aliens who were previously in local custody, which endangers immigration officers, the particular alien, and others who may be nearby; or (2) determine that it is not appropriate to transfer an alien to local custody in the first place, in order to comply with their mission to enforce the immigration laws.

71.     Additionally, Defendants do not permit local law enforcement to place a detainer or administrative warrant in the alien's file or to enter its existence in government databases, such that if an alien is transferred to another law enforcement agency, that agency cannot act on the undisclosed detainer or administrative warrant or learn about and share that alien's immigration status with other law enforcement, including the Federal Government.

72.     These legal barriers are made all the worse because they are part of Defendants' broader hostility toward, and campaign against, federal immigration enforcement.

73.     For instance, in just the last two months alone, the Essex County Correctional Facility in Newark has repeatedly refused to cooperate with federal immigration officials to keep dangerous illegal aliens off the streets:

  a.  On April 5, 2025, the Essex County Correctional Facility released an alien from Nigeria arrested for theft and credit card theft, with a prior arrest for theft, despite an ICE detainer lodged against him.

  b.  On April 3, 2025, the Essex County Correctional Facility released an alien from Peru arrested for domestic violence, despite an ICE detainer lodged against him.

  c.  On March 31, 2025, the Essex County Correctional Facility released two aliens from Brazil who had both been arrested for domestic violence and assault, despite ICE detainers lodged against them.

74.     These are the Challenged Policies in action. Defendants have no lawful interest in assisting removable aliens' evasion of federal immigration enforcement. Indeed, the Constitution forbids their efforts to obstruct and undermine federal immigration enforcement.

75.     The combined effect of the Challenged Policies prohibits even the most basic cooperation with federal officials.

19

76.     That directly conflicts with federal law. Congress, in comity to the states, permitted state and local jurisdictions to fully punish aliens for state criminal violations prior to removal. *See* 8 U.S.C. § 1231(a)(4)(A) (providing that, subject to limited exceptions, federal agents "may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment"). But Congress crafted a statutory scheme that clearly envisioned the Federal Government being able to detain and remove those aliens, once their state proceedings and sentences concluded.

77.     Namely, Congress specified that the removal period begins immediately upon release from state criminal custody, *id.* § 1231(a)(1)(B)(iii), and detention during that period is mandatory, *id.* § 1231(a)(2); *see also* 8 U.S.C. § 1226(c)(3), *id.* § 1357(d) (directing immigration officers to obtain a detainer to facilitate the transfer of criminal aliens from state to federal custody). Congress granted this permission expecting that states and local governments would then facilitate, or at the very least not obstruct, detention of criminal aliens by federal immigration authorities. If ICE lacks knowledge of criminal aliens' release dates from state custody, ICE cannot exercise its statutory responsibility of effecting an arrest upon the alien's release.

78.     Furthermore, federal law contemplates that DHS will be able to inspect all applicants for admission and take all appropriate action against those found to be inadmissible to the United States, even those transferred to state or local custody pending prosecution. *See id.* §§ 1182, 1225(b)(2); 8 C.F.R. § 235.2. And, to facilitate coordination between state and local officials and the Federal Government, Congress expressly prohibited any federal, state, or local government entity or official from prohibiting, or in any way restricting, any government entity or official from sending to, or receiving from, DHS "information regarding the citizenship or immigration status, lawful or unlawful, of any individual," 8 U.S.C. § 1373(a), or from maintaining

and exchanging such information with other law enforcement entities. *Id.* § 1373(b); *see also id.* § 1644.

79.     The Challenged Policies cannot square with this scheme.

80.     Many of the Challenged Policies restrict the free flow of voluntary information from local governments and officers to federal immigration officials. *See, e.g.*, Newark Executive Order §§ 2(E), 6; Newark Police Division General Order 19-01 § IV(B)(1)-(6); Jersey City Executive Order §§ 2(E), 6; Paterson SOPs § III(B); Hoboken Executive Order §§ 3(E), 7. That runs afoul of §§ 1373(a), 1644. Nor do these Challenged Policies' purported savings clauses— which gesture to federal law—do much help, because they are narrower than what federal law provides. *See, e.g.*, Jersey City Executive Order § 13; Hoboken Executive Order §§ 4, 7.

