**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

THE UNITED STATES OF AMERICA,

                Plaintiff,

      v.

CITY OF NEWARK ET AL.,

                Defendants.

Hon. Evelyn Padin, U.S.D.J.

Civil Action No. 2:25-cv-5081

**<u>CIVIL ACTION</u>**

---

MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S COMPLAINT IN LIEU OF AN ANSWER

---

Neal K. Katyal (admitted *pro hac vice*)
Colleen Roh Sinzdak (admitted *pro hac vice*)
Kristina Alekseyeva (admitted *pro hac vice*)
MILBANK LLP
1101 New York Ave, NW
Washington, DC 20005

Gurbir S. Grewal, Bar No. 027771999
    *Counsel of Record*
MILBANK LLP
55 Hudson Yards
New York, NY 10001
ggrewal@milbank.com
Tel.: (212) 530-5000
Fax: (212) 530-5219

*Attorneys for Defendants City of Newark,
Newark City Council, C. Lawrence Crump,
Ras J. Baraka, City of Hoboken, Hoboken City
Council, James Doyle, and Ravinder S. Bhalla*

## **<u>TABLE OF CONTENTS</u>**

<u>Page</u>

PRELIMINARY STATEMENT..................................................................................................1

STATEMENT OF THE CASE..................................................................................................3

    A.  The Cities' Policies ..................................................................................................3

    B.  The New Jersey Attorney General Directive .......................................................7

    C.  The Instant Lawsuit...............................................................................................10

STANDARD OF REVIEW ....................................................................................................10

ARGUMENT ...........................................................................................................................11

    I.   The United States Lacks Standing .......................................................................11

    II.  The Preemption Claims Also Fail On The Merits ..............................................20

        A.  Third Circuit Precedent Requires Dismissal.................................................21

        B.  The INA's Plain Language, The Broader Statutory Scheme, And
            The Canon Of Constitutional Avoidance All Confirm The Conclusion
            That The INA Does Not Preempt The Cities' Policies .................................24

    III.  The Intergovernmental Immunity Claims Are Meritless ...................................28

    CONCLUSION.......................................................................................................................30

# TABLE OF AUTHORITIES

Page(s)

CASES:

*Arizona v. United States*,
  567 U.S. 387 (2012)...............................................................................................4, 5, 25, 26

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...............................................................................................10, 11

*Bond v. United States*,
  572 U.S. 844 (2014)...............................................................................................25, 27

*Carney v. Adams*,
  592 U.S. 53 (2020)...............................................................................................12

*City of Chicago v. Sessions*,
  321 F. Supp. 3d 855 (N.D. Ill. 2018) ...............................................................28

*City of Chicago v. Sessions*,
  888 F.3d 272 (7th Cir. 2018)...............................................................................26

*City of Chicago v. Sessions*,
  No. 17-2991, 2018 WL 4268814 (7th Cir. Aug. 10, 2018)...............................26, 27

*City of New York v. United States*,
  179 F.3d 29 (2d Cir. 1999)...............................................................................23

*City of Philadelphia v. Att'y Gen. of U.S.*,
  916 F.3d 276 (3d Cir. 2019) ...............................................................28

*City of Philadelphia v. Sessions*,
  309 F. Supp. 3d 289 (E.D. Pa. 2018) ...............................................................28

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)...............................................................................................12, 13

*Cnty. of Ocean v. Grewal*,
  475 F. Supp. 3d 355 (D.N.J. 2020) ...............................................9, 11, 13, 22, 23, 26, 30

*Colorado v. U.S. Dep't of Just.*,
  455 F. Supp. 3d 1034 (D. Colo. 2020) ...............................................................28

*CoreCivic, Inc. v. Governor of N.J.*,
  145 F.4th 315 (3d Cir. 2025)...............................................................................18, 29

## TABLE OF AUTHORITIES—Continued

Page(s)

*Davis v. Fed. Election Comm'n*,
   554 U.S. 724 (2008) ........................................................................................... 20

*Dawson v. Steager*,
   586 U.S. 171 (2019) ........................................................................................... 30

*Falcone v. Dickstein*,
   92 F.4th 193 (3d Cir. 2024) ............................................................................... 16

*Finkelman v. Nat'l Football League*,
   810 F.3d 187 (3d Cir. 2016) ............................................................................... 10

*FW/PBS, Inc. v. City of Dallas*,
   493 U.S. 215 (1990) ............................................................................... 18, 19, 20

*Guerrero-Sanchez v. Warden York Cnty. Prison*,
   905 F.3d 208 (3d Cir. 2018) ............................................................................... 27

*Hershey v. Jasinski*,
   86 F.4th 1224 (8th Cir. 2023) ........................................................................... 20

*In re Boy Scouts of Am.*,
   137 F.4th 126 (3d Cir. 2025) ............................................................................. 23

*Kansas v. Garcia*,
   589 U.S. 191 (2020) ..................................................................................... 22, 26

*Lewis v. Casey*,
   518 U.S. 343 (1996) ........................................................................................... 20

*Loggerhead Turtle v. Cnty. Council of Volusia Cnty.*,
   148 F.3d 1231 (11th Cir. 1998) .................................................................... 15, 16

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ........................................................................................... 12

*McCulloch v. Maryland*,
   17 U.S. (4 Wheat.) 316 (1819) .......................................................................... 28

*McHenry Cnty. v. Raoul*,
   44 F.4th 581 (7th Cir. 2022) .................................................................. 18, 29, 30

*Montana v. United States*,
   440 U.S. 147 (1979) ........................................................................................... 14

## TABLE OF AUTHORITIES—Continued

Page(s)

*Murphy v. National Collegiate Athletic Ass'n*,
   584 U.S. 453 (2018)................................................................21, 22, 27

*Murthy v. Missouri*,
   603 U.S. 43 (2024)......................................................................10

*Nixon v. Mo. Mun. League*,
   541 U.S. 125 (2004)....................................................................29

*North Dakota v. United States*,
   495 U.S. 423 (1990)................................................................28, 29

*O'Shea v. Twp. of W. Milford*,
   982 A.2d 459 (N.J. Super. Ct. App. Div. 2009) ...............................7, 13

*Ocean Cnty. Bd. Of Comm'rs v. Att'y Gen. of N.J.*,
   8 F.4th 176 (3d Cir. 2021)............................1, 2, 9, 11, 20, 21, 22, 23, 28

*Paff v. Ocean Cnty. Prosecutor's Off.*,
   192 A.3d 975 (N.J. 2018)................................................................7

*Phillips v. Cnty. of Allegheny*,
   515 F.3d 224 (3d. Cir. 2008) ...........................................................10

*Printz v. United States*,
   521 U.S. 898 (1997).................................................................27, 28

*Rappa v. New Castle Cnty.*,
   18 F.3d 1043 (3d Cir. 1994) ........................................................22, 23

*Simon v. E. Ky. Welfare Rts. Org.*,
   426 U.S. 26 (1976)................................................................12, 13

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016).............................................................11, 12, 18

*St. Thomas-St. John Hotel & Tourism Ass'n v. Gov't of U.S.V.I.*,
   218 F.3d 232 (3d. Cir. 2000) ...........................................................24

*State of New York v. Dep't of Just.*,
   951 F.3d 84 (2d Cir. 2020) ..............................................................23

*United States v. California*,
   314 F. Supp. 3d 1077 (E.D. Cal. 2018).........................................25, 30

## <u>TABLE OF AUTHORITIES—Continued</u>

Page(s)

*United States v. California*,
 921 F.3d 865 (9th Cir. 2019) ...............................................................25, 26, 27, 28

*United States v. Illinois*,
 No. 25 CV 1285, 2025 WL 2098688 (N.D. Ill. July 25, 2025) ....................................2, 26, 30

*United States v. Missouri*,
 114 F.4th 980 (8th Cir. 2024) ...............................................................15

*United States v. New Jersey*,
 No. 20-1364, 2021 WL 252270 (D.N.J. Jan. 26, 2021) ......................1, 2, 9, 10, 11, 14, 29, 30

