# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,

*Plaintiff,*

v.

CITY OF NEWARK *et al.,*

*Defendants.*

Hon. Evelyn Padin, U.S.D.J.
Hon. Andre M. Espinosa, U.S.M.J.

Docket No. 2:25-cv-5081

<u>Civil Action</u>

**Motion Date: November 17, 2025**

---

## BRIEF OF AMICUS CURIAE THE STATE OF NEW JERSEY

---

Jeremy M. Feigenbaum
*Solicitor General*

Lara J. Fogel
Benjamin M. Shultz
*Assistant Attorneys General*

Surinder K. Aggarwal
Anaiis Gonzalez
Giancarlo G. Piccinini
Nathaniel Rubin
*Deputy Attorneys General*

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
Division of Law
124 Halsey Street, P.O. Box 45029
Newark, New Jersey 07101
*Attorneys for Amicus Curiae the State of New Jersey*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...........................................................................1

PROCEDURAL HISTORY AND STATEMENT OF FACTS ...........................2

ARGUMENT.....................................................................................................11

    I.  The Federal Government Lacks Article III Standing To Pursue Its Claims Against the Cities. ....................................................................................11

    II.  On the Merits, The Complaint Should Be Dismissed. ...........................22

CONCLUSION.................................................................................................36

# TABLE OF AUTHORITIES

## Cases

*Adam v. Barone*,

    41 F.4th 230 (3d Cir. 2022) ..................................................................14

*Arizona v. United States*,

    567 U.S. 387 (2012) ..................................................................... 28, 29

*Chafin v. Chafin*,

    568 U.S. 165 (2013) ..............................................................................14

*Chamber of Commerce of United States v. Whiting*,

    563 U.S. 582 (2011) ..............................................................................29

*City of Chicago v. Sessions*,

    888 F.3d 272 (7th Cir. 2018) ......................................................... 25, 31

*CoreCivic, Inc. v. Governor of New Jersey*,

    145 F.4th 315 (3d Cir. 2025) ...............................................................34

*County of Ocean v. Grewal*,

    475 F. Supp. 3d 355 (D.N.J. 2020) .......................................................9

*Davis v. FEC*,

    554 U.S. 724 (2008) ..............................................................................11

*Delta Construction Co. v. EPA*,

    783 F.3d 1291 (D.C. Cir. 2015) .................................................... 12, 17

*Diamond Alternative Energy, LLC v. EPA*,

    145 S. Ct. 2121 (2025) .........................................................................12

*Dubin v. United States*,

    599 U.S. 110 (2023) ..........................................................................................27

*El Cenizo v. Texas*,

    890 F.3d 164 (5th Cir. 2018) .........................................................................32

*Falcone v. Dickstein*,

    92 F.4th 193 (3d Cir. 2024) ...........................................................................17

*Fischer v. Governor of New Jersey*,

    842 F. App'x 741 (3d Cir. 2021) ............................................................ 13, 18

*Fraternal Order of Police v. City of Newark*,

    236 A.3d 965 (N.J. 2020) ...............................................................................3

*Galarza v. Szalczyk*,

    745 F.3d 634 (3d Cir. 2014) ................................................................... 32, 34

*Goodyear Atomic Corp. v. Miller*,

    486 U.S. 174 (1988) .......................................................................................35

*Guerrero-Sanchez v. Warden York County Prison*,

    905 F.3d 208 (3d Cir. 2018) ..........................................................................33

*In re Attorney General Law Enforcement Directive Nos. 2020-5 & 2020-6*,

    252 A.3d 135 (N.J. 2021) ................................................................................3

*In re Lazy Days' RV Center Inc.*,

    724 F.3d 418 (3d Cir. 2013) ..........................................................................14

*Kansas v. Garcia*,

    140 S. Ct. 791 (2020) ........................................................................ 23, 24, 28

*Kaspersky Lab, Inc. v. United States Department of Homeland Security*,

    909 F.3d 446 (D.C. Cir. 2018)................................................................13

*Khodara Environmental, Inc. v. Blakey*,

    376 F.3d 187 (3d Cir. 2004) ...............................................................18

*Knudsen v. MetLife Group, Inc.*,

    117 F.4th 570 (3d Cir. 2024) ..............................................................14

*Lewis v. Government Employees Insurance Co.*,

    98 F.4th 452 (3d Cir. 2024) ................................................................11

*Loggerhead Turtle v. County Council of Volusia County*,

    148 F.3d 1231 (11th Cir. 1998) ..........................................................17

*Lujan v. Defs. of Wildlife*,

    504 U.S. 555 (1992)...................................................................... 12, 18

*Massachusetts v. EPA*,

    549 U.S. 497 (2007)............................................................................12

*McConnell v. FEC*,

    540 U.S. 93 (2003).............................................................................12

*McHenry County v. Raoul*,

    44 F.4th 581(7th Cir. 2022)................................................................35

*Maine Forest Products Council v. Cormier*,

    51 F.4th 1, 8 (1st Cir. 2022) ...............................................................23

*Murphy v. NCAA*,

    584 U.S. 453 (2018)............................................................... 22, 24, 34

*North Jersey Media Group, Inc. v. Township of Lyndhurst*,

    163 A.3d 887, 901 (N.J. 2017)................................................................3

*New York v. United States*,

    505 U.S. 144 (1992)............................................................. 22, 33

*Nuclear Information & Resource Service v. Nuclear Regualory Commission*,

    457 F.3d 941 (9th Cir. 2006)..............................................................13

*O'Shea v. Township of West Milford*,

    982 A.2d 459 (N.J. Super. Ct. App. Div. 2009) ........................................3

*Ocean County Board of Commissioners v. Attorney General of New Jersey*,

    8 F.4th 176 (3d Cir. 2021).................................................... 1, 9, 22, 33

*Paff v. Ocean County Prosecutor's Office*,

    192 A.3d 975 (N.J. 2018).....................................................................3

*Parker v. Brown*,

    317 U.S. 341 (1943)..........................................................................29

*Peace Church Risk Retention Group v. Johnson Controls Fire Protection LP*,

    49 F.4th 866 (3d Cir. 2022)................................................................11

*Printz v. United States*,

    521 U.S. 898 (1997)..................................................................... 33, 36

*Public Interest Legal Foundation v. Secretary of the Commonwealth (PILF)*,

    136 F.4th 456 (3d Cir. 2025)..............................................................11

*Sikkelee v. Precision Airmotive Corp.*,

    822 F.3d 680 (3d Cir. 2016)...............................................................29

*Spokeo v. Robins*,

    578 U.S. 330 (2016) ..............................................................................................11

*St. John Hotel & Tourism Association v. Government of the Virgin Islands*,

    218 F.3d 232 (3d Cir. 2000) .................................................................................25

*Steel Co. v. Citizens for a Better Environment*,

    523 U.S. 83 (1998) ...............................................................................................22

*Steinle v. City & Cnty. of San Francisco*,

    919 F.3d 1154 (9th Cir. 2019) ....................................................................... 27, 28

*Taylor v. Sturgell*,

    553 U.S. 880 (2008) .............................................................................................19

*Toll Bros. v. Township of Readington*,

    555 F.3d 131 (3d Cir. 2015) .................................................................................12

*United States v. California*,

    921 F.3d 865 (9th Cir. 2019) ..................................................... 25, 27, 29, 31, 33

*United States v. Colorado*,

    No. 25-1391 (D. Colo.) (filed May 2, 2025)........................................................19

