Farrin R. Anello
Délany Sisirucá*
Molly K.C. Linhorst
Katie Considine
Jeanne LoCicero
Ezra D. Rosenberg
American Civil Liberties Union
  of New Jersey Foundation
570 Broad Street, 11th Floor
P.O. Box 32159
Newark, New Jersey 07102
(973) 854-1713
fanello@aclu-nj.org

*Attorneys for Amici Curiae*

*\*Pro hac vice application forthcoming*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,

    *Plaintiff,*

    - against -

CITY OF NEWARK; CITY OF JERSEY CITY; CITY OF PATERSON; CITY OF HOBOKEN; NEWARK CITY COUNCIL; JERSEY CITY CITY COUNCIL; PATERSON CITY COUNCIL; HOBOKEN CITY COUNCIL; C. LAWRENCE CRUMP, Newark City Council President, in his official capacity; JOYCE E. WATTERMAN, Jersey City City Council President, in her official

Civil Action No.:
2:25-CV-05081-EP-AME

capacity; ALEX MENDEZ, Paterson
City Council President, in his official
capacity; JAMES DOYLE, Hoboken
City Council President, in his official
capacity; RAS J. BARAKA, Mayor of
Newark, in his official capacity;
STEVEN M. FULOP, Mayor of Jersey
City, in his official capacity; ANDRÉ
SAYEGH, Mayor of Paterson, in his
official capacity; RAVINDER S.
BHALLA, Mayor of Hoboken, in his
official capacity,

*Defendants*.

**[PROPOSED] BRIEF OF 30 COMMUNITY ORGANIZATIONS AS AMICI
CURIAE IN SUPPORT OF DEFENDANTS' MOTIONS TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. ii

INTEREST OF AMICI CURIAE ........................................................... 1

INTRODUCTION ............................................................................... 1

ARGUMENT ....................................................................................... 3

  I.  The Community Trust Policies Promote Public Safety. ................. 3

     A. The Community Trust Policies Allow Immigrant Residents to Interact Openly with Local Law Enforcement. ...................................... 4

     B. The Community Trust Policies Conserve the Cities' Limited Resources .................................................................................. 8

  II.  The Community Trust Policies Protect Access to Municipal Programs ........ 11

     A. The Community Trust Policies Allow City Residents to Access Healthcare. ............................................................................. 12

     B. The Community Trust Policies Allow City Residents to Access Municipal IDs. ....................................................................... 16

CONCLUSION ................................................................................... 18

i

# TABLE OF AUTHORITIES

**CASES**

*City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018), *reh'g en banc granted in part*, *opinion vacated in part*, 2018 WL 4268817 (7th Cir. June 4, 2018), *vacated on other grounds*, No. 17-2991, 2018 WL 4268814 (7th Cir. Aug. 10, 2018) ................................................................................. 4, 6, 9

*County of Ocean v. Grewal*, 475 F. Supp. 3d 355 (D.N.J. 2020), *aff'd sub nom. Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of State of N.J.*, 8 F.4th 176 (3d Cir. 2021) ......................................................................... 3, 4, 9

*Fraternal Ord. of Police, Newark Lodge No. 12 v. City of Newark*, 244 N.J. 75 (2020) ........................................................................................ 1-2

*Inganamort v. Borough of Fort Lee*, 62 N.J. 521 (1973) ................................. 2

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) ............................................. 3

**STATUTES**

8 U.S.C. § 1357(g) ................................................................................. 10

New Jersey Home Rule Act, N.J. STAT. ANN. 40:48-2 (2017) .......................... 1

**OTHER AUTHORITIES**

Alexia Elejalde-Ruiz, *Fear, Anxiety, Apprehension: Immigrants Fear Doctor Visits Could Leave Them Vulnerable to Deportation*, Chi. Trib. (Dec. 15, 2018), https://www.chicagotribune.com/business/ct-biz-immigration-fears-hurt-health-care-access-0225-story.html ................................................. 13

Am. Immigr. Council, *Debunking the Myth of Immigrants and Crime, Fact Sheet* (2024), https://www.americanimmigrationcouncil.org/wp-content/uploads/2025/01/debunking_the_myth_of_immigrants_and_crime.pdf ........................................................................................ 9

Anita Khashu, *The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties*, Police Found. (2009), https://www.policefoundation.org/wp-content/uploads/2015/07/Khashu-2009-The-Role-of-Local-Police.pdf ................................................. 10

Arya Sundaram, *Fearful NY Migrants Are Skipping Doctors' Visits and Food Help, Advocates Say*, Gothamist (Sep. 16, 2025), https://gothamist.com/news/fearful-ny-migrants-are-skipping-doctors-visits-and-food-help-advocates-say ............................................................................ 2

Benjamin Gonzalez O'Brien et al., *The Politics of Refuge: Sanctuary Cities, Crime, and Undocumented Immigration*, 55 Urb. Affs. Rev. 3 (2017), https://journals.sagepub.com/doi/abs/10.1177/1078087417704974 .............. 8