81.     Defendants' Challenged Policies also prohibit ICE from entering jail facilities to interview detainees who may be subject to immigration enforcement—at least without the detainee's written consent (which they virtually never provide). In general, the Challenged Policies broadly restrict federal immigrant officers' access to aliens in Defendants' custody. *See, e.g.,* Newark Police General Order 19-01 § IV(B); Paterson SOPs § III(B). This also conflicts with federal law, which establishes a system of civil administrative warrants as the basis for immigration arrest and removal and does not require or contemplate use of a judicial warrant for civil immigration enforcement. *See* 8 U.S.C. §§ 1226(a), 1231(a).

## CLAIMS FOR RELIEF
## COUNT ONE – VIOLATION OF THE SUPREMACY CLAUSE
## (PREEMPTION)

82.     Plaintiff hereby incorporates the foregoing paragraphs of the Complaint as if fully stated herein.

83.    By intent and design, the Challenged Policies obstruct the Federal Government's ability to enforce the federal immigration laws. That constitutes an obstacle to the enforcement of federal immigration law and violates the Supremacy Clause.

84.    The Challenged Policies also undermine federal immigration law's protections for information sharing and are thus preempted under both express and conflict preemption principles. *E.g.*, 8 U.S.C. §§ 1373(a), 1644.

85.    Accordingly, the Challenged Policies violate the Supremacy Clause, interfere with federal law, and create obstacles to the enforcement of federal immigration law both on their face and as applied to the Federal Government.

### COUNT TWO – VIOLATION OF THE SUPREMACY CLAUSE (UNLAWFUL DISCRIMINATION AGAINST THE FEDERAL GOVERNMENT)

86.    Plaintiff hereby incorporates the foregoing paragraphs of the Complaint as if fully stated herein.

87.    Defendants' Challenged Policies discriminate against the Federal Government.

88.    Defendants' Challenged Policies single out federal immigration officials, expressly and impliedly, for unfavorable and uncooperative treatment when other law enforcement officials and entities are not so treated.

89.    Such discriminatory targeting of the Federal Government is unlawful. *See, e.g., United States v. Washington*, 596 U.S. 832, 839 (2022) (A "state law discriminates against the Federal government … if it singles them out for less favorable treatment or if it regulates them unfavorably on some basis related to their governmental status.") (citations and alterations omitted).

90.    Accordingly, Defendants' Challenged Policies violate the Doctrine of Intergovernmental Immunity and therefore alternatively are invalid on that basis.

## COUNT THREE – VIOLATION OF THE SUPREMACY CLAUSE
## (UNLAWFUL REGULATION OF THE FEDERAL GOVERNMENT)

91.    Plaintiff hereby incorporates the foregoing paragraphs of the Complaint as if fully stated herein.

92.    Defendants' Challenged Policies amount to direct regulation of the Federal Government.

93.    Under the Supremacy Clause, "the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943).

94.    By refusing to honor civil detainers and warrants expressly authorized by Congress, Defendants have unlawfully eliminated these means for federal immigrations officials to carry out their statutory functions.

95.    Accordingly, Defendants' Challenged Policies effect regulation of the Federal Government and alternatively are invalid on that basis.

### PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests the following relief:

A.    That this Court enter a judgment declaring that Defendants' Challenged Policies violate the Supremacy Clause and are therefore invalid;

B.    That this Court issue an injunction prohibiting Defendants (as well as their successors, agents, and employees) from enforcing the Challenged Policies;

C.    That this Court award the United States its costs and fees in this action; and

D.    That this Court award any other relief it deems just and proper.

Dated: May 22, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General

ANTHONY P. NICASTRO
Acting Director
Office of Immigration Litigation

JOHN J.W. INKELES
Chief
Affirmative Litigation Unit

*/s/ Hans H. Chen*
HANS H. CHEN
Deputy Chief, Affirmative Litigation Unit
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
General Litigation and Appeals Section
P.O. Box 878
Washington DC 20044
(202) 305-0190
hans.h.chen@usdoj.gov

*Attorneys for Plaintiff*
*United States of America*