*United States v. New Mexico*,
 455 U.S. 720 (1982) ...............................................................29

*United States v. Washington*,
 596 U.S. 832 (2022) ...............................................................30

*Uzuegbunam v. Preczewski*,
 592 U.S. 279 (2021) ...............................................................16

**CONSTITUTION:**

U.S. Const. amend. X...............................................................2, 21, 27, 28

**STATUTES:**

8 U.S.C. § 1103(a)(11)(B) ...............................................................5, 18

8 U.S.C. § 1357(g)(1) ...............................................................5

8 U.S.C. § 1357(g)(9) ...............................................................5

8 U.S.C. § 1357(g)(10)(B) ...............................................................4

8 U.S.C. § 1373 ...............................................................7, 9, 21, 22, 23, 24, 28

8 U.S.C. § 1373(a) ...............................................................6, 21, 24, 26

8 U.S.C. § 1644 ...............................................................6, 7, 9, 21, 22, 24, 26

28 U.S.C. § 517 ...............................................................9

28 U.S.C. § 518(b) ...............................................................9

## TABLE OF AUTHORITIES—Continued

Page(s)

Brady Handgun Violence Prevention Act,
Pub. L. No. 103-159, 107 Stat. 1536 (1993)........................................................27, 28

Foreign Intelligence Surveillance Act § 702,
50 U.S.C. 1881(a) .................................................................................................12, 13

Immigration and Nationality Act of 1965,
Pub. L. No. 89-236, 79 Stat. 911.................................1, 4, 6, 9, 20, 22, 24, 28, 29

N.J. Stat. Ann. § 30:4-8.16(b)(1) (2021)............................................................17, 18, 19

N.J. Stat. Ann. § 30:8-1 (2024) ......................................................................................19

N.J. Stat. Ann. § 30:8-19 (2024) ....................................................................................19

N.J. Stat. Ann. § 52:17B-98 (1970) .............................................................................7, 13

**RULES AND REGULATIONS:**

8 C.F.R. § 287.7(a)..........................................................................................................5

Attorney General Law Enforcement Directive No. 2018-6 v2.0
(Sept. 27, 2019), https://www.nj.gov/lps/dcj/agguide/directives
/ag-directive-2018-6_v2.pdf ........................................1, 7, 8, 9, 13, 14, 17, 18, 19, 21

City of Newark Executive Order, MEO 17-001 (June 19, 2017),
https://npl.org/wp-content/uploads/2017/09/City-Exec-Order-
re-sanctuary-city.pdf ....................................................3, 6, 14, 17, 19, 24, 25, 26

Executive Order Declaring Hoboken a Fair and Welcoming City,
No. 1 (Jan. 1, 2018), https://www.hobokennj.gov/docs/fair-and
-welcoming-city-2018-executive-order .................................4, 7, 14, 19, 24, 25, 26

Fed. R. Civ. P. 12(b)(6) ................................................................................................10

Newark Police Division General Order 19-01 (Feb. 15, 2019),
https://public.powerdms.com/NewarkPD/documents/1317028 ...............................4, 6, 7, 19

**OTHER AUTHORITIES:**

Government Accountability Office, *Immigration Detention: Actions Needed to Improve
Planning, Documentation, and Oversight of Detention Facility Contracts* (Jan. 2021),
https://www.gao.gov/assets/gao-21-149-highlights.pdf...........................................5

**TABLE OF AUTHORITIES—Continued**

Page(s)

The Essex County Department of Corrections, *About the Essex County Department of Corrections*, https://essexdoc.com/about/ ..................................................................19

## PRELIMINARY STATEMENT

The Third Circuit has already decided this case. In *Ocean County Board of Commissioners v. Attorney General of New Jersey*, 8 F.4th 176 (3d Cir. 2021), the court of appeals rejected several counties' assertion that the Immigration and Naturalization Act ("INA") preempted the New Jersey Immigrant Trust Directive (the "Directive")—which requires *all* New Jersey law enforcement officers to limit their voluntary cooperation with federal *civil* immigration efforts. And in *United States v. New Jersey*, No. 20-1364, 2021 WL 252270 (D.N.J. Jan. 26, 2021), the District Court rejected the United States' parallel challenge to the Directive. Both courts deferred to local officials' determination that law enforcement and humanitarian values required such a policy, lest residents fear going to the hospital, police station, or school. The United States now once again tries the same tactic, suing the cities of Newark and Hoboken, along with two other New Jersey cities (together, the "Cities"), for similarly limiting local officers' cooperation with federal civil immigration authorities. These efforts are squarely foreclosed by *Ocean County* and *New Jersey*, and the Court should dismiss this case.

Over seven years ago, the mayors of Newark and Hoboken determined that—in order to promote public safety, conserve city resources, and best serve all of their residents (immigrant and non-immigrant alike)—city officials should not voluntarily cooperate with federal civil immigration enforcement efforts. That policy is embodied in Executive Orders issued by each mayor, and in a Police Order governing the Newark Police Department. Critically, the very same limitations are also set out in the Directive, which is binding on *all* law enforcement officers in New Jersey. The United States therefore lacks standing to challenge the Cities' orders, because it cannot show that its alleged injuries are traceable to the Cities' (rather than New Jersey's) policies or that they are redressable by this case. Nor can the United States overcome that obstacle by

suing New Jersey, because it already tried that in *United States v. New Jersey*, and it lost.  Any challenge now is therefore barred by res judicata.

Prior litigation also forecloses the United States' primary claim on the merits.  This Court is required to dismiss the United States' preemption claim under *Ocean County* because there is no meaningful distinction between the Directive that the Third Circuit upheld against a preemption challenge in that case and the policies the United States challenges here.  Indeed, the United States barely disputes this, acknowledging in its pre-motion letter that it intends to seek reconsideration of *Ocean County* en banc.  Dkt. No. 30 at 3 ("Pl.'s Letter").  That reconsideration effort is likely to fail.  Courts have consistently rejected similar challenges to policies like these—including, most recently, in *United States v. Illinois*, No. 25 CV 1285, 2025 WL 2098688 (N.D. Ill. July 25, 2025)—recognizing that local officials may decide for themselves how much assistance to provide to federal immigration authorities.  Those courts are right: local officials' decision to limit their voluntary cooperation does not obstruct federal officials' ability to enforce federal law, and the Tenth Amendment in any event prohibits the federal government from conscripting local officers into federal service.  Regardless, the United States' plans for future en banc review merely confirm that the Complaint must be dismissed under existing precedent.

Courts have also consistently rejected the United States' assertion that policies like the Cities' discriminate against, or impermissibly regulate, the federal government.  *See, e.g.*, *Illinois*, 2025 WL 2098688, at *25-27.  Intergovernmental discrimination occurs when there is differential treatment of similarly situated entities.  Here, the Cities' policies are not treating the federal government differently from any other entities that enforce civil immigration law because there are none.  "[O]nly the federal government enforces civil immigration law."  *Id.* at *25.  And the policies "directly regulate" local officials, not federal actors.  *Id.* at *26.

The Cities therefore respectfully request that this Court dismiss the federal government's Complaint, reiterating what the Third Circuit and courts throughout the country have already held: Cities have the sovereign authority to decide whether and to what extent their officials will voluntarily cooperate with federal immigration enforcement efforts.

## STATEMENT OF THE CASE

### A.  The Cities' Policies

Like many city leaders across the United States, the mayors of Newark and Hoboken have determined that their communities are best served, and the public's safety is best protected, by a policy that limits city officials' participation in federal civil immigration enforcement.  Thus, both mayors have adopted Executive Orders precluding city participation in such initiatives except where federal law requires it.