*United States v. Illinois*,

    No. 25-1285, 2025 WL 2098688 (N.D. Ill. July 25, 2025) ........................... 19, 25

*United States v. New Jersey*,

    No. 20-1364, 2021 WL 252270 (D.N.J. Jan. 26, 2021)....................... 1, 8, 24, 34

*United States v. Washington*,

    596 U.S. 832 (2022) .............................................................................................34

*Uzuegbunam v. Preczewski*,

    592 U.S. 279 (2021) ...........................................................................17

*Virginia House of Delegates. v. Bethune-Hill*,

    587 U.S. 658 (2019) ...........................................................................11

*We the Patriots, Inc. v. Grisham*,

    119 F.4th 1253 (10th Cir. 2024) .........................................................12

*White v. United States*,

    601 F.3d 545 (6th Cir. 2010) .............................................................13

**<u>Statutes</u>**

8 U.S.C. § 1227(a)(2) .............................................................................31

8 U.S.C. § 1231(a)(4) .............................................................................31

8 U.S.C. § 1357(g)(1) .............................................................................32

8 U.S.C. § 1357(g)(9) .............................................................................32

8 U.S.C. § 1357(g)(10)(A) ......................................................................27

8 U.S.C. § 1360(a) ..................................................................................27

8 U.S.C. § 1360(b) ..................................................................................27

8 U.S.C. § 1360(c)(2) ..............................................................................27

8 U.S.C. § 1373(a) ..................................................................................25

8 U.S.C. § 1644 .......................................................................................25

N.J. Stat. Ann. § 30:8-1 ..........................................................................21

N.J. Stat. Ann. § 30:8-19 ........................................................................21

N.J. Stat. Ann. § 52:17B-98 ......................................................................2

**Regulations**

8 C.F.R. § 287.7(a) ................................................................................32

**Constitutional Provisions**

U.S. CONST. art. VI, cl. 2...........................................................................28

**Treatises**

15 MOORE'S FED. PRAC.: CIVIL §  101.42 (2020) ....................................................13

## **PRELIMINARY STATEMENT**

This is a rerun of a lawsuit the Federal Government already lost in this district years ago. In 2018, the New Jersey Attorney General issued the Immigrant Trust Directive (the "Directive"), which binds all state and local law enforcement agencies in the State, and which closely tracks the municipal policies at issue in this case. The Federal Government sued the State, seeking to enjoin the Immigrant Trust Directive, and articulating the same preemption and intergovernmental immunity arguments it raises here, but this Court rejected those arguments on the merits. *See United States v. New Jersey*, No. 20-1364, 2021 WL 252270 (D.N.J. Jan. 26, 2021). The Federal Government declined to appeal, and when two other entities challenged the Directive before the Third Circuit, that Court also ruled for the State on the merits. *See Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of N.J.*, 8 F.4th 176 (3d Cir. 2021).

Having prevailed in that prior litigation, the State of New Jersey submits this amicus brief to ensure that this Court understands the Directive's full significance in disposing of this litigation. Initially, the Attorney General's Directive is binding on both state *and* local law enforcement in New Jersey, including on all four municipal defendants (the "Cities"). The Federal Government is not seeking to invalidate the Directive in this lawsuit, nor could it, given that the Federal Government has already challenged it unsuccessfully. But that is dispositive: because the Directive requires the Cities to undertake the actions required by the policies challenged here, nothing

1

would change on the ground from a U.S. victory in this lawsuit. Put another way, the Federal Government's purported injuries would not be redressed by a court order invalidating those policies—meaning that the Federal Government lacks Article III standing to obtain an advisory opinion from this Court.

In any event, the Federal Government's claims fail on the merits. The Third Circuit's binding decision in *Ocean County* makes that clear, as does this Court's decision in *United States v. New Jersey*. Like the State's Directive, the challenged municipal policies prioritize state and local resources for state and local purposes— instead of using them to help enforce federal law. Nothing in the Immigration and Nationality Act (or the Constitution) permits the Federal Government to conscript state and local governments into federal service over these governments' objections. This Court should therefore grant Defendants' motions to dismiss.

## PROCEDURAL HISTORY AND STATEMENT OF FACTS

The State largely relies on the statements of facts and procedural history in the Defendants' briefs. The State adds the following additional background.

### A.    New Jersey's Immigrant Trust Directive

New Jersey's Attorney General serves as the "chief law enforcement officer of the State." N.J. Stat. Ann. § 52:17B-98. As part of that role, the Attorney General has "power to adopt guidelines, directives, and policies that bind law enforcement throughout" the State, including municipal law enforcement officers. *Paff v. Ocean*

2

*Cnty. Prosecutor's Off.*, 192 A.3d 975, 986 (N.J. 2018); *see also, e.g.*, *Fraternal Order of Police v. City of Newark*, 236 A.3d 965, 979 (N.J. 2020) ("County prosecutors, police officers, and all other law enforcement officers must cooperate with ... the Attorney General in the performance of their respective duties."); *O'Shea v. Township of West Milford*, 982 A.2d 459, 465 (N.J. Super. Ct. App. Div. 2009) (explaining that the Attorney General's directives bind local law enforcement "in the day-to-day administration of the law enforcement process"). These directives have "the force of law." *N. Jersey Media Grp., Inc. v. Township of Lyndhurst*, 163 A.3d 887, 901 (N.J. 2017) (citation omitted); *see also, e.g.*, *In re Att'y Gen. Law Enf't Directive Nos. 2020-5 & 2020-6*, 252 A.3d 135, 150 (N.J. 2021) (confirming it has repeatedly "recognized" that "Attorney General directives relating to the administration of law enforcement have the 'force of law'" for state and local law enforcement).

In November 2018, then-Attorney General Gurbir Grewal exercised this power by issuing the Directive.[1] The Directive explained that ongoing state and local participation in federal civil immigration operations had "present[ed] challenges to

---

[1] The Directive was amended in 2019 to add that no law enforcement agency "shall enter into, modify, renew, or extend" an agreement pursuant to 8 U.S.C. § 1357(g), or "exercise any law enforcement authority" under a preexisting agreement. *See* Att'y Gen. Law Enf't Directive No. 2018-6 v2.0 ("Directive") § III.A, at 6 (Sep. 27, 2019), https://tinyurl.com/3rh4u3ap. The Directive otherwise remains unchanged. All references in this brief are to the amended version.

New Jersey's law enforcement officers, who have worked hard to build trust with [the] state's large and diverse immigrant communities." Directive at 1. The Directive also recognized that immigrants will be "less likely to report a crime if they fear that the responding officer will turn them over to immigration authorities," and explained that if individuals are afraid to approach law enforcement as victims or to cooperate as witnesses for this reason, it would be increasingly "more difficult for officers to solve crimes and bring suspects to justice, putting all New Jerseyans at risk." *Id.* The Directive thus reflects the State's decision to draw a clear line between New Jersey's "state, county, and local law enforcement officers, who are responsible for enforcing *state criminal law*, and federal immigration authorities, who enforce federal *civil immigration law*." *Id.* Said another way, the Directive ensures that residents who have been victims or witnesses to a crime can come forward to state and local law enforcement without fear that doing so will lead to their civil deportation.