Catalina Amuedo-Dorantes & Esther Arenas-Arroyo, *Police Trust and Domestic Violence: Evidence from Immigration Policies*, IZA Institute of Labor Economics (2019), http://ftp.iza.org/dp12721.pdf ......................................... 7

Catalina Amuedo-Dorantes & Monica Deza, *Can Sanctuary Policies Reduce Domestic Violence?*, Ctr. for Growth & Opportunity at Utah State U. (2020), https://www.thecgo.org/wp-content/uploads/2020/09/Can-Sanctuary-Polices-Reduce-Domestic-Violence.pdf ....................................................... 7

City of Newark, *Newark ID Application* (2017), https://drive.google.com/file/d/1klo5bM-cKPyohjL4ySZ4pzCHXvuxhKxX/view ................................................. 17, 18

Daniel E. Martínez, Ricardo D. Martínez-Schuldt & Guillermo Cantor, *Providing Sanctuary or Fostering Crime? A Review of the Research on "Sanctuary Cities" and Crime*, Socio. Compass, Oct. 7, 2017, https://sociology.unc.edu/wp-content/uploads/sites/165/2018/01/2017SocComp-Providing-Sanctuary-or-Fostering-Crime-A-Review-of-the-Research-on-Sanctuary-Cities-and-Crime.pdf ............................................................................ 8

David Becerra et al., *Policing Immigrants: Fear of Deportations and Perceptions of Law Enforcement and Criminal Justice*, 17 J. Soc. Work 715 (2017), https://journals.sagepub.com/doi/10.1177/1468017316651995 ...................... 2

*Elizabeth Municipal Identification Card Program*, City of Elizabeth, https://www.nj.gov/corrections/pdf/OTS/FRARA/OtherResources/FAQ_Sheet.pdf (last visited Oct. 22, 2025) ........................................... 16, 17

Francisco Pedraza, *Cautious Citizenship: The Deterring Effect of Immigration Issue Salience on Health Care Use and Bureaucratic Interactions Among Latino US Citizens*, 42 J. Health Pol., Pol'y & L. 925 (2017),

https://read.dukeupress.edu/jhppl/article-abstract/42/5/925/131418/Cautious-Citizenship-The-Deterring-Effect-of?redirectedFrom=fulltext ....................13

Hamutal Bernstein et al., *Adults in Immigrant Families Report Avoiding Routine Activities Because of Immigration Concerns*, Urb. Inst. (2019), https://www.urban.org/research/publication/adults-immigrant-families-report-avoiding-routine-activities-because-immigration-concerns ...............12

*Hoboken, NJ*, Data USA, https://datausa.io/profile/geo/hoboken-nj (last visited Oct. 24, 2025) ........................................................................................3

Interview with Alma Godinez, Senior Att'y, NJCIC (Aug. 14, 2025) ...................17

Interview with Katarina Martucci, Fellow, NJCIC (Aug. 15, 2025) ........................6

*Jersey City, NJ*, Data USA, https://datausa.io/profile/geo/jersey-city-nj (last visited Oct. 24, 2025) ........................................................................................3

Karen Hacker et al., *The Impact of Immigration and Customs Enforcement on Immigrant Health: Perceptions of Immigrants in Everett, Massachusetts, USA*, 73 Soc. Sci. & Med. 586 (2011), https://www.sciencedirect.com/science/article/pii/S0277953611003522 .....12

Kendra Sena, *Municipal IDs: Local Governments and the Power to Create Identity Documents*, Albany L. (Aug. 8, 2018), https://www.albanylaw.edu/government-law-center/municipal-ids-local-governments-and-the-power-create-identity-documents ................................16

Lindsay Kee, ACLU of Tennessee, *Consequences & Costs: Lessons Learned from Davidson County Tennessee's Jail Model 287(g) Program* (2012), https://www.aclu-tn.org/sites/default/files/287gF.pdf ...................................10

Lisa J. Hardy et al., *A Call for Further Research on the Impact of State-Level Immigration Policies on Public Health*, 102 Am. J. Pub. Health 1250 (2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3477996/pdf/AJPH.2011.300541.pdf ............................................................................... 14-15

Marta Ascherio, *Do Sanctuary Policies Increase Crime? Contrary Evidence from a County-Level Investigation in the United States*, Soc. Sci. Rsch., Aug. 2022, https://www.sciencedirect.com/science/article/abs/pii/S0049089X22000497 .. ........................................................................................................8

Medha D. Makhlouf, *Health Care Sanctuaries*, 20 Yale J. Health Pol'y, L. & Ethics 1 (2021).................................................................................................13, 14

Michael Runner et al., Family Violence Prevention Fund for the Robert Wood Johnson Found., *Intimate Partner Violence in Immigrant and Refugee Communities: Challenges, Promising Practices and Recommendations* (2009), https://irp.cdn-website.com/25448aaa/files/uploaded/IPV-in-Immigrant-and-Refugee-Communities-Challenges-Promising-Practices-Recommendations.pdf ...................................................................................6