1.   Adopted in 2017, Newark's Executive Order explains that the "cooperation of the City of Newark's immigrant communities is essential to prevent and solve crimes and maintain public order, safety and security" and that when local law enforcement volunteers to assist Immigration and Customs Enforcement ("ICE") to facilitate deportations, "significant gaps in trust and cooperation grow between immigrant communities and the police."  City of Newark Executive Order, MEO 17-001, at 1 (June 19, 2017) ("Newark Executive Order"), https://npl.org/wp-content/uploads/2017/09/City-Exec-Order-re-sanctuary-city.pdf.   That erosion of trust makes "immigrants less likely to report crimes, act as witnesses in criminal investigations and prosecutions, and provide intelligence to law enforcement," making everyone less safe.  *Id.*  The Newark Executive Order accordingly declares that local officers will not "expend any time, funds, or resources on facilitating" federal immigration enforcement beyond the requirements imposed by state or federal law.  *Id.* § 2.

The Hoboken Executive Order, which was adopted January 1, 2018, similarly explains that "facilitating deportations will harm [the City's] efforts at community policing" and that the "City's limited resources" should be put towards other law enforcement objectives. Executive Order Declaring Hoboken a Fair and Welcoming City, No. 1, at 1-2 (Jan. 1, 2018) ("Hoboken Executive Order"), https://www.hobokennj.gov/docs/fair-and-welcoming-city-2018-executive-order. The Hoboken Order therefore provides that the City "and its agents shall not expend any time, funds, or resources on facilitating the civil enforcement of federal immigration law nor participating in civil immigration enforcement operations, except where legally required to do so by state or federal law, regulation, or directive." *Id.* § 3.

At the same time, as Newark stressed in an analogous Police Order it adopted in 2019, these policies limiting local cooperation with federal immigration authorities do *not* shield immigrants from criminal laws: "any person who violates . . . criminal laws can and will be held accountable for their actions, no matter their immigration status." Newark Police Division General Order 19-01 § 1 (Feb. 15, 2019) ("Newark Police Order"), https://public.powerdms.com/NewarkPD/documents/1317028.

2. The Newark and Hoboken Executive Orders and the Newark Police Order also address several specific ways in which local officials might be called on to voluntarily cooperate with federal immigration enforcement.

a. The INA provides several opportunities for such cooperation. For example, that statute permits local officials to "cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States," 8 U.S.C. § 1357(g)(10)(B), including by forming "a joint task force," providing "operational support in executing a warrant," and facilitating "access to detainees held in state facilities." *Arizona v.*

*United States*, 567 U.S. 387, 410 (2012).  The INA also allows federal officials to ask local officers for help in transferring certain immigrants from state criminal custody to federal immigration detention.  *See id.*  To simplify that transfer, ICE can issue a "detainer" request that asks state, county, and local law enforcement officers to notify ICE of the date on which the immigrant will be released from local custody and to hold the individual for up to 48 hours beyond that time to allow DHS to assume custody.  8 C.F.R. § 287.7(a).

The INA also permits local law enforcement agencies to volunteer to participate directly in immigration enforcement under federal supervision by signing formal agreements with the federal government.  One type of these agreements, known as "Section 287(g) agreements," allows local law enforcement to perform the "function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States."  8 U.S.C. § 1357(g)(1). The INA makes exceedingly clear, however, that "[n]othing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement."  *Id.* § 1357(g)(9).

The second type of voluntary agreement is known as an Intergovernmental Service Agreement ("IGSA").  IGSAs are "cooperative agreement[s]" between the Attorney General and "any State, territory, or political subdivision thereof, for the necessary construction, physical renovation, acquisition of equipment, supplies or materials required to establish acceptable conditions of confinement and detention services in any State or unit of local government."  8 U.S.C. § 1103(a)(11)(B).  Because ICE does not operate its own detention centers, it "primarily uses" these agreements "to acquire detention space."  Government Accountability Office, *Immigration Detention: Actions Needed to Improve Planning, Documentation, and Oversight of Detention Facility Contracts* (Jan. 2021), https://www.gao.gov/assets/gao-21-149-highlights.pdf.

In addition, the INA allows for information sharing between localities and the federal government.  Section 1373 provides that, "[n]otwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [ICE] information regarding the citizenship or immigration status, lawful or unlawful, of any individual."  8 U.S.C. § 1373(a).  A separate statute similarly provides that "no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States."  8 U.S.C. § 1644.

b.  The Newark Executive Order specifically addresses the types of cooperation described in many of these INA provisions.  It provides that Newark officers will not "[p]articipate jointly in or assist in any civil immigration enforcement operations"; "share confidential personal information" with federal authorities like "contact information, information about national origin, . . . housing status, . . . [or] status as a victim of domestic violence"; "[h]onor immigration detainer requests"; grant federal authorities access to "municipal facilities, property, equipment, or databases"; or enter into Section 287(g) agreements or IGSAs—unless required "by state or federal law or regulation . . . or directive or court order."  Newark Executive Order §§ 2, 6; *see also* Complaint ¶¶ 41-43, Dkt. No. 1 ("Compl.").  The Executive Order also contains savings clauses clarifying that its provisions are operative to the extent they do not conflict with applicable state or federal law.  *See* Newark Executive Order §§ 2, 6.

Similarly, Newark's Police Order specifies that the Newark Police Department will not "[s]top, question, arrest, search, or detain" any individual based on immigration status; "inquire about the immigration status of any individual" unless doing so is "necessary to the ongoing

investigation"; share confidential information with immigration authorities except where required by 8 U.S.C. §§ 1373, 1644; or accept detainer requests absent a "signed" judicial warrant.  Newark Police Order § IV; Compl. ¶¶ 45-47.  Nor will the police enter Section 287(g) agreements except where "necessary to address threats to the public safety or welfare of New Jersey residents arising out of a declaration of a state or national emergency."  Newark Police Order § V.

The Hoboken Executive Order is much the same.  Hoboken will not aid federal civil immigration enforcement operations; provide access to City facilities without a judicial warrant; solicit citizenship information unless that information is necessary to investigate a crime; share confidential information with federal authorities except as required by state or federal law; honor immigration detainers without a judicial warrant; or sign Section 287(g) or other agreements.  Hoboken Executive Order §§ 3, 4; *see* Compl. ¶¶ 62-64.  Like the Newark Order, the Hoboken Executive Order contains savings clauses requiring conformity with state and federal law, and the Hoboken Order specifically provides that its restrictions on information sharing are limited by 8 U.S.C. §§ 1373, 1644.  Hoboken Executive Order § 4.

### B.  The New Jersey Attorney General Directive

The State of New Jersey has also adopted a policy limiting voluntary cooperation with the federal government, which is binding on all New Jersey law enforcement officers.[1]  In 2018, the New Jersey Attorney General issued Directive 2018-6, known as the "Immigrant Trust Directive," to address state, county, and local law enforcement cooperation with federal immigration authorities.  The Directive was updated in 2019.  *See* Attorney General Law Enforcement Directive No.  2018-6  v2.0  (Sept.  27,  2019),  https://www.nj.gov/lps/dcj/agguide/directives/ag-directive-

---

[1] Because the New Jersey Attorney General is the "chief law enforcement officer of the State," N.J. Stat. Ann. § 52:17B-98 (1970), he may "adopt . . . policies that bind law enforcement throughout" the State.  *Paff v. Ocean Cnty. Prosecutor's Off.*, 192 A.3d 975, 986 (N.J. 2018); *accord O'Shea v. Twp. of W. Milford*, 982 A.2d 459, 465 (N.J. Super. Ct. App. Div. 2009).

2018-6_v2.pdf.  The Directive therefore creates a ceiling for the types of voluntary cooperation New Jersey officers may provide to federal civil immigration enforcement efforts.