The Directive achieves this public-safety goal by limiting the extent to which law enforcement agencies and officers—including municipal ones—may voluntarily assist federal immigration enforcement efforts "above and beyond" what federal law requires. *Id.* at 1–2. Subject to delineated exceptions, the Directive states that officers may not "[s]top, question, arrest, search, or detain any individual based solely on ... actual or suspected citizenship or immigration status ... or actual or suspected violations of federal civil immigration law." *Id.* § II.A.1, at 3. It also prevents officers

from "[p]articipating in civil immigration enforcement operations," *id.* § II.B.1, at 3–4, and states that state and local officers cannot provide "non-public personally identifying information regarding any individual" or grant "access to any ... database" to federal agents if the "sole purpose of that assistance is to enforce federal civil immigration law," *id.* §§ II.B.2, II.B.3, at 3–4—subject to the Directive's specific exceptions, *see id.* §§ II.B, II.C, III., at 3–6. In addition, the Directive bars local governments from entering into voluntary agreements with the federal government under 8 U.S.C. § 1357(g) to help enforce federal immigration laws. *Id.* § III.A, at 6.

The duties the Directive imposes on all state and local law enforcement also include notification requirements. State and local officers must "promptly notify a detained individual, in writing and in a language the individual can understand, when federal civil immigration authorities request" the following:

1. To interview the detainee. (*See* § II.B.4.)

2. To be notified of the detainee's upcoming release from custody. (*See* § II.B.5.)

3. To continue detaining the detainee past the time he is otherwise eligible for release. (*See* § II.B.6.)

*Id.* § VI.A, at 8–9. The Directive also requires that, "[w]hen providing such notification, law enforcement officials shall provide the detainee a copy of any

documents provided by immigration authorities in connection with the request." *Id.* § VI.A, at 9.

The Directive additionally lists a variety of specific limitations on state and local law enforcement's ability to participate in federal civil immigration operations. The Directive thus prohibits state and local law enforcement from "provid[ing] the following types of assistance to federal immigration authorities when the sole purpose of that assistance is to enforce federal civil immigration law:"

1. Participating in civil immigration enforcement operations.

2. Providing any non-public personally identifying information regarding any individual.

3. Providing access to any state, county, or local law enforcement equipment, office space, database, or property not available to the general public.

4. Providing access to a detained individual for an interview, unless the detainee signs a written consent form that explains:

   a) the purpose of the interview;

   b) that the interview is voluntary;

   c) that the individual may decline to be interviewed; *and*

   d) that the individual may choose to be interviewed only with his or her legal counsel present.

5. Providing notice of a detained individual's upcoming release from custody, unless the detainee:

a) is currently charged with, has ever been convicted of, has ever been adjudicated delinquent for, or has ever been found not guilty by reason of insanity of, a violent or serious offense as that term is defined in Appendix A;

b) in the past five years, has been convicted of an indictable crime other than a violent or serious offense; *or*

c) is subject to a Final Order of Removal that has been signed by a federal judge and lodged with the county jail or state prison where the detainee is being held.

6. Continuing the detention of an individual past the time he or she would otherwise be eligible for release from custody based solely on a civil immigration detainer request, unless the detainee:

a) is currently charged with, has ever been convicted of, has ever been adjudicated delinquent for, or has ever been found not guilty by reason of insanity of, a violent or serious offense as that term is defined in Appendix A;

b) in the past five years, has been convicted of an indictable crime other than a violent or serious offense; *or*

c) is subject to a Final Order of Removal that has been signed by a federal judge and lodged with the county jail or state prison where the detainee is being held.

Any such detention may last only until 11:59 p.m. on the calendar day on which the person would otherwise have been eligible for release.

*Id.* § II.B, at 3–5 (footnote omitted).

A separate provision of the Directive further mandates that "[a]ll state, county, and local law enforcement agencies ... adopt and/or revise their existing policies and practices, consistent with this Directive, either by rule, regulation, or standard operating procedure." *Id.* § VIII.A, at 10. The Directive remains in full force and effect statewide today, just as it has for seven years.

### B.    Prior Litigation

In 2020, the Federal Government filed suit against the State of New Jersey. Complaint, *United States v. New Jersey*, No. 20-1364 (D.N.J. Feb. 10, 2020), ECF No. 1. Paralleling its claims against the Cities here, the Federal Government alleged that the statewide Directive was preempted by federal law and that it violated the intergovernmental immunity doctrine by "obstructing federal immigration operations and discriminating against federal authorities." *Id.* at *13.

This Court, in a detailed opinion by Chief Judge Wolfson, rejected the Federal Government's challenge. *See United States v. New Jersey*, No. 20-1364, 2021 WL 252270 (D.N.J. Jan. 26, 2021). This Court determined that the Directive was not preempted under any form of preemption. *See id.* at *6–13. The Court also found that the statewide Directive did not violate the intergovernmental immunity doctrine, as its provisions did not discriminate against the Federal Government (and did not

even regulate the Federal Government at all, as distinguished from its regulation of state and local law enforcement). *Id.* at \*13–14.

The Federal Government declined to appeal the adverse final judgment against it in *New Jersey*. However, in separate litigation, two New Jersey counties challenged the Directive and argued that it was preempted by federal law. *See Ocean County*, 8 F.4th at 181–82; *County of Ocean v. Grewal*, 475 F. Supp. 3d 355, 371–76 (D.N.J. 2020). The Third Circuit rejected their arguments, explaining that the immigration statutes relied upon by the counties as sources of preemption—various provisions of the federal Immigration and Nationality Act (INA), 8 U.S.C. §§ 1101–1157—could not validly "serve as a basis for preemption." *Ocean County*, 8 F.4th at 182.

## C.    The Cities' Policies

The municipal policies set out in the Complaint closely track the duties and limitations mandated by the Directive. For example, the Complaint describes how each of the Defendant Cities has a policy that prohibits the municipality from voluntarily entering into immigration enforcement agreements with the Federal Government under 8 U.S.C. § 1357(g)—which the Directive already independently prohibits. *See* Compl. ¶¶ 41, 49, 59, 62. The Complaint also states that the Cities' policies restrict their local law enforcement's ability to provide non-public personally identifying information to federal immigration authorities—just as the

9

Directive already does for the entire State. *See id*. ¶¶ 43, 47, 51, 55, 64. In addition, the Complaint describes the policies as having various other restrictions (such as making immigration-related arrests, notifying federal immigration authorities about releases from custody, and honoring non-judicial warrants and detainer requests) that closely track the mandates established statewide by the Directive. *See id*. ¶¶ 40–65.

In various respects, the policies even acknowledge their close relationship with the Directive. For example, Newark General Police Division General Order 19-01 expressly notes that its purpose is to maintain "compliance with" the Directive.[2] Similarly, the Paterson policy states its express purpose "is to maintain procedures for dealing with the immigrant community in compliance with" the Directive.[3] And even though the Hoboken[4] and Jersey City[5] policies predate the Directive's issuance and thus do not mention it by name, the policies closely track it—as even the Federal Government's Complaint alludes to when it avers that Hoboken is "committed to the guidance provided by the New Jersey Attorney General." Compl. ¶ 65.

---

[2] Newark General Police Division General Order 19-01, Immigration Enforcement at 2 (Feb. 15, 2019), https://tinyurl.com/yvs3vjub.