Michael T. Light et al., *Comparing Crime Rates Between Undocumented Immigrants, Legal Immigrants, and Native-Born US Citizens in Texas*, 117 Procs. Nat'l Acad. Scis. USA 32528 (2020), https://www.pnas.org/doi/epdf/10.1073/pnas.2014704117 .............................9

*Municipal Identification*, City of Paterson, https://www.patersonnj.gov/department/division.php?structureid=180 (last visited Oct. 22, 2025)....................................................................................16

*Newark Municipal ID Program*, City of Newark, https://www.newarknj.gov/card/municipalid (last visited Oct. 22, 2025).....16

*Newark, NJ*, Data USA, https://datausa.io/profile/geo/newark-nj (last visited Oct. 24, 2025) .........................................................................................3

Nik Theodore, U. Ill. at Chi., *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* (2013), https://greatcities.uic.edu/wp-content/uploads/2014/05/Insecure_Communities_Report_FINAL.pdf ..........5

*Paterson, NJ*, Data USA, https://datausa.io/profile/geo/paterson-nj (last visited Oct. 24, 2025) .........................................................................................3

Physicians for Hum. Rts., *Consequences of Fear: How the Trump Administration's Immigration Policies and Rhetoric Block Access to Healthcare* (2025), https://phr.org/wp-content/uploads/2025/04/Consequences-of-Fear_Research-Brief_PHR_April-2025.pdf#xd_co_f=ZGIwMGUwZWEtOTI0OC00MjMwLTgxN2ItMGQ2Njg4NDVlOWI0~ .................................................................15, 16

*Survey of Advocates Reveals Immigrant Survivors Fear Reporting Violence*,
Tahirih Justice Center (June 4, 2019), https://www.tahirih.org/news/survey-of-advocates-reveals-immigrant-survivors-fear-reporting-violence/ ..............7

Vanessa Cruz Nichols et al., *Spillover Effects: Immigrant Policing and Government Skepticism in Matters of Health for Latinos*, 78 Pub. Admin Rev. 432 (2018), https://onlinelibrary.wiley.com/doi/10.1111/puar.12916 ...14

## INTEREST OF AMICI CURIAE

Proposed amici curiae are 30 organizations that represent or advocate on behalf of a wide range of New Jersey communities, including immigrant communities, women, youth, workers, and survivors of domestic violence and sexual assault. Amici are united in their strong belief that the Community Trust Policies, defined *infra*, are lawful and benefit all residents of Hoboken, Jersey City, Newark, and Paterson by promoting public safety, health, and welfare.

## INTRODUCTION

When the cities of Hoboken, Jersey City, Newark, and Paterson (together, the "Cities," and each a "City") enacted the orders and standard operating procedures that the United States challenges here (the "Community Trust Policies"),[1] each City was acting to promote the safety, health, and welfare of their respective residents, citizens and noncitizens alike.[2] And indeed a city is strongest when all of its residents

---

[1] The Community Trust Policies comprise the Newark Executive Order 17-001 (the "Newark Executive Order"); Newark Police Division General Order 19-01 (the "Newark PD General Order"); Jersey City E.O. 2017-003, "Executive Order Establishing the City of Jersey City as a Sanctuary City" (the "Jersey City Executive Order"); the June 12, 2019 Paterson Police Department Standard Operating Procedures (the "Paterson PD Procedures"); and the Hoboken "Executive Order Declaring Hoboken a Fair and Welcoming City" (the "Hoboken Executive Order"). Compl. ¶¶ 40, 44, 48, 52, 61. The Newark Executive Order, the Jersey City Executive Order, and the Hoboken Executive Order are hereinafter referred to together as the "Executive Orders."

[2] *See* New Jersey Home Rule Act, N.J. STAT. ANN. 40:48-2 (2017) (detailing the powers and rights of municipalities and giving local government broad powers to ensure the safety, health, and welfare of their residents); *Fraternal Ord. of Police,*

can thrive: when residents feel safe contacting the police to seek protection or share information, this promotes public safety; when residents seek medical care, this promotes public health; and when residents utilize public services, this promotes public welfare.

Due to increasingly indiscriminate federal immigration arrests, detentions, deportations, and renditions to third countries, many of New Jersey's immigrant residents – documented and undocumented alike – fear interacting with federal immigration enforcement. When local agents engage or assist in federal immigration enforcement, this fear carries over to police and other municipal agencies.[3] Critically, the Community Trust Policies draw a clear distinction between the roles of the Cities' agencies and those of federal immigration authorities. As amici explain below, these policies play a critical role in building trust between immigrant

---

*Newark Lodge No. 12 v. City of Newark*, 244 N.J. 75, 92 (2020) ("[T]he principle of home rule is legislatively stitched into the fabric of New Jersey government. . . . That principle finds expression in the legislative choice to invest 'the police power of the State . . . in local government to enable local government to discharge its role as an arm or agency of the State and to meet other needs of the community.'") (quoting *Inganamort v. Borough of Fort Lee*, 62 N.J. 521, 528 (1973)).