1.  Like the Newark and Hoboken Orders, the Directive explains that ongoing state, county, and local participation in federal immigration enforcement operations "presents significant challenges to New Jersey's law enforcement officers, who have worked hard to build trust with [the] state's large and diverse immigrant communities."  *Id.* at 1.  "It is well-established," the Directive notes, that immigrants will be "less likely to report a crime if they fear that the responding officer will turn them over to immigration authorities."  *Id.*  And if such individuals are afraid to approach law enforcement as victims or to cooperate as witnesses, it is "more difficult for officers to solve crimes and bring suspects to justice."  *Id.*

The Directive closely parallels the Hoboken and Newark Orders in its substantive mandates.  It forbids all New Jersey law enforcement officers to "[s]top, question, arrest, search, or detain any individual based solely on . . . actual or suspected citizenship or immigration status," participate "in civil immigration enforcement," provide "any non-public personally identifying information regarding any individual," or grant federal agents "access to any . . . database" when the "sole purpose of that assistance is to enforce federal civil immigration law."  *Id.* §§ II.A.1, B.1, B.3-4.  The Directive also prohibits law enforcement officers from "[p]roviding notice of a detained individual's upcoming release from custody" to immigration agents.  *Id.* § II.B.5.  But because New Jersey—unlike Newark or Hoboken—operates prisons that hold convicted criminals and defendants accused of violent and serious offenses, the Directive allows officers to give ICE advance notice of the release date for "convicted" prisoners and prisoners who are "currently charged with" a with a violent offense like murder or domestic violence.  *Id.*  The Directive also largely prohibits officers from entering Section 287(g) agreements or IGSAs.  *Id.* § III.  The only

exception the Directive makes is for IGSAs that "currently" exist. *Id.* § III.B. Finally, like the Newark and Hoboken Orders, the Directive includes savings clauses to ensure compliance with federal law. *See, e.g.*, *id*. § II.C.3, 10 (mandating compliance with judicial warrants and court orders and requiring New Jersey law enforcement officers to share information "regarding the citizenship or immigration status" under 8 U.S.C. §§ 1373 & 1644).

2. The Directive has been challenged—and upheld—several times. In 2019, several New Jersey counties and local officials sued the Attorney General, arguing "that express, conflict, and field preemption appl[ies] to" the Directive. *Ocean Cnty.*, 8 F.4th at 181. Some plaintiffs focused on 8 U.S.C. §§ 1373 and 1644 in particular, while others broadly contended that the Directive frustrated "the federal government's execution of federal immigration law." *Id.* (citation omitted). The United States filed a Statement of Interest under 28 U.S.C. §§ 517, 518(b), largely echoing the plaintiffs' preemption arguments and adding that the Directive "violates the principles of intergovernmental immunity embodied by the Supremacy Clause." *Cnty. of Ocean v. Grewal*, 475 F. Supp. 3d 355, 384 (D.N.J. 2020), *aff'd sub nom. Ocean Cnty.*, 8 F.4th 176. The District Court and the Third Circuit squarely rejected all of those arguments. As the courts explained, neither the INA nor Section 1644 are valid preemption statutes because they regulate "*state*" rather than "private" action, and a "federal statute that does not regulate private actors cannot serve as a basis for preemption." 8 F.4th at 181-182. Nor does the Directive violate intergovernmental immunity: It "does not regulate the United States directly," or "discriminate[ ]" against the United States simply by "refusing to assist their enforcement efforts." 475 F. Supp. 3d at 385 (quotation marks and citation omitted).

The United States separately challenged the Directive in 2021. It again argued that the Directive was "expressly" and "conflict-preempted by the INA" and that the Directive "violate[d]

the doctrine of intergovernmental immunity." *New Jersey*, 2021 WL 252270, at *5, 13. The District Court again rejected those arguments, relying in large part on the *Ocean County* decisions. *Id.* at *6-14. In the Court's view, "the United States has not proffered any other reasons why this Court should come to a different conclusion." *Id.* at *12. The United States did not appeal.

### C. The Instant Lawsuit

The United States now challenges Newark, Hoboken, Jersey City, and Paterson policies that are essentially identical to the Immigrant Trust Directive. As before, the United States contends that the policies "obstruct the Federal Government's ability to enforce the federal immigration laws," are "preempted under both express and conflict preemption principles," "discriminate against the Federal Government," and impermissibly "regulat[e] the Federal Government." Compl. ¶¶ 83, 84, 87, 92.

### STANDARD OF REVIEW

The United States must establish standing on every claim. *Murthy v. Missouri*, 603 U.S. 43, 61 (2024). To do so, it must "allege facts that affirmatively and plausibly suggest that it has standing to sue. Speculative or conjectural assertions are not sufficient." *Finkelman v. Nat'l Football League*, 810 F.3d 187, 194 (3d Cir. 2016) (quotation marks and citation omitted).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the United States' Complaint must also "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks and citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court is "required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the plaintiff]." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d. Cir. 2008). "[N]aked assertions devoid of further

factual enhancement," however, do not suffice, and the Court may not accept the plaintiff's "legal conclusions." *Iqbal*, 556 U.S. at 678 (quotation marks and citation omitted).

## ARGUMENT

The United States' challenge to the Cities' policies is squarely foreclosed by binding decisions of this Court and the Third Circuit. The United States raised all of its arguments in this Court before, when it challenged the Immigrant Trust Directive in *United States v. New Jersey* and submitted a statement of interest in *Ocean County*. This Court rejected the arguments then, and the Third Circuit affirmed its determination in *Ocean County*. The United States' claims therefore fail for two separate and independent reasons. First, the United States cannot establish standing. Because the Directive already limits city officers from voluntarily cooperating with federal immigration authorities to the same extent as the Cities' own policies, the United States cannot show that its injuries are traceable to the Cities' policies alone or redressable by this case. Second, because the Third Circuit rejected preemption challenges to the Directive on the merits in *Ocean County*, that precedent requires this Court to reject the United States' identical challenges to the Cities' policies here. If that were not enough, courts across the Nation have overwhelmingly dismissed similar attempts to invalidate policies limiting local officials' cooperation with federal civil immigration enforcement efforts, rebuffing the United States' arguments that the policies are somehow preempted or that they impermissibly discriminate against or regulate the federal government. The Court should follow the same course here.

## I.    The United States Lacks Standing.

No suit may proceed in federal court unless plaintiffs establish Article III standing. To do so, a plaintiff must satisfy three "irreducible" requirements: injury in fact, traceability, and redressability. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016)

(citation omitted).  A plaintiff "bears the burden of establishing standing as of the time [it] brought [its] lawsuit and maintaining it thereafter." *Carney v. Adams*, 592 U.S. 53, 59 (2020).

The United States has not and cannot establish two of the three closely related standing requirements: traceability and redressability.  Traceability requires a showing that the complained of action "caused" the plaintiff's alleged injury, and redressability asks whether "a judgment preventing . . . the action will redress it." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). The United States cannot show either because, even without the Executive and Police Orders it challenges, the Directive would still limit city officers' cooperation with the federal government in the exact same way.

A.  Traceability and redressability are causation inquiries.  When a plaintiff challenges a particular law, it must show that its alleged injury is a direct result of that law and not "some other authority." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013).  If defendants would have acted the same way "without regard" to the challenged law because of "the independent action of some third party not before the court," there is no standing. *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 42-43 (1976).  In *Clapper*, for example, plaintiffs sought to invalidate Section 702 of the Foreign Intelligence Surveillance Act ("FISA"), which allows government officials to surveil "individuals who are not United States persons and are reasonably believed to be located outside the United States."  568 U.S. at 401 (citation modified).  The rub for plaintiffs, however, was that Section 702 was not the only authority that granted the government access to that information. The government could conduct the same surveillance "under the older provisions of FISA," "obtain information from the intelligence services of foreign nations," or "conduct FISA-exempt human and technical surveillance programs that are governed by" an executive order. *Id.* at 413.  Because plaintiffs could "only speculate as to whether any (asserted) interception would be

under [Section 702] or some other authority," the Court held they could not "satisfy the 'fairly traceable' requirement." *Id.*

A similar result followed in *Simon*. There, plaintiffs sued the Treasury Secretary and the IRS Commissioner, arguing that an IRS Revenue Ruling unlawfully encouraged hospitals to deny services to patients who could not afford to pay. 426 U.S. at 28, 33. But plaintiffs could not establish whether "the denials of service . . . fairly [could] be traced to [the government's] 'encouragement' or instead result[ed] from decisions made by the hospitals without regard to the tax implications." *Id.* at 42-43. The Court therefore held that plaintiff could not satisfy the traceability requirement. And the plaintiffs also failed the redressability requirement for much the same reason: because the hospitals could deny treatment even without the tax benefit, it was simply too "speculative" to conclude that the "exercise of the court's remedial powers in this suit would result in the availability" of services. *Id.* at 43.