[3] Paterson Police Department, Standard Operating Procedures, Dealing with the Immigrant Community at 1 (June 12, 2019), https://tinyurl.com/ym7sx8se.

[4] City of Hoboken, Office of the Mayor, Executive Order No. 1: Declaring Hoboken a Fair and Welcoming City (Jan. 1, 2018), https://tinyurl.com/mrcncwmr.

[5] City of Jersey City, Office of the Mayor, E.O. 2017-003, Executive Order of the Mayor of the City of Jersey City Establishing the City of Jersey City as a Sanctuary City (Feb. 3, 2017), https://tinyurl.com/mr352vm2.

# **ARGUMENT**

## I.    The Federal Government Lacks Article III Standing To Pursue Its Claims Against the Cities.

"Standing is a threshold jurisdictional issue," *Pub. Int. Legal Found. v. Sec'y of the Commonwealth (PILF)*, 136 F.4th 456, 461 (3d Cir. 2025), and federal courts must resolve it "before proceeding to the merits," *Peace Church Risk Retention Grp. v. Johnson Controls Fire Prot. LP*, 49 F.4th 866, 869–70 (3d Cir. 2022). *See also Va. House of Delegates. v. Bethune-Hill*, 587 U.S. 658, 662 (2019). "To have standing, '[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant[s], and (3) that is likely to be redressed by a favorable judicial decision.'" *PILF*, 136 F.4th at 461 (first alteration in original) (quoting *Spokeo v. Robins*, 578 U.S. 330, 338 (2016)). Standing must be assessed "for each claim [a plaintiff] bring[s]," *Lewis v. Gov't Emps. Ins. Co.*, 98 F.4th 452, 459 (3d Cir. 2024), and "'for each form of relief' that is sought," *Davis v. FEC*, 554 U.S. 724, 734 (2008) (citation omitted). The Federal Government "bears the burden of establishing" its standing. *Spokeo*, 578 U.S. at 338. It has not done so here.

The main problem is that the Federal Government has failed to establish both traceability (causation) and redressability—namely, that even if it is suffering some injury, it has not shown that the injury is actually stemming from the Cities' challenged policies or that the injury would be remedied by a court order enjoining them. "As is often the case, the questions of causation and redressability overlap."

*Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1296 (D.C. Cir. 2015) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 543 (2007) (Roberts, J., dissenting)); *accord Toll Bros. v. Township of Readington*, 555 F.3d 131, 142 (3d Cir. 2015) ("Redressability ... is 'closely related' to traceability, and the two prongs often overlap." (citation omitted)). As the Third Circuit has observed, "[t]he difference is that while traceability looks backward (did the defendants cause the harm?), redressability looks forward (will a favorable decision alleviate the harm?)." *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)); *see also Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121, 2133 (2025) (describing these elements as "flip sides of the same coin" (citation omitted)).

One well-established way that a plaintiff's claims will fail on these grounds is when the plaintiff challenges one legal requirement but does not challenge a second requirement that is independently responsible for the alleged injury. For example, in *McConnell v. FEC*, 540 U.S. 93, 229 (2003), the Supreme Court held that plaintiffs lacked standing to challenge one provision of a campaign finance statute where a separate provision (that plaintiffs could not challenge in that lawsuit) independently imposed the same requirement plaintiffs complained about. And numerous of the federal courts of appeals have articulated the same basic principle. *See, e.g.*, *We the Patriots, Inc. v. Grisham*, 119 F.4th 1253, 1259–61 (10th Cir. 2024) (challenge to a state executive order would not redress plaintiffs' claimed injury where

unchallenged city and county laws independently made it illegal for the plaintiffs to engage in their desired conduct); *Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 465 (D.C. Cir. 2018) (lawsuit failed on redressability grounds where invalidation of the challenged agency policy would do nothing to relieve the plaintiff's plight so long as a statute prohibiting the same conduct remained in force); *White v. United States*, 601 F.3d 545, 552 (6th Cir. 2010) (finding challenge to a federal anti-cockfighting law would not redress the plaintiffs' claimed economic injury where state laws in all relevant jurisdictions independently made it illegal to engage in cockfighting); *Nuclear Info. & Res. Serv. v. Nuclear Reg. Comm'n*, 457 F.3d 941, 955 (9th Cir. 2006) (challenge to one agency's action would not redress a plaintiff's injury when a second agency's unchallenged rule independently imposed the same requirements).

Cases from the Third Circuit are in accord. For instance, in *Fischer v. Governor of New Jersey*, a group of teachers challenged a statutory waiting period to disaffiliate from a union, and the court concluded their putative injury was not redressable so long as they still had contractual agreements that prescribed an even longer waiting period. 842 F. App'x 741, 750–51 (3d Cir. 2021) ("[T]he redressability element [of Article III standing] is not satisfied if a favorable result would eliminate one of multiple causes of an injury without actually decreasing the injury at all." (citing 15 MOORE'S FED. PRAC.: CIVIL § 101.42 (2020))). And in

discussing traceability, the Third Circuit has recognized that, "[t]o establish a causal connection, the plaintiff must at least allege that the defendant's challenged action is the 'but for' cause of the injury, 'even where the conduct in question might not have been the proximate cause of the harm.'" *Knudsen v. MetLife Grp., Inc*., 117 F.4th 570, 577 (3d Cir. 2024) (citation omitted); *see also Adam v. Barone*, 41 F.4th 230, 235 (3d Cir. 2022) (traceability "is akin to but-for causation").

There are good reasons for this bedrock rule. Article III "restricts the power of federal courts to 'Cases' and 'Controversies.'" *Chafin v. Chafin*, 568 U.S. 165, 171 (2013). The flipside of this venerable limitation is that "[f]ederal courts have no jurisdiction to render advisory opinions." *In re Lazy Days' RV Ctr. Inc.*, 724 F.3d 418, 421 (3d Cir. 2013). Taken together, "[f]ederal courts … 'may not decide questions that cannot affect the rights of litigants in the case before them.'" *Id.* (quoting *Chafin*, 568 U.S. at 172). If the exact same injury stems from two wholly independent legal sources, and if the plaintiff only challenges one of those measures (and indeed could not challenge the other one), then nothing changes on the ground from a judicial determination. And if the plaintiff would suffer the same injury both with and without the court order, nothing has been redressed, and the underlying opinion the federal court issues is an impermissibly advisory one.

These Article III principles are fatal to this challenge. In light of the statewide Directive, the substance of which the Complaint does not even acknowledge, these

claims against the four Cities flunk both traceability and redressability. The reason is simple: no matter whether the Cities policies are or are not enjoined, the Cities are still bound by the Immigrant Trust Directive, *see supra* at 2–3 (discussing binding nature of an Attorney General Directive in New Jersey), and the Federal Government will thus still suffer from the same alleged injuries, *see supra* at 4–8 (discussing statewide requirements established by the Directive).

The particulars of the Complaint make this clear. For instance, the Federal Government complains that the Cities' policies deny it "the ability to readily obtain from local law enforcement the release date of aliens." Compl. ¶ 69. But this alleged injury already flows independently from the Directive, because the Directive likewise bars all law enforcement officers in New Jersey from "[p]roviding notice of a detained individual's upcoming release from custody." Directive § II.B.5. And so regardless of whether a City has a policy that codifies or mimics the Directive, and whether or not that policy is or is not enjoined by an order of this Court, their law enforcement agencies' actions would be the same.