[3] *See, e.g.*, Arya Sundaram, *Fearful NY Migrants Are Skipping Doctors' Visits and Food Help, Advocates Say*, Gothamist (Sep. 16, 2025), https://gothamist.com/news/fearful-ny-migrants-are-skipping-doctors-visits-and-food-help-advocates-say; David Becerra et al., *Policing Immigrants: Fear of Deportations and Perceptions of Law Enforcement and Criminal Justice*, 17 J. Soc. Work 715, 717 (2017), https://journals.sagepub.com/doi/10.1177/1468017316651995.

residents[4] and municipal employees. As amici have learned through direct experience or advocating for diverse communities across New Jersey, such trust is critical to protect the safety, health, and welfare of all the Cities' residents.

## ARGUMENT

### I.    The Community Trust Policies Promote Public Safety.

The Community Trust Policies fall squarely into the "police powers" of the Cities. The Constitution reserves broad "police powers" to the states, which refers not only to an abstract legal concept but also to actions that state and local policymakers take to protect the safety, health, and welfare of their residents. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996). These "police powers" include the authority to direct the activities of state and local law enforcement officers. *County of Ocean v. Grewal*, 475 F. Supp. 3d 355, 379 (D.N.J. 2020), *aff'd sub nom. Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of State of N.J.*, 8 F.4th 176 (3d Cir. 2021). The Cities enacted the Community Trust Policies with this exact goal in mind: of promoting the safety of their residents by promoting open communication between

---

[4] As of 2023, 19 percent of Hoboken residents, 40.8 percent of Jersey City residents, 34.5 percent of Newark residents, and 44.1 percent of Paterson residents were born outside of the United States. *See Hoboken, NJ*, Data USA, https://datausa.io/profile/geo/hoboken-nj (last visited Oct. 24, 2025); *Jersey City, NJ*, Data USA, https://datausa.io/profile/geo/jersey-city-nj (last visited Oct. 24, 2025); *Newark, NJ*, Data USA, https://datausa.io/profile/geo/newark-nj (last visited Oct. 24, 2025); *Paterson, NJ*, Data USA, https://datausa.io/profile/geo/paterson-nj (last visited Oct. 24, 2025).

City residents and law enforcement and reserving local law enforcement resources

for criminal law enforcement.[5]

### A. The Community Trust Policies Allow Immigrant Residents to Interact Openly with Local Law Enforcement.

As the Third Circuit has already recognized, New Jersey's

> decision not to cooperate with the enforcement of federal immigration law in an effort to strengthen the relationship between its communities and police, and shore up more effective enforcement of state criminal law . . . is a clear exercise of the State's police power to regulate the conduct of its own law enforcement agencies.

*Grewal*, 475 F. Supp. 3d at 381; *see also City of Chicago v. Sessions*, 888 F.3d 272, 282 (7th Cir. 2018) (dismissing preemption claims), *reh'g en banc granted in part, opinion vacated in part*, 2018 WL 4268817 (7th Cir. June 4, 2018), *vacated on other grounds*, No. 17-2991, 2018 WL 4268814 (7th Cir. Aug. 10, 2018). The Cities have made the same decision. *See supra* note 2.

---

[5] *See, e.g.*, Jersey City Executive Order at 1 ("[U]ndue collaboration between local law enforcement and ICE will make immigrants less likely to report crimes, act as witnesses in criminal investigations and prosecutions, and provide intelligence to law enforcement . . . . [T]he cooperation of Jersey City's immigrant communities is essential to prevent and solve crimes and maintain public order, safety and security in the entire City . . . ."); Hoboken Executive Order at 2 ("[D]ue to the City's limited resources; the clear need to foster the trust of and cooperation from the public, including members of vulnerable communities; and to effectuate the City's goals, Hoboken must clarify its role in protecting all city residents' privacy and rights."); Newark PD General Order at § 1 ("[T]he NPD relies on the cooperation of its community, including immigrants, to ensure success in preventing and solving crime . . . [F]urthermore, the Division does not have the resources nor the authority to enforce civil immigration laws.").

Academic research bears out the observation that mixing local law enforcement with federal immigration enforcement destroys trust between immigrant communities and local authorities. One study conducted in four counties across the United States found that Latinos, regardless of immigration status, reported being less likely to volunteer information about crimes because they feared attracting unwanted law enforcement attention to their family or friends.[6] 70 percent of undocumented Latino respondents and 44 percent of Latino respondents across all immigration statuses reported that they would be less likely to communicate with law enforcement if they were victims of a crime, out of fear that local officers would question their immigration status or the status of people they know. *Id.* at 5.