The traceability and redressability problems are even more pronounced here. Although the United States complains about the Cities' policies, the Directive would prohibit local officers from voluntarily cooperating with federal immigration authorities, even if the Cities' policies did not exist. That is because the Directive has the "force of law" and binds all New Jersey law enforcement "in the day-to-day administration of the law enforcement process." *O'Shea*, 982 A.2d at 465; *see also* N.J. Stat. Ann. §§ 52:17B-98 (1970). All "state, county, and local" officers therefore must follow the Directive regardless of the Cities' Orders. *Cnty. of Ocean*, 475 F. Supp. 3d at 364. Thus, unlike in *Clapper* or *Simon*, where traceability and redressability were merely "speculative," here, there is no possibility at all of local cooperation with the federal government even if the Court strikes down the Cities' policies because the Directive categorically prohibits such cooperation.

13

For example, the United States objects that the Newark Order prohibits city employees from "participating in civil immigration enforcement operations," Compl. ¶ 41, but the Directive independently bans them from "[p]articipating in civil immigration enforcement operations," Directive § II.B.1.  The United States challenges Newark's policy not to "[s]top, question, arrest, or detain any individual based solely on . . . actual or suspected immigration status," Compl. ¶ 45, but ignores the Directive's command that no "local law enforcement agency or official shall . . . [s]top, question, arrest, search, or detain any individual based solely on . . . actual or suspected citizenship or immigration status," Directive § II.A.1.  And the United States objects to Hoboken prohibiting city employees from allowing federal immigration authorities access to non-public facilities or databases without a warrant, Compl. ¶ 64, but the Directive imposes precisely the same bar, *see* Directive § II.B.3 (no "local law enforcement agency or official shall" provide "access to any state, county, or local law enforcement equipment, office space, database, or property not available to the general public").  And so on down the list—each challenged policy has a Directive doppelganger, which controls.  *Compare* Compl. ¶¶ 41-47, 62-64, *with* Directive §§ II, III.

Nor can the United States avoid this fundamental defect in its Article III standing by amending its complaint to sue New Jersey in an attempt to invalidate the Immigrant Trust Directive because the United States already brought such a challenge and lost.  In *New Jersey*, 2021 WL 252270, the District Court dismissed a suit by the federal government alleging that the Directive was preempted or otherwise unlawful.  The United States did not appeal that final judgment, and basic principles of collateral estoppel now bar them from relitigating their claims against the State. *See, e.g.*, *Montana v. United States*, 440 U.S. 147, 152-153 (1979).

B.  The United States insisted in its pre-motion letter that it can "establish[ ] the requisite redressability" even if it "does not challenge" the Directive because "the cities themselves are

directly and independently responsible for issuance and implementation of the policies."  Pl.'s Letter at 2.  This attempt to overhaul basic causation principles is unpersuasive, and none of the cases the United States cites even remotely resembles this one.  Take *United States v. Missouri*, 114 F.4th 980 (8th Cir. 2024).  The United States claims it categorically holds that "[i]nterference with the federal government's interest in enforcing federal law is sufficient to establish that [a state policy] injured the United States" and therefore sufficient to establish standing.  Pl.'s Letter at 2 (quoting *Missouri*, 114 F.4th at 985).  But that case did not involve a situation like this one, where another set of laws requires local officials to act exactly the same way even without the challenged policies.  Instead, *Missouri* involved just one law that directly "impeded the federal government's ability to enforce federal law by causing state officials to withdraw from joint task forces with federal law enforcement."  114 F.4th at 984.  The Eighth Circuit accordingly held that the plaintiff had standing to challenge *that* law because an "injunction enjoining the State from implementing the Act would prevent state officials from . . . withdrawing from participation in federal law enforcement."  *Id.* at 985.  Nothing about that case bears on the standing question here.

*Loggerhead Turtle v. County Council of Volusia County*, 148 F.3d 1231 (11th Cir. 1998), is similarly inapt.  The United States claims it stands for the proposition that "[s]tanding is not defeated merely because the alleged injury can be fairly traced to the actions of both parties and non-parties."  Pl.'s Letter at 2 (quoting 148 F.3d at 1247).  That is true, but irrelevant.  In some circumstances, like those present in *Loggerhead Turtle*, an injury can be fairly traced to multiple parties and fairly redressed by an order against any of them.  Thus, in *Loggerhead Turtle*, plaintiffs showed that a County had caused the plaintiffs' alleged injury by failing to adopt a minimum light pollution standard that sufficiently protected hatching turtles, even though the relevant locality within the County had the option of adopting a more protective standard than the county minimum.

148 F.3d at 1249. All that mattered was that the plaintiffs would not have been injured if the County had adopted a stricter standard. *Id.* But the same is not true here. Even if the Cities abandon their policies, that will not prevent the United States' alleged injury because all New Jersey law enforcement officers, including in the Cities, are still required to follow the Directive. Indeed, local policies can only exist to the extent they are consistent with the Directive.

*Falcone v. Dickstein*, 92 F.4th 193 (3d Cir. 2024), is even further off the mark. In that case, a New Jersey resident refused to abide by the COVID mask mandates and repeatedly tried to attend school board meetings without a mask. *Id.* at 198-199. The city police eventually charged Mr. Falcone with trespass, and the school board canceled the meeting where he wished to protest the school's masking requirement. *Id.* at 199. Mr. Falcone sued the school district and other local officials. Critically, he did "not claim he was injured from having to wear a mask" and did not challenge "the permissibility of the Board's masking policy." *Id.* at 204 (quotation marks omitted). He instead alleged that defendants "retaliated against him for his views by issuing a criminal summons and canceling the . . . Board meeting to prevent him from speaking." *Id.* The court simply recognized that Mr. Falcone had standing to challenge the defendants' "specific actions." *Id.* The only similarly between *Falcone* and this case is that both happened in New Jersey.

The United States finally leans on *Uzuegbunam v. Preczewski*, 592 U.S. 279 (2021). The "only" thing that case established is that, "for the purpose of Article III standing, nominal damages provide the necessary redress for a completed violation of a legal right." *Id.* at 293. That is what the Court meant by "a partial remedy"—it did not come close to suggesting that a plaintiff has standing where, as here, a court's decision in the plaintiff's favor would bring no relief at all. *Contra* Pl.'s Letter at 2 (quoting 592 U.S. at 291). The United States's attempts to evade basic standing principles fail.

C.  The United States alternatively argues that it can challenge the Newark and Hoboken policies because they depart from the Directive in certain respects, *see* Pl.'s Letter at 1-2, but that too is wrong.  The United States' Complaint does not even mention the Directive, let alone allege facts that would permit this Court to conclude its injury flows from the Cities' policies rather than the State's Directive.  And while the United States attempts to reframe its challenge in its pre-motion letter to focus on distinctions between the state and local policies, that effort fails.

Start with the United States' claim that the Newark Order—but not the Directive—precludes "any contract, agreement, or arrangement to detain immigrants in deportation proceedings, including but not limited to Intergovernmental Service Agreements."  Compl. ¶ 41.  That is triply wrong.  First, the United States misreads both the Directive and the Order—there is no mismatch.  The Directive broadly prohibits law enforcement officers from participating in *any* "civil immigration enforcement operations" or "[p]roviding access to *any* state, county, or local . . . property not available to the general public."  Directive § II.B.1, 3 (emphasis added).  Those broad mandates necessarily preclude New Jersey municipalities and law enforcement agencies from entering into agreements with the federal government to provide immigration-detention facilities.  And the only relevant carve-out in the Directive is for IGSAs that "currently" exist.  *Id.* § III.  That matches the Newark Order precisely: it forbids local officials only to "*[e]nter into* any contract, agreement, or arrangement to detain immigrants in deportation proceedings," Compl. ¶ 41 (emphasis added), but does not require officials to withdraw from any existing ones.