The examples go on and on. The Federal Government complains that it "lacks access to such aliens," Compl. ¶ 69, and cannot "enter[] jail facilities to interview detainees," *id.* ¶ 81. But again, its purported injury independently stems from the Directive, which largely bars "[p]roviding access to a detained individual for an interview," or "[c]ontinuing the detention of an individual past the time he or she

15

would otherwise be eligible for release from custody based solely on a civil immigration detainer request." Directive §§ II.B.4, II.B.6; *see id.* § II.B.3 (barring the provision of "access to any state, county, or local law enforcement equipment, office space, database, or property not available to the general public"). Those portions also independently cause the alleged injury of which the Federal Government complains when it asserts the Cities "do not permit local law enforcement to place a detainer or administrative warrant in the alien's file or to enter its existence in government databases." Compl. ¶ 71. And the Directive's other constraints on "[p]articipating in civil immigration enforcement operations," Directive § II.B.1, and on "[p]roviding any non-public personally identifying information," *id.* § II.B.2, when paired with the release date provision above, *id.* § II.B.5, cause the Cities to restrict the provision of information of which the Federal Government complains, Compl. ¶ 80. In short, whatever conclusion this Court reaches as to the validity of the Cities' policies—and as explained below, they are valid, *see infra* at 22–36—the Cities would be bound by the unchallenged Immigrant Trust Directive. And because the Cities would still be bound to take the same actions by the Directive, an order from this Court on the validity of the Cities' policies alone is necessarily advisory.

In its pre-motion letter, the Federal Government erroneously asserted standing on the inapplicable theory that a partial remedy can give rise to standing. *See* ECF

No. 30, at 2 (citing *Uzuegbunam v. Preczewski*, 592 U.S. 279 (2021), and *Falcone v. Dickstein*, 92 F.4th 193 (3d Cir. 2024)). But to the extent that the municipal policies prohibit the same conduct that the Directive independently prohibits, that rule does not apply here. *See Delta Constr. Co.*, 783 F.3d at 1297 (rejecting this precise theory of redressability in the context of a challenge to one of two regulatory burdens that caused the same, rather than two distinct, harms). And nothing in *Uzuegbunam* and *Falcone* are to the contrary: both cases stand only for the limited proposition that in some circumstance a plaintiff can have standing to seek some damages even if he lacks the ability to seek either injunctive relief, *see Falcone*, 92 F.4th at 204–05, or broader damages that might provide additional compensation, *see Uzuegbunam*, 592 U.S. at 290–91. These cases in no way say that a plaintiff can obtain injunctive or declaratory relief against the aspects of a policy that are duplicated by another policy that is both binding and unchallenged.[6] And they do not disagree with all the cases above, which are on point to this exact situation, that say the opposite. The Federal

---

[6] The Federal Government also cited *Loggerhead Turtle v. County Council of Volusia County*, 148 F.3d 1231 (11th Cir. 1998), but that case is even farther afield. The plaintiffs in *Loggerhead Turtle* were trying to compel the defendant county to enact additional protections for an endangered species. *Id.* at 1235. Even though some municipalities also could have issued the desired protections (but had not done so), the court concluded that plaintiffs still had standing. *Id.* at 1247–50. That conclusion is unremarkable, because when two different governments have decided to *allow* an activity, forcing at least one of them to enact a prohibition would normally result in the activity being prohibited. By contrast, when two overlapping governments have each *prohibited* an activity, removing the prohibition from one normally redresses nothing because the other government will still be prohibiting the same action.

Government may wish for this Court to grant relief even against local policies that "mirror" the Directive, ECF No. 30 at 2, but that goes beyond Article III.

Nor is Judge Phipps's concurring opinion in *Fischer*—arguing redressability should be satisfied so long as the plaintiff challenges one of "multiple sufficient causes" for an injury—applicable or persuasive here. *See* 842 F. App'x at 754–56 (Phipps, J., concurring in part). Unlike in this case, the *Fischer* plaintiffs challenged *both* causes of their claimed injuries—New Jersey's statute and their union contracts. *See id.* at 745 (majority). As a result, the *Fischer* plaintiffs were able to request both prospective and retrospective relief, including a refund of past union dues and an injunction against a mandate to pay future ones. *Id.* at 756 (Phipps, J., concurring in part). Moreover, because those plaintiffs alleged the same government defendants were responsible for both injuries, the one-judge concurrence was willing to conflate redressability with cause if "neither cause [was] 'the independent action of some third party not before the court.'" *Id.* (quoting *Lujan*, 504 U.S. at 560); *see also Khodara Env't, Inc. v. Blakey*, 376 F.3d 187, 195 (3d Cir. 2004) (allowing challenge to one of "two, independent [regulatory] obstacles that are potentially removable but that cannot be challenged in a single litigation"). Said simply, because the plaintiffs challenged *both* independent sources of the same harm in the same case, Judge Phipps perceived no Article III problem.

18

But that is not what the Federal Government did here. In this case, the Federal Government challenged *only* the four Cities' policies. The Federal Government did not challenge the statewide Directive or make New Jersey a party to this suit before this Court. The Federal Government did not acknowledge the Directive's content and its wholly independent mandates on local law enforcement in its Complaint. And it is easy to see why the Federal Government sued the Cities alone—in sharp contrast to the cases where it sued *both* state and local defendants seeking to enjoin both state and local law enforcement policies all at once. *See, e.g.*, *United States v. Illinois,* No. 25-1285, 2025 WL 2098688 (N.D. Ill. July 25, 2025) (suit against Illinois and Illinois local governments); *United States v. Colorado*, No. 25-1391 (D. Colo.) (filed May 2, 2025) (suit against Colorado and the City and County of Denver). Here, given its unsuccessful prior suit challenging the Directive, preclusion prevents the Federal Government from suing New Jersey to challenge the Directive again in this case. *See Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). But its failure to sue New Jersey and its inability to enjoin the Directive thus has jurisdictional consequences: it cannot redress its harm with an order aimed at these four Cities alone, because the Cities would still be bound to the Directive, so Article III forbids its suit.

So at most, the Federal Government has standing solely to the extent it seeks relief from independent, *non-overlapping* effects of the policies. *Compare* Compl. at 23 (seeking to enjoin and declare unlawful the entirety of the Cities' policies);

ECF No. 30 at 2 (even the aspects that "mirror" the Directive). Yet even on that score, as to whatever small differences may exist between these challenged local policies and the statewide Directive, the Federal Government faces traceability and redressability problems again. That is because the Federal Government's complaint does not so much as even *acknowledge* the content of the Directive—let alone identify any portions of the Cities' policies that impose additional duties or restrictions beyond the Directive, and/or how those differences actually cause the Federal Government any injury in the real world. But that is fatal: the Federal Government bore the burden of establishing its Article III standing, *Spokeo*, 578 U.S. at 338, and so the Federal Government must identify the parts of the challenged local policies that differ—and then plead facts showing that *those* discrete aspects of these Cities' policies cause it concrete harms that are likely to be redressed by the sought-after relief.