The Community Trust Policies allow members of immigrant communities to communicate more openly with local law enforcement. For example, amicus the New Jersey Consortium for Immigrant Children ("NJCIC") partners with Jersey City schools for an educational-legal partnership which provides direct representation, personalized legal advice, and Know-Your-Rights presentations to students and families. Thanks to the Jersey City Executive Order, NJCIC is able to advise students and their caretakers at its partner schools in Jersey City that calling the police in the

---

[6] Nik Theodore, U. Ill. at Chi., *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* 17 (2013), https://greatcities.uic.edu/wp-content/uploads/2014/05/Insecure_Communities_Report_FINAL.pdf.

event of a crime is distinct from communicating with federal immigration authorities.[7]

The fear that reporting a crime will lead to negative immigration consequences is especially prevalent among survivors of domestic and intimate partner violence. Immigrant women are particularly vulnerable to such violence due to factors such as language barriers and lack of familiarity with available support systems.[8] Moreover, some abusers threaten survivors of violence with deportation if they disclose the abuse. *Id.* at 12. Courts have thus recognized that

> [i]n the case of domestic violence or crimes of that nature, the reluctance to report that is endemic to such offenses could be magnified in communities where reporting could turn a misdemeanor into a deportation. And the failure to obtain that victim and witness cooperation could both hinder law enforcement efforts and allow criminals to freely target communities with a large undocumented population, knowing that their crimes will be less likely to be reported.

*City of Chicago v. Sessions*, 888 F.3d at 280. The data support this: in a 2019 survey of advocates across the country who represent immigrant victims of domestic and sexual violence, 76 percent of advocates reported that their immigrant survivor

---

[7] Interview with Katarina Martucci, Fellow, NJCIC (Aug. 15, 2025). Notes on file with amicus ACLU-NJ.

[8] Michael Runner et al., Family Violence Prevention Fund for the Robert Wood Johnson Found., *Intimate Partner Violence in Immigrant and Refugee Communities: Challenges, Promising Practices and Recommendations* 11 (2009), https://irp.cdn-website.com/25448aaa/files/uploaded/IPV-in-Immigrant-and-Refugee-Communities-Challenges-Promising-Practices-Recommendations.pdf.

clients had concerns about contacting the police, and around 60 percent of advocates reported that their agencies observed an increase in immigration-related questions from clients.[9] In the same survey, 52 percent of advocates reported working with immigrant survivors who elected to drop their civil or criminal cases against a perpetrator out of fear. *Id.*[10] Policies like the Community Trust Policies encourage immigrants experiencing domestic violence to seek protection, and in fact, jurisdictions with such policies have a lower rate of domestic homicides against Hispanic women.[11]

Without Community Trust Policies, members of the Cities' immigrant communities would reasonably fear that interactions with municipal law enforcement – ranging from routine traffic stops to reporting domestic violence or child abuse – could result in deportations and family separations. The Community

---

[9] *Survey of Advocates Reveals Immigrant Survivors Fear Reporting Violence*, Tahirih Justice Center (June 4, 2019), https://www.tahirih.org/news/survey-of-advocates-reveals-immigrant-survivors-fear-reporting-violence/.

[10] In places with policies that allow for, or in some cases require, state or local immigration enforcement, the rate of petitions submitted under the Violence Against Women Act – which creates a pathway for immigrant survivors of domestic violence to leave abusive relationships and independently apply for lawful permanent resident status – decreased. *See* Catalina Amuedo-Dorantes & Esther Arenas-Arroyo, *Police Trust and Domestic Violence: Evidence from Immigration Policies*, IZA Inst. of Labor Econ. 27 (2019) http://ftp.iza.org/dp12721.pdf.

[11] Catalina Amuedo-Dorantes & Monica Deza, *Can Sanctuary Policies Reduce Domestic Violence?*, Ctr. for Growth & Opportunity at Utah State U. 4 (2020), https://www.thecgo.org/wp-content/uploads/2020/09/Can-Sanctuary-Polices-Reduce-Domestic-Violence.pdf.

Trust Policies allow immigrants and their families to live in greater security and feel safer reporting crimes, thus promoting public safety for all residents. Furthermore, academic studies have repeatedly demonstrated that there is either no link between policies like the Community Trust Policies and increased crime,[12] or that these policies even "are associated with a decrease in both property crime and violent crime within counties over time."[13]

### B.    The Community Trust Policies Conserve the Cities' Limited Resources.

In addition to building trust and stronger communication between immigrant communities and law enforcement, the Community Trust Policies ensure that state and local law enforcement agencies focus on their core mission: enforcing criminal law. The crime rate among immigrants – whether documented or not – is the same

---

[12] *See* Daniel E. Martínez, Ricardo D. Martínez-Schuldt & Guillermo Cantor, *Providing Sanctuary or Fostering Crime? A Review of the Research on "Sanctuary Cities" and Crime*, Socio. Compass, Oct. 7, 2017, at 1, https://sociology.unc.edu/wp-content/uploads/sites/165/2018/01/2017SocComp-Providing-Sanctuary-or-Fostering-Crime-A-Review-of-the-Research-on-Sanctuary-Cities-and-Crime.pdf. ("The few empirical studies that exist illustrate a 'null' or negative relationship between [sanctuary] policies and crime."); Benjamin Gonzalez O'Brien et al., *The Politics of Refuge: Sanctuary Cities, Crime, and Undocumented Immigration*, 55 Urb. Affs. Rev. 3, 26 (2017), https://journals.sagepub.com/doi/abs/10.1177/1078087417704974.