Second, another New Jersey statute independently prohibits city officials from signing IGSAs to operate immigration-detention centers on the federal government's behalf.  *See* N.J. Stat. Ann. § 30:4-8.16(b)(1) (2021) (forbidding New Jersey law enforcement officers to "enter into, renew, or extend any immigration detention agreement").  The United States claims in its pre-

motion letter that this Court "struck down" that statute in *CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315 (3d Cir. 2025). *See* Pl.'s Letter at 1. But *CoreCivic* found the statute unconstitutional only "as applied to CoreCivic," finding that New Jersey could not preclude a *private* entity from contracting with the government to run a detention facility. 145 F.4th at 329. The court had good reason to limit its ruling in this way. It is one thing to hold that a State may not regulate "private" third-party contracts with the federal government; it is quite another to hold that a state (or local) government may not enact legislation expressing its own policy preference to limit cooperation with federal authorities—particularly where Congress explicitly permits such limitations. 8 U.S.C. § 1103(a)(11)(B) (calling for "a cooperative agreement"); *see McHenry Cnty. v. Raoul*, 44 F.4th 581, 589, 594 (7th Cir. 2022) (upholding an identical Illinois statute prohibiting local governments from entering IGSAs); *CoreCivic*, 145 F.4th at 327 (distinguishing *McHenry* on that ground).

Third, the United States does not identify a single IGSA that has been or *could be* affected by the Newark policy. The United States has not, for example, alleged that it had to withdraw from IGSAs when Newark enacted its policy or that an IGSA with Newark was imminent at that time but had to be abandoned because of the policy. Even now, the United States does not allege that Newark officials would enter into an IGSA but for the City's policy. The United States therefore cannot establish that its injury is "concrete and particularized" rather than "conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (citation omitted). That deficiency independently dooms the United States's argument. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (Plaintiffs "must allege facts essential to show jurisdiction. If they fail to make the necessary allegations, they have no standing." (citation modified)).

To sum up, the Directive and another state law separately prohibit city officials from entering new immigration-detention agreements with the federal government, and the United States does not allege any facts sufficient to establish that it would have entered an IGSA but for Newark's policy. The United States has no standing to challenge Newark's IGSA bar.

The United States also claims that the Hoboken Order "prohibits the honoring of any and all detainer requests," whereas the Directive makes "exceptions for detainers issued against dangerous individuals, such as those convicted of violent or serious offenses," Pl.'s Letter at 1-2. According to the United States, that policy has resulted in at least three instances where the Essex County Correctional Facility "refused to cooperate with federal immigration officials to keep dangerous illegal aliens off the streets." Compl. ¶ 73. But in New Jersey it is the counties, not the cities, that operate the facilities that detain such criminals. *See* N.J. Stat. Ann. § 30:8-1 (2024) (providing that county "[s]heriffs and jailers shall receive from constables or other officers all persons apprehended by such constables or officers for offenses against this state"); *id.* § 30:8-19 (giving the county sheriffs and county boards of commissions control over their county's jails). Indeed, the Essex facility is located in Newark and is controlled and operated by Essex County, a distinct subunit of government that is not party to this action. *See* The Essex County Department of Corrections, *About the Essex County Department of Corrections*, https://essexdoc.com/about/.[2]

We will say it again: A complaint "must allege facts essential to show jurisdiction." *Dallas*, 493 U.S. at 231 (citation modified). Here, the Complaint says nothing about the Directive *at all*; still less does it allege facts explaining why and how the Newark and Hoboken policies differ from the Directive in ways that inflict concrete, non-speculative injuries on the United

---

[2] In any event, the Newark Police Order makes an exception for violent, serious, and convicted criminals. *See* Newark Police Order § IV.B.5.

States.  And the United States' belated attempt to address that omission by citing alleged distinctions between the Directive and the Cities' policies fails because the alleged distinctions are illusory and the United States cannot show any injury that has resulted from them.

Further, even if the United States could establish that the Cities' policies have some distinct provision that has resulted in a concrete injury, that would not establish its standing to challenge the policies wholesale.  It would establish the United States's standing only with respect to the specific provision that injures it.  The Supreme Court has said many times over that "standing is not dispensed in gross" and the remedy must "be limited to the inadequacy that produced the injury."  *Lewis v. Casey*, 518 U.S. 343, 357, 358 n.6 (1996).  That Court has accordingly directed lower courts to examine standing provision-by-provision and has repeatedly dismissed actions insofar as they run afoul of that rule.  *See, e.g.*, *Dallas*, 493 U.S. at 235 ("Because we conclude that no petitioner has shown standing to challenge either the civil disability provisions or the provisions involving those who live with individuals whose licenses have been denied or revoked, we conclude that the courts below lacked jurisdiction to adjudicate petitioners' claims with respect to those provisions."); *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733-334 (2008) ("that Davis has standing to challenge § 319(b) does not necessarily mean that he also has standing to challenge . . . § 319(a)"); *see also Hershey v. Jasinski*, 86 F.4th 1224, 1229 (8th Cir. 2023) ("standing must exist as to each challenged provision" (quotation marks and citation omitted)).  The United States' broad Complaint cannot survive.

## II.    The Preemption Claims Also Fail On The Merits.

The United States' primary claim on the merits is foreclosed by binding precedent.  The United States contends that the Cities' policies are invalid because they are express and conflict preempted by the INA and federal immigration policy, but the Third Circuit rejected a virtually identical preemption claim in *Ocean County*.  The same result is required here.  And looking

beyond *Ocean County*, every court that has considered this issue has rejected the United States'
preemption arguments based on the INA's plain language, the broader statutory scheme, and the
Tenth Amendment's anticommandeering doctrine.

### A. Third Circuit Precedent Requires Dismissal.

The Third Circuit's decision in *Ocean County* disposes of the United States' preemption
claim. In that case, several political subdivisions sued New Jersey alleging "that express, conflict,
and field preemption appl[ies] to" New Jersey's Immigrant Trust Directive. 8 F.4th at 181. There,
as here, plaintiffs claimed that 8 U.S.C. §§ 1373(a) and 1644 expressly prohibit local authorities
from restricting the communication of "immigration information to the federal government" and,
more broadly, prohibit New Jersey from "impos[ing] an obstacle to the federal government's
execution of federal immigration law." *Id.* (citation modified).

The Third Circuit disagreed. It observed that Sections 1373 and 1644 purport to prohibit
"*state* action." *Id.* at 182. Section 1373 bars "State, or local government entit[ies] or official[s]"
from prohibiting or restricting local officials from providing certain information to ICE, and
Section 1644 reiterates that "State or local government entit[ies]" cannot be prohibited from
sharing that information. The Third Circuit held that such state-directed provisions "cannot serve
as a basis for preemption" because, as the Supreme Court explained in *Murphy v. National
Collegiate Athletic Association*, 584 U.S. 453 (2018), " 'the Constitution confers upon Congress
the power to regulate individuals, not States.' " *Ocean Cnty.*, 8 F.4th at 181-182 (quoting *Murphy*,
584 U.S. at 455). That reasoning holds "regardless of the type of preemption claimed" because all
preemption claims ultimately " 'work in the same way.' " *Id.* at 181 (quoting *Murphy*, 584 U.S. at
477). The Third Circuit accordingly dismissed plaintiffs' preemption claims. *Id.* at 182.