That missing link is underscored by the Federal Government's belated effort to attempt that showing, for the first time, in its pre-motion letter. There, the Federal Government identified initial concern with the fact that the City of Newark's policy prohibits it from entering into any agreement to detain individuals during deportation proceedings. ECF No. 30. But the Federal Government pleaded no facts to show that Newark even has municipal facilities that may reasonably be suited for that purpose, such that it is likely (and not merely speculative) that the City would enter into such

agreements in the absence of the policy. Indeed, the Complaint does not even allege that Newark (or any of the Defendants) operates any jails *at all*. Instead, it appears the Federal Government misunderstands the Cities' actual roles in detaining individuals in New Jersey. The Federal Government specifically cites the "refus[al] to cooperate" of "Essex County Correctional Facility in Newark," and a general inability to "enter[] jail facilities." Compl. ¶¶ 73, 81. But these allegations cannot support standing in a suit against the Cities because, in this State, correctional facilities are a *county*-level responsibility. *See* N.J. Stat. Ann. § 30:8-1 (providing that "[s]heriffs and jailers shall receive from constables or other officers all persons apprehended by such constables or officers for offenses against this state"); *id.* § 30:8-19 (giving the county sheriffs and county boards of commissioners control over their county's jails).

If the Federal Government thinks there is a delta between the Directive and the Cities' policies and can allege with facts that this delta actually harms the Federal Government in the real world, the Federal Government must amend the Complaint to press that specific challenge. It cannot make up for that shortcoming by complaining, in a subsequent brief, about policies of facilities that the Cities do not even control. Until it does so, this Court must consider this Complaint. And this Complaint has no plausible facts to show traceability or redressability in its lawsuit against these four Cities—when all remain subject to the Immigrant Trust Directive.

## II.  On the Merits, The Complaint Should Be Dismissed.

Because the Federal Government lacks Article III standing, this Court must dismiss for lack of jurisdiction. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998) (explaining that Article III questions must be resolved before the merits are addressed). But should the Court reach the merits, it should dismiss the Complaint for failure to state a claim because these policies are not preempted and do not run afoul of the intergovernmental immunity doctrine. That conclusion flows from the Third Circuit's precedential decision in *Ocean County*, from this Court's decision in *New Jersey*, and from first principles.

The Third Circuit's decision in *Ocean County* is on point. In sustaining the Directive against a preemption challenge, the Third Circuit explained that a federal law can only preempt state laws to the extent the federal law is best read as regulating private actors. *Ocean County*, 8 F.4th at 181 ("For a federal law to preempt state law" it "must be best read as one that regulates private actors."); *see also Murphy v. NCAA*, 584 U.S. 453, 477 (2018); *New York v. United States*, 505 U.S. 144, 166 (1992). The Court went on to hold that the two immigration statutes relied upon by the plaintiffs in that case, 8 U.S.C. §§ 1373 and 1644, failed that test in the relevant respects because they purported to regulate only what state actors could do in their interactions with the federal immigration system—they did not bind private parties. *See Ocean County*, 8 F.4th at 181–82 (noting these provisions said "nothing about

private actors" and "cannot be fairly read to regulate them"). And the Court relied on that conclusion to reject the plaintiffs' preemption claims not only with regard to those two particular express preemption provisions, but also with respect to the broader suggestion that parts of the Directive "unlawfully impeded the enforcement of federal immigration law"—*i.e.*, conflict preemption. *Id.* at 179; *see also Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020) (holding that *every* form of preemption works the same way: Congress "imposes restrictions or confers rights on private actors"; "a state law confers rights or imposes restrictions that conflict with the federal law"; and so "the federal law takes precedence and the state law is preempted").

This Complaint's preemption theories rely on the same statutes addressed in *Ocean County* and fail for the same reason. *See* Compl. ¶ 84 (citing Sections 1373(a) and 1644 as the specific federal laws that allegedly preempt the challenged policies). As to those two express preemption provisions, there can be no question that *Ocean County* forecloses the Federal Government's arguments. And because *Ocean County* also understood its conclusions about these federal immigration statutes to speak to a broader conclusion about how the INA more generally interacts with policies like the Directive, *Ocean County* also provides meaningful and binding precedent to the extent the Federal Government is making an obstacle preemption argument too. *See, e.g.*, *Garcia*, 140 S. Ct. at 806; *Me. Forest Prod. Council v. Cormier*, 51 F.4th 1, 8 (1st Cir. 2022) (agreeing the Supreme "Court's recent cases have subtly reframed

the obstacle preemption analysis as limited to cases in which Congress enacts a law that imposes restrictions or confers rights on private actors"). Simply put, without a federal statute that imposes any rights or obligations on third parties—the very sort of law *Ocean County* said is missing here—all forms of preemption necessarily fail. *NCAA*, 584 U.S. at 479; *Garcia*, 140 S. Ct. at 801 (same).

Even apart from *Ocean County*, the Federal Government's claims fail. Indeed, this Court squarely rejected nearly identical preemption claims in the prior litigation challenging the Directive. *See New Jersey*, 2021 WL 252270. There, the Federal Government claimed the Directive's various provisions (including notification and information-sharing provisions akin to the ones at issue here) were preempted. *Id.* at *4–5. As to the information-sharing provisions, the Court explained in detail why those provisions merely reflected the State's choice about how it would employ its own law enforcement resources and did not constitute affirmative interference with federal law enforcement—meaning there could be no conflict preemption. *Id.* at *6–8. The Court employed a similar analysis regarding the notification provisions and rejected the Federal Government's argument that the Directive was preempted just because it might have to expend more resources on civil immigration enforcement. *See id.* at *8–9. The Court also rejected the Federal Government's arguments about Sections 1373(a) and 1644, *see id.* at *10–13, in language later squarely affirmed by the Third Circuit in *Ocean County*. And the Court indicated that a contrary rule—

restricting state and local governments' abilities to make their own decisions on their involvement in immigration enforcement—would raise serious concerns under the Tenth Amendment's anti-commandeering principles. *Id.* at \*12 n.9.

This Court's analysis in *United States v. New Jersey* was right, as other courts have repeatedly concluded. *See, e.g.*, *United States v. California*, 921 F.3d 865, 886–91 (9th Cir. 2019); *City of Chicago v. Sessions*, 888 F.3d 272, 282–87 (7th Cir. 2018), *vacated in part on other grounds en banc*, 2018 WL 4268817 (7th Cir. June 4, 2018); *United States v. Illinois,* No. 25-1285, 2025 WL 2098688, at \*8–23 (N.D. Ill. July 25, 2025). To the extent the Federal Government relies on express preemption, such preemption only "arises when there is an explicit statutory command that state law be displaced." *St. Thomas-St. John Hotel & Tourism Ass'n v. Gov't of the V.I.*, 218 F.3d 232, 238 (3d Cir. 2000). The only provision of the INA that potentially applies is Section 1373, which provides that a local government entity or official "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from [the Federal Government] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a).[7] But the Cities' policies do, in fact, allow for full

_____

[7] Section 1644 also pertains to communications between state and local government entities and the Federal Government, but only with respect to the "immigration status of an alien in the United States." 8 U.S.C. § 1644. Section 1644 does not apply to any communications concerning "citizenship status." As such, the State's discussion

compliance with the statute's terms. They clearly state that they are not intended to restrict, prohibit, or otherwise prevent any agency or official from sending to, receiving from, or maintaining information with federal immigration authorities regarding an individual's citizenship or immigration status.[8] Since these policies (like the Directive) do not conflict with the specific prohibitions outlined in Section 1373, express preemption does not apply.