[13] Marta Ascherio, *Do Sanctuary Policies Increase Crime? Contrary Evidence from a County-Level Investigation in the United States*, Soc. Sci. Rsch., Aug. 2022, at 2, https://www.sciencedirect.com/science/article/abs/pii/S0049089X22000497.

as or lower than that of citizens.[14] The Cities have reasonably determined that rather than holding immigrants past their release dates, responding to queries from federal immigration officials, and arranging jail visits for ICE officers, law enforcement resources are better expended investigating crimes. Moreover, "[t]he choice as to how to devote law enforcement resources – including whether or not to use such resources to aid in federal immigration efforts – would traditionally be one left to state and local authorities." *County of Ocean v. Grewal*, 475 F. Supp. 3d at 381 (quoting *City of Chicago v. Sessions*, 888 F.3d at 282).[15] Consistent with this emphasis on law enforcement's public safety mission, the Community Trust Policies expressly allow cooperation with federal authorities with regard to enforcement of criminal law.[16] The Community Trust Policies therefore keep municipal law

---

[14] Am. Immigr. Council, *Debunking the Myth of Immigrants and Crime, Fact Sheet* 6 (2024), https://www.americanimmigrationcouncil.org/wp-content/uploads/2025/01/debunking_the_myth_of_immigrants_and_crime.pdf (citing studies); Michael T. Light et al., *Comparing Crime Rates Between Undocumented Immigrants, Legal Immigrants, and Native-Born US Citizens in Texas*, 117 Procs. Nat'l Acad. Scis. USA 32528, 32341 (2020), https://www.pnas.org/doi/epdf/10.1073/pnas.2014704117.

[15] Indeed, "the federal government may, without the cooperation of local law enforcement agencies, expend extra efforts and resources to apprehend aliens who are subject to removal." *Id.* at 382 (internal citations omitted).

[16] For example, under the Newark PD General Order and Paterson PD Procedures, local police officers generally may not inquire about immigration status unless doing so is necessary and relevant to an ongoing criminal investigation. Newark PD General Order § IV(A)(2); Compl. ¶ 54. The Executive Orders each explain that local employees may honor "such request" if it "is a valid and properly issued judicial criminal warrant." Compl. ¶¶ 41, 49, 62. The Executive Orders also require the Cities' agents not to share individuals' confidential personal information with

enforcement agencies' resources focused on their core public safety mission. In addition to conserving monetary resources, the Community Trust Policies ensure that local law enforcement agencies conserve staff time for keeping the community safe. As a point of comparison, Phoenix mayor Eric Gordon reported that aggressive immigration enforcement initiatives in Maricopa County, Arizona resulted in the sheriff's failure to investigate at least thirty violent crimes over the course of a year.[17]

Data also suggest that cooperative agreements with ICE can lead to a focus on punishing immigrants for minor offenses at the expense of investigating more serious crimes. For example, Tennessee's Davidson County witnessed a 15-percent increase in arrests of foreign-born residents for minor offenses after implementing its 287(g)[18] agreement with ICE, while arrests of foreign-born residents for more severe offenses decreased by 21 percent.[19] By keeping law enforcement resources

_____

ICE, but do not "restrict the maintenance, or communication and exchange between local officials and federal immigration authorities, of information regarding the citizenship or immigration status of an individual, pursuant to 8 U.S.C. 1373 and 8 U.S.C. 1644." Newark Executive Order § 2(C); *see also* Jersey City Executive Order § 2(C); Hoboken Executive Order § 3(C).

[17] Anita Khashu, *The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties*, Police Found. 27 (2009), https://www.policefoundation.org/wp-content/uploads/2015/07/Khashu-2009-The-Role-of-Local-Police.pdf.

[18] 8 U.S.C. § 1357(g). Under 287(g), ICE and a state or local agency may enter into an agreement which delegates specific immigration enforcement authority to designated officers within the local agency.

[19] Lindsay Kee, ACLU of Tennessee, *Consequences & Costs*: *Lessons Learned from Davidson County Tennessee's Jail Model 287(g) Program* 6 (2012), https://www.aclu-tn.org/sites/default/files/287gF.pdf.

focused on public safety priorities, the Community Trust Policies therefore make the Cities safer.

## II.    The Community Trust Policies Protect Access to Municipal Programs.

In addition to governing local law enforcement, several of the Community Trust Policies apply to all City employees. *See generally* Executive Orders. Additionally, all of the Community Trust Policies implicate municipal programs beyond policing because immigrant communities' fear of local law enforcement also influences their willingness to trust other government agencies and employees. The Community Trust Policies are a critical step toward empowering the Cities' residents to go about their daily lives without fear that an interaction with a City employee or agent could lead to permanent separation from their loved ones. The fear of deportation not only deters non-citizens from accessing municipal programs but equally discourages family members of non-citizens from accessing such programs, including those that are essential to health and well-being.