The same result is required here. As explained, the Directive at stake in *Ocean County* and
the city policies challenged here are materially the same. And the United States' preemption

claims are also materially indistinct from those of the plaintiffs in *Ocean County*; both boil down to the assertion that state or local policies limiting cooperation with federal immigration authorities are express and conflict preempted. Indeed, the United States largely agrees. *See* Pl.'s Letter at 3 ("The Third Circuit previously rejected a claim that 8 U.S.C. §§ 1373 and 1644 conflict preempted the state of New Jersey's [Immigrant Trust Directive] policy."). It suggests, however, that *Ocean County* is not fully preclusive because in this case the United States claims that the Cities' "policies conflict not merely with § 1373 and § 1644 but with the entire extensive and complex statutory scheme for the governance of immigration and alien status." Pl.'s Letter at 3 (quotation marks and citation omitted). But the plaintiffs in *Ocean County* made the exact same argument about the Directive. They claimed it generally "frustrates and impedes the federal government's regulation and enforcement of immigration laws." Compl. ¶ 34, Dkt. No. 1, *Cnty. of Ocean*, 475 F. Supp. 3d. 355. The Third Circuit nonetheless dismissed the claim, and the plaintiffs' lawsuit as a whole. 8 F.4th at 181-182. That decision is dispositive.

Indeed, it is not possible to read *Ocean County* in a way that does not foreclose the United States' "statutory scheme" argument. The Third Circuit held that *any* statute that regulates "state" rather than "private" action "cannot serve as a basis for preemption." 8 F.4th at 181-182 (emphasis omitted). And the United States' whole point here is that the INA requires state and local government to behave a certain way. That argument necessarily suffers from the same fundamental defect that caused the Third Circuit to dismiss the preemption claims in *Ocean County*. *See id.* at 181 (explaining that, "regardless of the type of preemption claimed," a federal law does not preempt state law if it regulates States (citing *Murphy*, 584 U.S. at 477)); *Kansas v. Garcia*, 589 U.S. 191, 202 (2020) (same). Accordingly, the reasoning of *Ocean County* forecloses the United States' preemption claims in their entirety. *See Rappa v. New Castle Cnty.*, 18 F.3d

1043, 1061 & n.26 (3d Cir. 1994) (*stare decisis* prohibits courts from "embracing a line of reasoning that will lead to a" result that diverges from the court's precedents (citation omitted)).

The United States also frankly acknowledges that it has brought this lawsuit to "re-examin[e]" and "reverse" *Ocean County*.  Pl.'s Letter at 3.  That is largely an admission that the Government cannot prevail before this Court because only the Third Circuit sitting en banc may reverse its own precedent.  *In re Boy Scouts of Am.*, 137 F.4th 126, 160 n.21 (3d Cir. 2025).  And even then, it is highly unlikely that the Third Circuit will agree to the reexamination the federal government requests.  The United States contends that it is necessary "so that the law in this circuit accords with the holding of" *City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999), and *State of New York v. Department of Justice*, 951 F.3d 84 (2d Cir. 2020).  Pl.'s Letter at 3.  But *State of New York* was a Spending Clause case, where plaintiffs challenged the federal government's decision to withhold federal funding for local law enforcement based on the State's failure to comply with specific federal-immigration-related conditions.  It is well established that the United States has broader latitude to impose requirements on States as grant conditions rather than as outright commands.  And the Second Circuit expressly acknowledged as much, explaining that "Congress cannot regulate the States," and holding only that "Section 1373 raises no commandeering concerns *as applied to a federal funding requirement*."  *Id.* at 114 (capitalization altered) (emphasis added).  Meanwhile, *City of New York* predates the Supreme Court's decision in *Murphy* and is flatly inconsistent with that now-binding precedent.  This Court accordingly found *City of New York* inapplicable—especially "where federal law plainly allows states to decide whether to participate in a federal program."  *Cnty. of Ocean*, 475 F. Supp. 3d at 383 n.23.

In short, *Ocean County* is binding on this Court, and the United States' efforts to overturn it cannot succeed.

**B.  The INA's Plain Language, The Broader Statutory Scheme, And The Canon Of Constitutional Avoidance All Confirm The Conclusion That The INA Does Not Preempt The Cities' Policies.**

Because *Ocean County* is dispositive, this Court need not consider the multiple additional reasons the United States' preemption claims fail.  But each would provide an additional basis for dismissing the claims, even without *Ocean County*.

To begin, the United States' express preemption claim fails because the United States misconstrues the Cities' policies.  Express preemption occurs when federal law contains "an explicit statutory command that" the local policy "be displaced."  *St. Thomas-St. John Hotel & Tourism Ass'n v. Gov't of U.S.V.I.*, 218 F.3d 232, 238 (3d. Cir. 2000).  Here, the United States suggests that the "privacy" provisions in the Cities' policies are expressly preempted by Sections 1373(a) and 1644, which bar state and local authorities from prohibiting the sharing of "information regarding" a person's "citizenship or immigration status, lawful or unlawful" with immigration authorities.  8 U.S.C. § 1373(a); *see* 8 U.S.C. § 1644 (similar).  But while the Cities' privacy provisions prevent city officials from "maintain[ing] and/or shar[ing] confidential personal information" with immigration authorities, Newark Executive Order § 6; Hoboken Executive Order § 7, both contain express savings clauses that prevent them from overriding any *valid* federal law.  Newark's provision ends with the caveat that maintaining and sharing information is barred "except where otherwise required by state or federal law or regulation or directive or court order." Newark Executive Order § 6.  Hoboken's savings clause is even more explicit, stating that the privacy provision applies "except where otherwise permitted by 8 U.S.C. 1373 or 8 U.S.C. 1644." Hoboken Executive Order § 7.  Moreover, both Cities prevent their officials from "maintain[ing]" any sensitive information in the first place, suggesting that federal provisions regarding sharing such information will be largely irrelevant.

The United States' conflict preemption arguments similarly fail.  A local law may be conflict preempted when it "stands as an obstacle to the accomplishment and execution" of federal law.  *Arizona*, 567 U.S. at 399 (citation omitted).  Given our centuries-long understanding "that Congress does not normally intrude upon the police power," *Bond v. United States*, 572 U.S. 844, 863 (2014), however, there is "a strong presumption against preemption when Congress legislates in an area traditionally occupied by the States," *United States v. California*, 314 F. Supp. 3d 1077, 1088 (E.D. Cal. 2018), *aff'd in part, rev'd in part*, 921 F.3d 865 (9th Cir. 2019).  In such cases, a "clear and manifest" say-so from Congress is required.  *Arizona*, 567 U.S. at 400 (citation omitted).

The Cities' policies are a straightforward exercise of traditional police power, and nothing in the INA so much as hints that Congress sought to take that power away from local authorities.  Consider the Cities' Orders.  They prohibit local officers from participating in immigration raids, referring residents for deportation, entering Section 287(g) agreements, and the like, based on the Cities' experience with community policing and their belief that the safety of all their residents "depends on trust with every community."  Newark Executive Order at 1; *see* Hoboken Executive Order at 1 (similar).  Newark and Hoboken have found that when their officials "voluntarily work[ ] on behalf of Immigration and Customs Enforcement (ICE) to facilitate deportations, significant gaps in trust and cooperation grow between immigrant communities and the police."  Newark Executive Order at 1.  The Cities also have "limited resources," so the Orders decide where to allocate them best.  Hoboken Executive Order at 2.  Those are classic policing choices that the Constitution has always left to the state and local governments.

None of those choices steps on federal toes.  Quite the opposite, the Cities require law enforcement officers to assist federal immigration authorities when "required" to do so "by state or federal law or regulation," including by providing "information regarding an individual's

citizenship or immigration status" and complying with "a valid and properly issued judicial criminal warrant" or another court order.  Compl. ¶¶ 41-43, 62-63.  And even where the Cities' policies limit voluntary assistance by local officers, they do not obstruct federal law.  The Orders, for example, do not give anyone the right to remain in the country or set limits on whom federal authorities can detain.  The Orders simply implement each City's policy choice to "not expend any time, funds, or resources on *facilitating* the civil enforcement of federal immigration" operations except as required to do so by law.  Newark Executive Order at 2 (emphasis added).