To prove that the INA nevertheless expressly preempts the Cities' policies, the Federal Government would have to claim—as it has unsuccessfully argued in other cases—that Section 1373 requires the sharing of *other* kinds of information that the policies restrict, such as an immigrant's release date from jail or her address. But that overbroad construction is incorrect. The statutory phrase "information regarding the citizenship or immigration status, lawful or unlawful, of any individual" means exactly what it says: information about an individual's category of presence, and whether they are a citizen. *See California*, 921 F.3d at 891 (explaining that this provision "is naturally understood as a reference to a person's legal classification

---

focuses on Section 1373's language. If Section 1373 does not expressly preempt the Cities' policies, *a fortiori* Section 1644 does not either.

[8] *See* Newark Police Division General Order 19-01 ("Newark Policy") at Section IV, D (10); Jersey City E.O. 2017-003 ("Jersey City Policy") at Section 13; Paterson Police Department SOPs, "Subject: Dealing with the Immigrant Community" ("Paterson Policy") at III(C)(9); City of Hoboken "Executive Order Declaring Hoboken a Fair and Welcoming City" ("Hoboken Policy") at Section 4.

under federal law"). Indeed, when Congress used this same phrase in another section of the INA, it provided only one example: "knowledge that a particular alien is not lawfully present in the United States." 8 U.S.C. § 1357(g)(10)(A); *see also Dubin v. United States*, 599 U.S. 110, 124–25 (2023) (discussing the *noscitur a sociis* canon, under which statutory terms are understood by looking at nearby terms). By contrast, and as a matter of plain English, information such as an individual's release date cannot even plausibly be understood to be considered "information regarding" the person's "immigration status." *Steinle v. City & Cnty. of San Francisco*, 919 F.3d 1154, 1164 (9th Cir. 2019).

The INA's structure confirms this, as "Congress has used more expansive phrases in other provisions of Title 8 when intending to reach broader swaths of information." *California*, 921 F.3d at 892. For example, the INA requires all *federal* agencies to provide "[a]ny information in any records ... as to the identity and location of aliens" to ICE, 8 U.S.C. § 1360(b), and calls on the Social Security Administrator to provide "information regarding the name and address" of undocumented individuals reporting employment earnings, *id.* § 1360(c)(2). Congress used even broader language in another section, "mandating the inclusion of 'such other relevant information as the Attorney General shall require as an aid' to the creation of a central index of noncitizens entering the country." *California*, 921 F.3d at 892 (quoting 8 U.S.C. § 1360(a)). Congress thus knew exactly how to

27

refer to the sharing of broader information relating to immigrants and their whereabouts, but did not do so in enacting Section 1373. *See, e.g.*, *Steinle*, 919 F.3d at 1164 (explaining that "Congress certainly could have added explicit 'release date' wording to the statutes, but it did not"). And because no other federal law even plausibly applies, there is no express preemption provision applicable here.

The Federal Government fares no better to the extent that it relies on conflict preemption—sometimes referred to as implied preemption. *See* Compl. ¶¶ 4, 84. In the absence of an applicable express preemption provision, courts can find state laws preempted only if "compliance with both federal and state regulations is a physical impossibility" or where the state statute imposes an obstacle to the effectuation of a federal statute based on a close read of the federal law's "text, structure, and history." *Arizona v. United States*, 567 U.S. 387, 399–400, 406 (2012). But as the Supreme Court and the Third Circuit have stressed in recent years, even in implied preemption cases, a close read of the federal law's text is paramount. Because "[t]he Supremacy Clause provides that the Constitution, federal statutes, and treaties constitute 'the supreme Law of the Land,'" the "federal restrictions or rights that are said to conflict with state law must stem from either the Constitution itself or a valid statute enacted by Congress." *Garcia*, 140 S. Ct. at 801 (quoting U.S. CONST. art. VI, cl. 2). And that means "preemption cannot be based on 'a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives.'" *Id.* (quoting *Chamber*

28

*of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011)). Instead, the question is whether the state statute prevents the effectuation of *Congress*'s enactments, not "some brooding federal interest." *Id.*

In giving the relevant federal statutes this careful read, "courts should assume that historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress." *Arizona*, 567 U.S. at 400 (cleaned up); *see also, e.g.*, *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 687 (3d Cir. 2016) (adding that "all preemption cases start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress"). That is especially important here: because a "state's ability to regulate its internal law enforcement activities is a quintessential police power," *California*, 921 F.3d at 887 n.11, it is that "historic police power— not preemption" that a Court "must assume, unless clearly superseded by federal statute," *id.* at 887; *see also Parker v. Brown*, 317 U.S. 341, 351 (1943) (noting that "an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress"). In short, this Court must carefully scrutinize the underlying federal laws to assess whether there truly is a conflict between the state and federal measures, and when it does so, follow a presumption against preemption.

The Federal Government cannot meet that high bar. The Federal Government maintains that the Cities' policies create various forms of "interference" with federal immigration policies. Compl. ¶ 8. But the Cities' policies, like the State's Directive, simply recognize that the responsibility of enforcing federal civil immigration law falls within the purview of the Federal Government.[9] And there is a key distinction between state laws that *obstruct* enforcement of federal laws, which are preempted, and state laws that decline to provide *affirmative* state and local assistance in federal enforcement efforts, which are not. As the Seventh Circuit put it when confronting an analogous local policy on officials' immigration assistance, "nothing in this case involves any affirmative interference with federal law enforcement at all, nor is there any interference whatsoever with federal immigration authorities." *Chicago*, 888

---

[9] *See* Newark Policy at Section IV(B) ("NPD personnel shall not provide the following types of assistance to federal immigration authorities when the sole purpose of that assistance is to enforce federal civil immigration law . . . ."); Jersey City Policy at Section 2 ("The City of Jersey City and its agents shall not expend any time, funds, or resources on facilitating the civil enforcement of federal immigration law nor participating in civil immigration enforcement operations, except where legally required to do so by state or federal law or regulation or directive or court order."); Paterson Policy at III(B) ("[N]o officer shall provide the following types of assistance to federal immigration authorities when the sole purpose of that assistance is to enforce federal civil immigration law."); Hoboken Policy at Section 3 ("Hoboken and its agents shall not expend any time, funds, or resources on facilitating the civil enforcement of federal immigration law nor participating in civil immigration enforcement operations, except where legally required to do so by state or federal law, regulation, or directive.").

F.3d at 282; *see also California*, 921 F.3d at 889 (holding that the decision to refrain from aiding in immigration enforcement "is not the same as impeding"). That point is uncontestable: the Cities' policies require officers to assist federal immigration authorities when required to do so by law, including pursuant to any valid judicial warrant or court order.[10] So there is no sense in which the Cities are obstructing any actions by the Federal Government; they are merely declining to provide their own voluntary assistance in its implementation. That is not preempted.