Indeed, researchers have documented that adults who have at least one relative who is not a green card holder or a U.S. citizen are more likely than others to avoid interacting with government programs or employees, to the extent of avoiding routine activities such as driving, going to a medical clinic, or speaking with a child's

teacher.[20] The Community Trust Policies seek to ensure that "[a]ll individuals, documented or undocumented, [] seek essential services from the community they may need . . . without fear of inquiry about their or their family member's immigration status." Newark Executive Order § 3.

### A. The Community Trust Policies Allow City Residents to Access Healthcare.

Disentangling municipal healthcare programs from federal immigration enforcement encourages immigrant residents of the Cities to seek routine medical care and to attend to medical emergencies sooner, protecting public health. Indeed, focus groups with immigrant participants have confirmed that hesitancy to seek out medical care often stems from fear of deportation and concerns about not being able to furnish documentation required to apply for insurance and for healthcare.[21]

---

[20] Hamutal Bernstein et al., *Adults in Immigrant Families Report Avoiding Routine Activities Because of Immigration Concerns*, Urb. Inst. (2019), https://www.urban.org/sites/default/files/publication/100626/2019.07.22_immigrants_avoiding_activities_final_v2_3.pdf ("Adults in families . . . where one or more foreign-born relatives do not have green cards or naturalized citizenship[] reported avoiding certain activities at higher rates. Nearly one in five (19.7 percent) adults in this group reported that they or a family member avoided driving a car . . . . Around one in five adults in the less secure group reported avoiding talking to the police (19.2 percent) or renewing or applying for a driver's license (18.2 percent); smaller shares reported avoiding going to public spaces (11.5 percent), using public transportation (10.1 percent), or talking to teachers or school officials (7.9 percent).").
[21] Karen Hacker et al., T*he Impact of Immigration and Customs Enforcement on Immigrant Health: Perceptions of Immigrants in Everett, Massachusetts, USA*, 73 Soc. Sci. & Med., 586, 592 (2011), https://www.sciencedirect.com/science/article/pii/S0277953611003522.

Latinos, even U.S. citizens, are less likely to see a healthcare provider when the issue of immigration is mentioned and are more inclined to perceive that information shared with health care providers is not secure if they know someone who has been deported.[22] Additionally, immigrants may fear sharing their personal information with doctors, healthcare administrators, and other public service providers.[23] Assurance that City healthcare providers are neither collaborating with nor sharing patients' medical information with federal immigration enforcement is essential to ensuring access to medical care for both immigrant residents and their loved ones. And importantly, ensuring that immigrant residents and their families engage with the healthcare system is critical to public health: Immigration-related healthcare system avoidance increases the risk of spreading infectious disease (e.g., COVID-19) and may contribute to the loss of herd immunity for vaccine-preventable diseases.[24]

---

[22] Francisco Pedraza, *Cautious Citizenship: The Deterring Effect of Immigration Issue Salience on Health Care Use and Bureaucratic Interactions among Latino US Citizens*, 42 J. Health Pol., Pol'y & L. 925, 927-28 (2017), https://read.dukeupress.edu/jhppl/article-abstract/42/5/925/131418/Cautious-Citizenship-The-Deterring-Effect-of?redirectedFrom=fulltext.

[23] *See, e.g.*, Alexia Elejalde-Ruiz, *Fear, Anxiety, Apprehension: Immigrants Fear Doctor Visits Could Leave Them Vulnerable to Deportation*, Chic. Trib. (Dec. 15, 2018), https://www.chicagotribune.com/business/ct-biz-immigration-fears-hurt-health-care-access-0225-story.html.

[24] Medha D. Makhlouf, *Health Care Sanctuaries*, 20 Yale J. Health Pol'y, L. & Ethics 1, 49-50 (2021).

Local collaboration between police and federal immigration enforcement also affects access to healthcare. *Id.* Analyzing the effects of ICE's controversial Secure Communities program, which expanded collaborative immigration enforcement by local officers and ICE, a 2018 study observed a "trickle-down effect" on Latino individuals' trust toward "government-provided health information."[25] "U.S.-born and immigrant Latinos who live in counties where immigrant policing under the [Secure Communities] program is the most intense are less likely to trust health information from government agencies than their Latino counterparts living in counties with lower levels of immigrant policing." *Id.* Although Secure Communities was designed to be an immigration enforcement policy, it had "spillover effects" on public health policy, threatening public health in areas of heightened immigration enforcement.

Arizona's infamous SB 1070 had a similar effect. The "show me your papers" law made it a state crime to be without immigration documents on one's person and expanded local police power to question and detain persons suspected to be without lawful status. Health providers reported a drop in routine care including doctor visits, vaccinations, HIV education, and prenatal care as a result of the law.[26] Providers

---

[25] Vanessa Cruz Nichols et al., *Spillover Effects: Immigrant Policing and Government Skepticism in Matters of Health for Latinos*, 78 Pub. Admin Rev. 432, 440 (2018), https://onlinelibrary.wiley.com/doi/10.1111/puar.12916.