The United States cites no evidence—let alone "clear and manifest" evidence, *Arizona*, 567 U.S. at 400 (citation omitted)—that the INA intended to strip the Cities of that sovereign choice.  On the contrary, the INA "provides states and localities the *option*, not the *requirement*, of assisting federal immigration authorities." *California*, 921 F.3d at 889.  Sections 1373(a) and 1644 are the *only* provisions in the INA that purport to regulate state or local authorities, and—as discussed above—they do not help the United States here.  *See id.* at 887.  Otherwise, the "burden of complying with the INA" is on the federal government, and States and localities are under no obligation to spend money and devote resources to alleviate that burden—especially when doing so would make their own law enforcement tasks more difficult.  *Cnty. of Ocean*, 475 F. Supp. 3d at 382; *see Garcia*, 589 U.S. at 202 ("There is no federal preemption *in vacuo*"; preemption must be based on statutory language, not "on a freewheeling judicial inquiry" (citations omitted)).

Accordingly, every court assessing this issue has held that a local government's decision to limit its own cooperation with federal immigration officials simply does not obstruct the federal government's efforts to enforce federal law.  *E.g.*, *City of Chicago v. Sessions*, 888 F.3d 272, 282 (7th Cir. 2018) (plaintiffs' assertion that "localities can[not] be allowed to thwart federal law enforcement" is nothing but "a red herring"), *vacated en banc in part on other grounds*, No. 17-

2991, 2018 WL 4268814 (7th Cir. Aug. 10, 2018); *California*, 921 F.3d at 890 ("the choice of a state to refrain from participation cannot be invalid under the doctrine of obstacle preemption where . . . it retains the right of refusal").  As one court recently put it, "refusing to help is not the same as impeding."  *Illinois*, 2025 WL 2098688, at *23 (citation omitted).

If any doubt remained, the canon of constitutional avoidance would resolve it.  The canon reflects the "cardinal principle of statutory interpretation that when an Act of Congress raises a serious doubt as to its constitutionality, courts will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided."  *Guerrero-Sanchez v. Warden York Cnty. Prison*, 905 F.3d 208, 223 (3d Cir. 2018) (citation modified).  That rule is especially important when a case presents issues of federalism, because courts must "be certain of Congress's intent before finding that federal law overrides the usual constitutional balance of federal and state powers."  *Bond*, 572 U.S. at 858 (quotation marks and citation omitted).  Because the United States' reading of the INA runs headlong into the Tenth Amendment's anti-commandeering doctrine, the Court should not adopt it.

Under the Tenth Amendment, the federal government "may not compel the States to implement, by legislation or executive action, federal regulatory programs," *Printz v. United States*, 521 U.S. 898, 925 (1997), because doing so undermines "political accountability," *Murphy*, 584 U.S. at 473-474.  When the federal government commandeers local officers, it "blur[s]" the line between state and federal policy initiatives so that voters no longer "know who to credit or blame," and it impermissibly "shift[s] the costs of [federal] regulation to the States" and local authorities.  *Id.* The Supreme Court explained this basic anti-commandeering principle in *Printz*. That case involved a Tenth Amendment challenge to the Brady Act, which required state law enforcement officials to "make 'reasonable efforts'" to verify "Brady Forms" sent by firearms

dealers as part of a new federal background check system. 521 U.S. at 904. The Supreme Court declared the scheme unconstitutional: Congress "may not compel the States to enact or administer a federal regulatory program." *Id.* at 925 (citation omitted).

The United States' interpretation of the INA would produce the same result. It would thwart policymakers' ability to extricate their State or municipality from involvement in federal immigration enforcement and impermissibly shift compliance costs to local governments with limited resources by "conscript[ing] the time and cooperation of local employees." *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 873 (N.D. Ill. 2018); *see also City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 330-331 (E.D. Pa. 2018) ("Section 1373 violates the Tenth Amendment of the Constitution" if construed to mandate municipalities to enact or refrain from enacting laws), *aff'd in part, vacated in part sub nom. City of Philadelphia v. Att'y Gen. of U.S.*, 916 F.3d 276 (3d Cir. 2019); *California*, 921 F.3d at 888 (similar); *Colorado v. U.S. Dep't of Just.*, 455 F. Supp. 3d 1034, 1059 (D. Colo. 2020) (similar); *Ocean Cnty.*, 8 F.4th at 182 n.4 (acknowledging that wall of authority). Because that result is incompatible with the Tenth Amendment and because the text of the INA does not unambiguously demonstrate that Congress intended such an unconstitutional result, the United States' preemption claim fails under the doctrine of constitutional avoidance as well.

### III. The Intergovernmental Immunity Claims Are Meritless.

The United States' claims that Newark and Hoboken policies discriminate against and unlawfully regulate the federal government fare no better. The principles of intergovernmental immunity were first set forth in *McCulloch v. Maryland*, which held that "[t]he States have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by Congress to carry into effect the powers vested in the national government." 17 U.S. (4 Wheat.) 316, 322 (1819). A state law or regulation therefore violates

the doctrine of intergovernmental immunity "only if it regulates the United States *directly* or discriminates against the Federal Government or those with whom it deals." *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (emphasis added).  The Cities' policies do neither.

As the Supreme Court has explained, a state or local law "directly" regulates the federal government where it purports to mandate or prohibit the actions of federal entities.  *United States v. New Mexico*, 455 U.S. 720, 735 (1982).  The Cities' policies do not qualify.  They govern how city officials should respond when the federal government asks for cooperation in immigration efforts.  And while the Third Circuit's decision in *CoreCivic* found that a state law can also directly regulate the federal government when it restricts the ability of *private* parties to contract with the United States, the court did not suggest that the same principle applies to restrictions on state and local authorities.  *Cf. Nixon v. Mo. Mun. League*, 541 U.S. 125, 134 (2004) ("when a government regulates itself (or the subdivision through which it acts) there is no clear distinction between the regulator and the entity regulated," so preventing "state or local governmental self-regulation" is conceptually quite distinct from preventing "regulation of private players").

Indeed, if a municipality violated intergovernmental immunity any time it placed limits on its own officers' cooperation with the federal government, local "participation in such efforts would no longer be voluntary."  *New Jersey*, 2021 WL 252270, at *13; *see also McHenry*, 44 F.4th at 593 (state law prohibiting "cooperative agreements to house immigration detainees in Illinois State or County facilities" did not run afoul of the intergovernmental immunity doctrine).  That result cannot be squared with the INA, which repeatedly encourages *voluntary*—not forced— intergovernmental cooperation.  Nor does it comport with the Tenth Amendment, which protects local officials from being conscripted for federal service.

The United States' claims of discrimination also fail. A state or local law unlawfully discriminates against the United States when it "treats similarly situated state and federal [entities] differently" in a way that cannot be attributed to "significant differences" between those entities. *Dawson v. Steager*, 586 U.S. 171, 177-178 (2019) (quotation marks omitted). Here, the United States cannot point to any state or local entity that is being treated differently from the United States with respect to its immigration enforcement activities because the United States is solely responsible for such activities. The Cities' policies therefore apply to the United States alone because the United States stands alone in this field, not because of any discrimination.

The Cities' policies are also different in kind from the policies the intergovernmental immunity doctrine usually considers problematic. Unlike in typical discrimination cases, where a State affirmatively levies a tax or cost on the federal government, *see, e.g.*, *United States v. Washington*, 596 U.S. 832, 838-839 (2022), the Cities' policies simply decline to aid federal immigration enforcement efforts. "The State's refusal to cooperate in the immigration context— a possibility contemplated by the relevant federal statutes—does not constitute discrimination against the federal government." *McHenry*, 44 F.4th at 594 n.7; *accord Illinois*, 2025 WL 2098688, at *25; *California*, 314 F. Supp. 3d at 1111; *Cnty. of Ocean*, 475 F. Supp. 3d at 385.

Unsurprisingly then, no court has ever accepted the intergovernmental immunity claims the United States presses here. Rather, court after court has rejected them. *See, e.g. New Jersey*, 2021 WL 252270, at *13; *Cnty. of Ocean*, 475 F. Supp. 3d at 385; *Illinois*, 2025 WL 2098688, at *26; *California*, 314 F. Supp. 3d at 1111. This Court should too.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the United States's Complaint.

By:    /s/ Gurbir S. Grewal
       Gurbir S. Grewal
       *Counsel for Defendants* (027771999)