Indeed, there is nothing in the INA itself that demonstrates (let alone clearly demonstrates) a decision to strip the States of their power to decide when their own officers should volunteer to assist in the enforcement of federal immigration law. "With the exception of § 1373(a)" (discussed above), the key portions of the INA each "direct federal activities, not those of state or local governments." *California*, 921 F.3d at 887. For instance, although Congress decided to allow federal agents to remove certain immigrants only after they have completed their criminal sentences (with a few specified exceptions), 8 U.S.C. §§ 1227(a)(2), 1231(a)(4), that statute speaks only to the obligations of federal officials, and says nothing about what states or their localities must do in such cases. Similarly, while the INA permits federal

---

[10] *See* Newark Policy, Section IV(D)(3); Jersey City Policy, Section 2(c); Paterson Policy, II(B); Hoboken Policy, Section 3(C).

agents to *ask* state and local officials for advance warning of an inmate's release, no provision of the statute requires state and local officials to answer. And although the Complaint expresses concern about the fact that the Cities may refuse to honor immigration detainers, the Third Circuit has already explained that any immigration detainer seeking personal data or release date information is likewise a mere "request," 8 C.F.R. § 287.7(a), and therefore responding is "permissive, not mandatory," *Galarza v. Szalczyk*, 745 F.3d 634, 642 n.9 (3d Cir. 2014).

These points are further buttressed by another INA provision, 8 U.S.C. § 1357(g), which explicitly leaves to States the discretion to decide whether to assist immigration enforcement efforts. *See id.* § 1357(g)(9) ("Nothing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement."); *El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) ("Section 1357 does not require cooperation at all."). Moreover, the INA states that agreements under Section 1357(g) can be carried out only "to the extent consistent with State and local law," 8 U.S.C. § 1357(g)(1), which means "some state and local regulation of cooperation is permissible." *El Cenizo*, 890 F.3d at 178; *see also id.* (noting that federal law "does not suggest the intent—let alone a 'clear and manifest' one—to prevent states from regulating" the decision to enter such agreements). Ultimately, Section 1357 "regulates how local entities may cooperate," but leaves it to the States

32

to "specif[y] whether they cooperate." *Id.* at 177. That provides more evidence that the INA does not preempt state laws governing voluntary assistance.

To the extent any doubt remains (and there should be none), the canon of constitutional avoidance confirms that this Court should not read the INA as the Federal Government demands. That canon requires courts to adopt fair constructions of a statute if the alternative would raise serious constitutional concerns. *See, e.g.*, *Guerrero-Sanchez v. Warden York Cnty. Prison*, 905 F.3d 208, 223 (3d Cir. 2018). And there are serious arguments that reading the INA as the Federal Government does would violate the Tenth Amendment's anti-commandeering principle. *See Ocean County*, 8 F.4th at 182 n.4 (observing that courts have invalidated INA provisions on this ground); *California*, 921 F.3d at 890–91 (holding "the choice of a state to refrain from participation" in federal immigration enforcement cannot be invalid under preemption doctrines when it "retains the right of refusal" under the Tenth Amendment).

Indeed, under the Tenth Amendment, federal statutes "may not compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz v. United States*, 521 U.S. 898, 925 (1997); *see also New York*, 505 U.S. at 177 (recognizing that the Constitution guarantees States the power to "decline to administer [a] federal program"); *Printz*, 521 U.S. at 909–10 (noting that the States may "refuse[] to comply with [a] request" to administer any federal

33

statute).  It therefore follows—as the Third Circuit has already recognized—that neither the INA nor individual "immigration officials" may constitutionally "compel state and local agencies to expend funds and resources to effectuate a federal regulatory scheme." *Galarza*, 745 F.3d at 644.  And it equally follows that States and local government are constitutionally entitled to adopt rules exercising the very discretion the Tenth Amendment guarantees to them. *See Murphy*, 584 U.S. at 481 (recognizing that the Tenth Amendment bars not only bars federal laws that tells state officials to "enact" a certain law or take specific action, and that it also bars federal statutes that tell States and localities to "refrain" from enacting laws).  The cities' policies exercise exactly that constitutional prerogative.

Finally, the Federal Government's intergovernmental immunity arguments are easily addressed. A locality's refusal to volunteer is not a basis for discriminating against the Federal Government, which requires *an affirmative act* of differential treatment, not mere inaction, to be actionable. *See New Jersey*, 2021 WL 252270, at *13; *cf. United States v. Washington*, 596 U.S. 832, 839 (2022) (invalidating a state law that, "[o]n its face, … *imposes upon* the Federal Government costs that state or private entities do not bear." (emphasis added)). Nor can the Federal Government point to entities "similarly situated" to federal immigration authorities yet treated more favorably, rendering this claim a red herring. *See CoreCivic, Inc. v. Gov. of N.J.*, 145 F.4th 315, 321 (3d Cir. 2025). Tellingly, the Federal Government's brief to

the Third Circuit in *CoreCivic* conceded that "New Jersey is free to make its own contracting decisions regarding whether its agencies and political subdivisions will house civil immigration detainees," without running afoul of the intergovernmental immunity doctrine. Br. for the United States as Amicus Curiae at 6–7, *CoreCivic, Inc. v. Gov. of N.J.*, 145 F.4th 315 (3d Cir. 2025). The Federal Government itself has thus recognized that when the State and its subdivisions regulate their relationships with federal immigration authorities, they cross no constitutional lines.

Furthermore, it would be particularly bizarre to say that the Cities' policies violate the intergovernmental immunity doctrine when federal law *itself* authorizes States and local governments to decline to enter into cooperative agreements to enforce federal immigration law, and federal law *itself* makes other forms of cooperation (such as honoring detainer requests) entirely voluntary. *See supra* at 32; *McHenry County v. Raoul*, 44 F.4th 581, 594 n.7 (7th Cir. 2022) ("The State's refusal to cooperate in the immigration context—a possibility contemplated by the relevant federal statutes—does not constitute discrimination against the federal government."). Indeed, since federal statutes can permissibly authorize states *to regulate the federal government directly*, *see, e.g.*, *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 181–82 (1988), federal statutes can surely also obviate intergovernmental immunity arguments by authorizing states to decline cooperation. And the Federal Government's approach to intergovernmental immunity in any

event cannot withstand the Tenth Amendment, which ensures that the "Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz*, 521 U.S. at 935.[11]

## **CONCLUSION**

This Court should dismiss the Complaint in full.

---

[11] In its pre-motion letter, the Federal Government did not explain how States can violate the intergovernmental immunity doctrine through their regulation of their own voluntary interactions with Federal agencies. Nor did it dispute the general notion that there is no entity similarly situated to the Federal Government when it comes to immigration enforcement. Instead, it singled out a lone provision in the Paterson policy that allows that city's law enforcement officers to participate in joint task forces with the federal government whose "primary purpose ... is unrelated to federal civil immigration enforcement." Paterson Policy at III.C.4. It is hard to see how this helps the Federal Government at all or shows discriminatory treatment. Rather, it reveals Paterson's willingness to use its own resources (including as part of a joint task force) to further its own law enforcement priorities rather than another government's law enforcement priorities.

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:    */s/ Giancarlo G. Piccinini*
         Giancarlo Genaro Piccinini (414322022)
         *Deputy Attorney General*
         Giancarlo.Piccinini@law.njoag.gov

         Surinder K. Aggarwal (016502007)
         Anaiis Gonzalez (478702024)
         Nathaniel Rubin (524572025)
         *Deputy Attorneys General*

Dated:    October 21, 2025
              Newark, New Jersey

Jeremy M. Feigenbaum (117762014)
*Solicitor General*

Lara J. Fogel (038292006)
Benjamin M. Shultz (548202025)
*Assistant Attorneys General*