[26] Lisa J. Hardy et al., *A Call for Further Research on the Impact of State-Level Immigration Policies on Public Health*, 102 Am. J. Pub. Health 1250, 1252 (2012),

"noted dramatic changes in clinic intake and service use," and public health services likewise observed a "definite change" that they attributed to fear of deportation. *Id.* The study even revealed immigrants' reluctance to travel outside their neighborhoods for healthier food, as well as parents' reluctance to allow their children to exercise outside their homes. *Id.* at 1251.

More broadly, healthcare providers nationwide reported to Physicians for Human Rights ("PHR") that individuals across a spectrum of immigration statuses are delaying care, missing preventive services, and interrupting ongoing treatment due to fear of immigration consequences stemming from seeking healthcare – trends that could have widespread public health implications.[27] Healthcare providers have highlighted that this delay in seeking care transforms treatable conditions into emergencies and undermines public health systems: consequences have included missed tuberculosis follow-ups, reduced communicable disease surveillance, and delays in screening and preventive care. *Id.* at 10. In response, PHR has recommended that local governments "introduce and advance legislation and

---

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3477996/pdf/AJPH.2011.300541.pdf.

[27] Physicians for Hum. Rts., *Consequences of Fear: How the Trump Administration's Immigration Policies and Rhetoric Block Access to Healthcare* 6 (2025), https://phr.org/wp-content/uploads/2025/04/Consequences-of-Fear_Research-Brief_PHR_April-2025.pdf#xd_co_f=ZGIwMGUwZWEtOTI0OC00MjMwLTgxN2ItMGQ2Njg4NDVlOWI0~.

policies that restrict immigration enforcement in health care settings and other sensitive locations." *Id.* at 17. This is precisely what the Community Trust Policies do: draw clear distinctions between immigration enforcement and the role of the Cities' local officers and employees, thereby promoting public health by allowing residents to feel safe in accessing healthcare services.

**B.      The Community Trust Policies Allow City Residents to Access Municipal IDs.**

Municipal identification cards are available to residents of Newark and Paterson, regardless of immigration status.[28] These cards serve as a government-issued ID and are accepted at, among other places, "any municipal institution, including schools, the police department and municipal court"; "[m]any financial institutions, including banks and credit unions"; pharmacies; and libraries.[29] These IDs allow their holders to access government services[30] and give holders – who may

---

[28] *Newark Municipal ID Program*, City of Newark,
https://www.newarknj.gov/card/municipalid (last visited Oct. 22, 2025); *Municipal Identification*, City of Paterson,
https://www.patersonnj.gov/department/division.php?structureid=180 (last visited Oct. 22, 2025).
[29] *Elizabeth Municipal Identification Card Program*, City of Elizabeth,
https://www.nj.gov/corrections/pdf/OTS/FRARA/OtherResources/FAQ_Sheet.pdf (last visited Oct. 22, 2025).
[30] Kendra Sena, *Municipal IDs: Local Governments and the Power to Create Identity Documents*, Albany L. (Aug. 8, 2018),
https://www.albanylaw.edu/government-law-center/municipal-ids-local-governments-and-the-power-create-identity-documents.

have no other form of ID – the confidence to interact with municipal police to report a crime or seek protection from violence.[31]

Since the adoption of the Newark Executive Order, amicus NJCIC has been able to advise clients applying for a Newark municipal ID that the relevant City agency does not collaborate with federal immigration authorities.[32] On one occasion, a young man had no form of ID issued in the United States and was afraid to apply for such identification. The young man had an asylum application pending but had nonetheless previously been placed in detention following a workplace raid in which he and many of his coworkers were apprehended. After this experience, the young man was especially afraid of being re-detained. After learning from NJCIC about the ways in which the Newark Executive Order disentangled City staff from federal immigration enforcement, the young man decided to access the municipal ID program. By allowing this young man and others similarly situated to freely apply for municipal IDs, and thereby gain access to banks, pharmacies, libraries and more, the Community Trust Policies promote financial and physical well-being, welfare, and education benefitting all of the Cities' residents.

---

[31] *Elizabeth Municipal Identification Card Program*, *supra*.
[32] Interview with Alma Godinez, Senior Att'y, NJCIC (Aug. 14, 2025). Notes on file with amicus ACLU-NJ.

## CONCLUSION

Because the Community Trust Policies are lawful and ensure the safety, health, and welfare of all the Cities' residents, the Court should grant Defendants' Motion to Dismiss.

Dated: October 28, 2025    Respectfully Submitted,

*s/ Farrin R. Anello*
Farrin R. Anello
Délany Sisirucá*
Molly K.C. Linhorst
Katie Considine
Jeanne LoCicero
Ezra D. Rosenberg
American Civil Liberties Union
  of New Jersey Foundation
570 Broad Street, 11th Floor
P.O. Box 32159
Newark, New Jersey 07102
(973) 854-1713
fanello@aclu-nj.org

*Attorneys for Amici Curiae*
*\*Pro hac vice application forthcoming*

18