BRETT A. SHUMATE
Assistant Attorney General
Civil Division
DREW C. ENSIGN
Deputy Assistant Attorney General
ANTHONY P. NICASTRO
Acting Director
Office of Immigration Litigation
JOHN J.W. INKELES
Chief
Affirmative Litigation Unit
HANS H. CHEN
Deputy Chief
Affirmative Litigation Unit
*Attorneys for the United States*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>CITY OF NEWARK; CITY OF JERSEY CITY; CITY OF PATERSON; CITY OF HOBOKEN; NEWARK CITY COUNCIL; JERSEY CITY CITY COUNCIL; PATERSON CITY COUNCIL; HOBOKEN CITY COUNCIL; C. LAWRENCE CRUMP, Newark City Council President, in his official capacity; JOYCE E. WATTERMAN, Jersey City City Council President, in her official capacity; ALEX MENDEZ, Paterson City Council President, in his official capacity; JAMES DOYLE, Hoboken City Council President, in his official capacity; RAS J. BARAKA, Mayor of Newark, in his official capacity; STEVEN M. FULOP, Mayor of Jersey City, in his official capacity; ANDRÉ SAYEGH, Mayor of Paterson, in his official capacity; RAVINDER S. BHALLA, Mayor of Hoboken, in his official capacity,<br><br>    Defendants. | No. 2:25-cv-5081<br><br>**AMENDED CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................iii

INTRODUCTION...........................................................................................................1

BACKGROUND.............................................................................................................2

I.    Principles of dual sovereignty .................................................................................2

II.   Federal immigration law .........................................................................................3

III.  Challenged Sanctuary Policies ...............................................................................6

STANDARD OF REVIEW ............................................................................................7

ARGUMENT .................................................................................................................8

I.    The United States has standing to defend its interests..........................................8

    A.    The United States has suffered a concrete injury traceable to the Sanctuary Policies that is redressable by the Court.........................................................................................8

    B.    The United States has suffered, and will continue to suffer, imminent injury from the Sanctuary Policies..........................................................................................12

II.   The Sanctuary Policies violate the Supremacy Clause......................................14

    A.    The Sanctuary Policies are conflict preempted by the Immigration and Nationality Act.14

        1.    The Sanctuary Policies impede congressionally sanctioned and authorized federal immigration law. ...................................................................................15

        2.    *Ocean County* does not preclude this Court from declaring the Sanctuary Policies conflict preempted...............................................................................16

    B.    The Sanctuary Policies' restrictions on information sharing are expressly preempted by 8 U.S.C. § 1373............................................................................17

    C.    The Tenth Amendment does not sanction Defendants' conduct....................................20

    D.    The Sanctuary Policies unlawfully discriminate against the United States....................25

    E.    The Sanctuary Policies unlawfully regulate the United States......................................27

CONCLUSION..............................................................................................................30

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Arizona v. United States*,
567 U.S. 387 (2012) ........................................................................... 1, *passim*

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................. 7

*Berger v. State of New York*,
388 U.S. 41 (1967) ................................................................................. 28

*California v. Superior Ct. of Cal.*,
482 U.S. 400 (1987) ................................................................................. 3

*Chamber of Com. of U.S. v. Whiting*,
563 U.S. 582 (2011) ............................................................................... 14

*City of Hazleton v. Lozano*,
563 U.S. 1030 (2011) ............................................................................. 11

*City of New York v. United States*,
179 F.3d 29 (2d Cir. 1999) ........................................................... 20, 21, 22

*Comm. for Freedom of the Press v. Rokita*,
147 F.4th 720 (7th Cir. 2025) ................................................................ 11

*CoreCivic, Inc. v. Governor of N.J.*,
145 F.4th 315 (3d Cir. 2025) ......................................................... 10, 26, 29

*Davis v. Elmira Sav. Bank*,
161 U.S. 275 (1896) .......................................................................... 14, 16

*Davis v. Fed. Election Comm'n*,
554 U.S. 724 (2008) ................................................................................. 8

*Davis v. Mich. Dep't of Treasury*,
489 U.S. 803 (1989) ............................................................................... 30

*Dawson v. Steager*,
586 U.S. 171 (2019) ............................................................................... 25

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
505 U.S. 88 (1992) ................................................................................. 24

*Greenberg v. Lehocky,*
   81 F.4th 376 (3d Cir. 2023) ............................................................. 13

*Hines v. Davidowitz,*
   312 U.S. 52 (1941) ...................................................................... 14, 20

*Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.,,*
   452 U.S. 264, 268 (1981) ............................................................... 23

*Hollis v. Lynch,*
   827 F.3d 436 (5th Cir. 2016) ......................................................... 12

*Hughes v. Oklahoma,*
   441 U.S. 322 (1979) ...................................................................... 24

*In re Cent. R. Co. of N.J.,*
   485 F.2d 208 (3d Cir. 1973) ......................................................... 22

*Jones v. Bock,*
   549 U.S. 199 (2007) ...................................................................... 12

*Kost v. Kozakiewicz,*
   1 F.3d 176 (3d Cir. 1993) ............................................................... 7

*Lamar, Archer & Cofrin, LLP v. Appling,*
   584 U.S. 709 (2018) ...................................................................... 18

*Larson v. Valente,*
   456 U.S. 228 (1982) ...................................................................... 11

*Leslie Miller, Inc. v. Arkansas,*
   352 U.S. 187 (1956) ...................................................................... 29

*Loughrin v. United States,*
   573 U.S. 351 (2014) ...................................................................... 18

*Lozano v. City of Hazleton,*
   620 F.3d 170 (3d Cir. 2010) ......................................................... 11

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ...................................................................... 13

*Maldonado v. Morales,*
   556 F.3d 1037 (9th Cir. 2009) ....................................................... 12

*Manchester v. Rzewnicki,*
   958 F.2d 364 (3d Cir. 1992) ........................................................... 8

*Manchester v. Rzewnicki,*
   777 F. Supp. 319 (D. Del. 1991) ..................................................................... 8

*Massachusetts v. EPA,*
   549 U.S. 497 (2007) ..................................................................................... 11

*Matsumoto v. Labrador,*
   122 F.4th 787 (9th Cir. 2024) ................................................................. 11, 12

*Mayo v. United States,*
   319 U.S. 441 (1943) ..................................................................................... 28

*Morales v. Trans World Airlines, Inc.,*
   504 U.S. 374 (1992) ..................................................................................... 17

*Murphy v. NCAA,*
   584 U.S. 453 (2018) ..................................................................... 2, 3, 18, 22

*N.J. Civ. Just. Inst. v. Grewal,*
   No. CV 19-17518, 2021 WL 1138144 (D.N.J. Mar. 25, 2021) ............................. 14

*New York SMSA Ltd. P'ship v. Town of Clarkstown,*
   612 F.3d 97 (2d Cir. 2010) ........................................................................... 20

*New York v. Hill,*
   528 U.S. 110 (2000) ....................................................................................... 8

*New York v. U.S. Dep't of Justice,*
   951 F.3d 84 (2d Cir. 2020) ............................................................ 20, 22, 23, 24

*New York v. United States,*
   505 U.S. 144 (1992) ..................................................................................... 21

*Nielsen v. Preap,*
   586 U.S. 392 (2019) ................................................................................. 6, 15

*North Dakota v. United States,*
   495 U.S. 423 (1990) ..................................................................................... 25

*Ocean County Board of Commissioners v. Attorney General,*
   8 F.4th 176 (3d Cir. 2021) ................................................................. 16, 17, 22

*Perez v. Campbell,*
   402 U.S. 637 (1971) ..................................................................................... 24

*Phillips v. County of Allegheny,*
   515 F.3d 224 (3d Cir. 2008) .......................................................................... 7, 13

*Printz v. United States*,
    521 U.S. 898 (1997) ........................................................................................... 21

*Schrader v. Dist. Att'y of York County*,
    74 F.4th 120 (3d Cir. 2023) ............................................................................. 13

*South Carolina v. Baker*,
    485 U.S. 505 (1988) ........................................................................................... 21

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ............................................................................................. 8

*United States v. California*,
    No. 18-cv-721, 2018 WL 5780003 (E.D. Cal. Nov. 1, 2018) .......................... 27

*United States v. Diaz*,
    116 F.4th 458 (5th Cir. 2024) .......................................................................... 12

*United States v. Ferrara*,
    847 F. Supp. 964 (D.D.C. 1993) ..................................................................... 28

*United States v. King County*,
    122 F.4th 740 (9th Cir. 2024) ............................................................. 26, 27, 29

*United States v. Missouri*,
    114 F.4th 980 (8th Cir. 2024) ............................................................................ 8

*United States v. Texas*,
    557 F. Supp. 3d 810 (W.D. Tex. 2021) ........................................................... 14

*United States v. Washington*,
    596 U.S. 832 (2022) .................................................................................... 25, 27

*Util. Air Regul. Grp. v. E.P.A.*,
    573 U.S. 302 (2014) ........................................................................................... 19

*Wyandotte Transp. Co. v. United States*,
    389 U.S. 191 (1967) ............................................................................................. 8

## Constitution

U.S. Const. art. I, § 8, cl. 4 ................................................................................... 1, 3

U.S. Const. art. VI, cl. 2 .......................................................................... 1, 2, 3, 20

U.S. Const. amend. X ............................................................................................ 3, 20

**Statutes**

8 U.S.C. § 1101 .................................................................................................... 3

8 U.S.C. § 1101(a)(15) ........................................................................................ 23

8 U.S.C. § 1103(a)(3) ........................................................................................... 4

8 U.S.C. § 1153 .................................................................................................. 23

8 U.S.C. § 1182 ............................................................................................. 3, 23

8 U.S.C. § 1188 .................................................................................................. 23

8 U.S.C. § 1226 .................................................................................................... 6

8 U.S.C. § 1226(a) .................................................................................. 4, 5, 15, 28

8 U.S.C. § 1226(c)(1)(E)(ii) ................................................................................. 6

8 U.S.C. § 1226(f) ........................................................................................... 6, 15

8 U.S.C. § 1227(a)(1)(C) ..................................................................................... 28

8 U.S.C. § 1227(a)(1)(D) ..................................................................................... 28

8 U.S.C. § 1231 ............................................................................................... 6, 15

8 U.S.C. § 1231(a)(4)(A) ................................................................................ 5, 19

8 U.S.C. § 1305 .................................................................................................. 19

8 U.S.C. § 1306 .................................................................................................. 19

8 U.S.C. § 1373 .......................................................................................... 2, 5, 12, 17

8 U.S.C. § 1373(a) .................................................................................... 17, 18, 21

8 U.S.C. § 1373(c) .............................................................................................. 18

8 U.S.C. § 1644 ..................................................................................... 1, 5, 21

49 U.S.C. app. § 1305(a)(1) (1988) .................................................................... 18

Homeland Security Act of 2002, Pub. L. No. 107-296, § 402, 116 Stat. 2135, 2178 (2002) ........ 4

Laken Riley Act, S. 5, 119th Cong. (2025) .......................................................... 6

N.J. Stat. Ann. § 30:4-8.16 ................................................................................. 10

**Rules**

Federal Rule of Civil Procedure 12(b)(1)................................................................................7

Federal Rule of Civil Procedure 12(b)(6)................................................................................7

**Regulations and Executive Orders**

8 C.F.R. § 287.7(a)................................................................................................................4

Declaring a National Emergency at the Southern Border of the United States, 90 Fed. Reg. 8327, 8327 (Jan. 20, 2025)......................................................................................................1, 6

## INTRODUCTION

The U.S. Constitution's Supremacy Clause provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof … shall be the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. The Constitution also vests the Federal Government with the exclusive power to regulate immigration. *See* U.S. Const. art. I, § 8, cl. 4. The immigration framework that Congress established and that federal agencies administer does not permit local governments to establish their own set of immigration rules. But Defendants have overtaken the authority exclusively vested with the Federal Government to further their own local immigration agendas.

Defendants' sanctuary city policies (the "Sanctuary Policies") stymie federal immigration enforcement while the United States faces a "national emergency" from the unprecedented "illegal entry of aliens" into the country. *See* Declaring a National Emergency at the Southern Border of the United States, 90 Fed. Reg. 8327, 8327 (Jan. 20, 2025). In addition, Defendants' Sanctuary Policies attempt to create an immigration policy of their own, separate from that of the federal government. This they cannot do. *See Arizona v. United States*, 567 U.S. 387, 408 (2012) ("This would allow the State to achieve its own immigration policy…This is not the system Congress created.").

The United States possesses standing to seek a remedy to the harm Defendants' Sanctuary Policies have created. First, Defendants' Sanctuary Policies differ in material respects from New Jersey's statewide sanctuary policy known as the Immigrant Trust Directive ("ITD") by imposing even greater barriers to effective federal enforcement of immigration statutes. That harm is traceable to Defendant's Sanctuary Policies, and this Court is empowered to redress that harm. But even if the statewide ITD did not differ from Defendants' Sanctuary Policies, the

United States would still have standing to challenge them, because such a challenge, if successful, would require the dismantling of not just Defendants' Sanctuary Policies but of the equally unlawful ITD as well. Finally, because a plaintiff need not sue every defendant that may cause it harm, where a regulatory scheme grants authority to multiple government authorities, an injunction against any one of those authorities suffices to establish standing.

Defendants' Sanctuary Policies are invalid under the Supremacy Clause of the United States Constitution for three independent reasons. *See* U.S. Const. art. VI, cl. 2. First, the Sanctuary Policies are conflict preempted and expressly preempted because they stand as obstacles to a panoply of statutes in the Immigration and Nationality Act ("INA"), and not just to 8 U.S.C. § 1373 and 1644, the two statutes at issue in earlier sanctuary city litigation. Second, the Sanctuary Policies single out the Federal Government for disfavored treatment in violation of the antidiscrimination component of the intergovernmental immunity doctrine. And third, they unlawfully regulate the Federal Government in violation of the intergovernmental immunity doctrine.

The Sanctuary Policies permit illegal aliens, including dangerous criminals, to move freely within the Defendant municipalities when they should have been detained and removed as federal law demands. That is precisely the type of harm our Framers sought to prevent in crafting the Supremacy Clause. *See, e.g.*, *Arizona*, 567 U.S. at 418 (Scalia, J., concurring). The United States's allegations easily state a claim for relief, and this Court should deny Defendants' motions to dismiss.

## BACKGROUND

## I.     Principles of dual sovereignty

The Constitution establishes a system of "dual sovereignty," in which the Federal Government and the States both wield sovereign powers. *See Murphy v. NCAA*, 584 U.S. 453,

458 (2018). Under that system, while the Federal Government lacks the "power to issue orders directly to the States," *id.* at 470, there are "certain limits on the sovereign powers of the States, limits that are an essential part of the Framers' conception of national identity and Union," *California v. Superior Ct. of Cal.*, 482 U.S. 400, 405 (1987).

The Constitution also grants enumerated legislative powers to Congress, *see* art. I, § 8, and confirms that legislative powers not granted to Congress are reserved for the States, *see* U.S. Const. amend. X. Under the Tenth Amendment, Congress must exercise its legislative power over individuals directly and may not commandeer States into enacting a federal regulatory program. *See Murphy*, 584 U.S. at 472. But when Congress exercises its enumerated powers to regulate individuals, the States cannot stand in the way. The Supremacy Clause provides that federal law is the "supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding," art. VI, cl. 2. Under the Supremacy Clause, "when federal and state law conflict, federal law prevails and state law is preempted." *Murphy*, 584 U.S. at 471.

## II.    Federal immigration law

Setting immigration policy is the exclusive prerogative of the Federal Government. *See* U.S. Const. art. I § 8, cl. 4 (Congress has the power to "establish an uniform Rule of Naturalization"). Congress has exercised this authority through the INA and related laws, *see* 8 U.S.C. § 1101 *et seq.*, which together make up the framework for the "governance of immigration and alien status," *Arizona*, 567 U.S. at 395. Those laws confer upon the Executive Branch broad authority to inspect, investigate, arrest, detain, and remove aliens suspected of being—or found to be—unlawfully in the United States. *See, e.g.*, 8 U.S.C. §§ 1182, 1225–1229a, 1231. They also direct the Executive Branch to arrange for appropriate detention locations for aliens pending removal or a decision on removal. *See, e.g.*, *id.* §§ 1103(a)(11),

1231(g). Responsibility for enforcing these laws is vested principally in the U.S. Department of Homeland Security ("DHS") and two of its component agencies: Immigration and Customs Enforcement ("ICE") and Customs and Border Protection ("CBP").

Congress gave DHS several tools to fulfill its responsibilities. For example, the INA expressly authorizes federal immigration officials to arrest and detain aliens pursuant to administrative warrants. *See* 8 U.S.C. § 1226(a).[1] To obtain an administrative warrant, ICE "must establish probable cause to believe that the subject is an alien who is removable from the United States."[2]

Relevant here, if an alien DHS seeks is in the custody of another law enforcement agency, DHS may issue an "immigration detainer" to advise that agency that DHS seeks custody "for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a); *see also* 8 U.S.C. §§ 1103(a)(3), 1226(a), (c), 1231(a), 1357(d). An immigration detainer is "a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible." 8 C.F.R. § 287.7(a). As a matter of policy, immigration detainers must be accompanied by an administrative warrant—either an alien arrest warrant or a warrant of removal—signed by an ICE immigration officer. ICE Policy No. 10074.2, §2.4.

In enacting the INA, Congress recognized that an alien who is subject to federal immigration proceedings may also be subject to state or local criminal law enforcement

---

[1] Although the statute refers to the Attorney General, in 2002, Congress transferred enforcement of immigration laws to the Secretary of Homeland Security under the Homeland Security Act of 2002, Pub. L. No. 107-296, § 402, 116 Stat. 2135, 2178 (2002).

[2] ICE Policy No. 10074.2, *Issuance of Immigration Detainers by ICE Immigration Officers*, § 2.4 (Mar. 24, 2017), https://www.ice.gov/sites/default/files/documents/Document/2017/10074-2.pdf.

confinement. Under those circumstances, the INA dictates that federal immigration officials generally "may not remove an alien who is sentenced to [state] imprisonment until the alien is released from [such] imprisonment." 8 U.S.C. § 1231(a)(4)(A). The INA further authorizes—and in some cases requires—federal immigration officials to assume custody immediately upon the alien's release from state or local custody. *See id.* §§ 1226(a), 1226(c).

To fulfill their duties, federal immigration officials rely on law enforcement partners across the country. *See Arizona*, 567 U.S. at 411 ("Consultation between federal and state officials is an important feature of the immigration system."). The INA reflects that expectation of collaboration, as several provisions of the statute regulate the way federal, state, and local officials share information about aliens subject to both state criminal law enforcement and federal immigration enforcement. For example, the INA directs the Federal Government to designate liaisons to "State[] and local law enforcement and correctional agencies … with respect to the arrest, conviction, and release of any alien charged with an aggravated felony[.]" *Id.* § 1226(d)(1)(B).

The INA similarly provides that federal, state, and local government entities and officials "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officials] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *Id.* § 1373(a); *see also id.* § 1644 (similar); *id.* § 1357(g)(10)(A) (providing that no formal agreement is required for a state or local official to communicate with immigration officials regarding the immigration status of any individual, including knowledge of unlawful presence).

These laws and processes promote public safety. Although "[a] principal feature of the removal system is the broad discretion exercised by immigration officials," *Arizona*, 567 U.S. at

396, Congress was concerned "that deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers," *Nielsen v. Preap*, 586 U.S. 392, 398 (2019) (citation omitted). To address that concern, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, amending 8 U.S.C. § 1226 to mandate the detention of certain aliens who, based on their commission of or arrest for specified "predicate crimes," pose a threat to public safety. *See Nielsen*, 586 U.S. at 398.

In the wake of President Trump's declaration of a national emergency at the southern border, 90 Fed. Reg. 8327, Congress enacted the Laken Riley Act, expanding the list of predicate crimes that trigger mandatory detention to include "burglary, theft, larceny, shoplifting, or assault of a law enforcement officer offense, or any crime that results in death or serious bodily injury to another person[.]" Laken Riley Act, S. 5, 119th Cong. (2025) (codified at 8 U.S.C. § 1226(c)(1)(E)(ii)). Once an alien is ordered removed from the United States, removal must take place within 90 days, and the alien must be detained during that "removal period." *See* 8 U.S.C. § 1231. If the Federal Government fails to detain an alien subject to mandatory detention and the alien harms a state or its residents, the Laken Riley Act authorizes that state to sue the Federal Government "to obtain appropriate injunctive relief." *See* 8 U.S.C. § 1226(f).

## III.    Challenged Sanctuary Policies

On June 19, 2017, Newark Mayor Ras J. Baraka issued Executive Order MEO 17-001 ("Newark Executive Order"). Compl. ¶ 40, ECF No. 1. *Id.* ¶¶ 41-43. On February 15, 2019, then-Newark Public Safety Director Anthony F. Ambrose issued Newark Police Division General Order 19-01 ("Newark General Order 19-01"). *Id.* ¶ 44.

On February 3, 2017, Jersey City Mayor Steven M. Fulop issued E.O. 2017-003, "Executive Order Establishing the City of Jersey City as a Sanctuary City" ("Jersey City Executive Order"). *Id.* ¶ 48-51.

On January 1, 2018, Hoboken Mayor Ravinder S. Bhalla issued "Executive Order Declaring Hoboken a Fair and Welcoming City" ("Hoboken Executive Order"). *Id.* ¶ 61-64.

In 2019, Troy Oswald, then-Chief of the Paterson Police Department, issued Standard Operating Procedures, effective June 12, 2019, titled "Subject: Dealing with the Immigrant Community" ("Paterson SOPs"). *Id.* ¶ 52. The Paterson SOPs state in part that "[u]nder federal and state law, local law enforcement agencies are not required to enforce civil administrative warrants or civil detainers issued by federal immigration officers." *Id.* ¶ 53-60.

As described in more detail below, these Sanctuary Policies prevent the Federal Government from enforcing the immigration provisions of the INA as they apply to illegal aliens by prohibiting Defendants, their employees, and their municipal police officers from sharing information on illegal aliens with the federal government, participating in civil enforcement of federal immigration laws, entering into any agreement to operate immigration custody facilities, and honoring detainer requests or administrative warrants.

## STANDARD OF REVIEW

Motions to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) are meant to test the sufficiency of the complaint, not to decide the merits of the case. *See Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (internal quotations omitted). A claim will survive a motion dismiss when it is facially plausible, in other words, where the plaintiff pleads facts sufficient to raise a right to relief beyond mere speculation. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (allegations that "raise [the plaintiff's] right to

relief above the speculative level" are adequate to survive a motion to dismiss). Importantly, dismissal is a "harsh remedy," *New York v. Hill*, 528 U.S. 110, 118 (2000), "to be used cautiously so as to promote the liberal rules of pleading and to protect the interests of justice." *Manchester v. Rzewnicki*, 777 F. Supp. 319, 324 (D. Del. 1991), *aff'd,* 958 F.2d 364 (3d Cir. 1992). The United States's allegations easily satisfy this standard, and Defendants' motions should be denied.

## ARGUMENT

### I.    The United States has standing to defend its interests.

The United States has standing to bring this suit. The doctrine of Article III standing stems from the Constitution's case-or-controversy limitation on judicial power. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008). To have standing, a plaintiff must demonstrate a concrete injury in fact that is fairly traceable to the conduct of the party sued and judicially redressable. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016). Defendants seek dismissal for lack of standing. *See* Mot. to Dismiss of Newark and Hoboken Defs. ("Newark Mot.") at 12-20, ECF No 37-1; Mot. to Dismiss of Jersey City Defs. ("Jersey City Mot.") at 13-15, ECF No. 38-1; Mot. to Dismiss of Paterson Defs. ("Paterson Mot.") at 6-10. They are wrong for several reasons.

### A.    The United States has suffered a concrete injury traceable to the Sanctuary Policies that is redressable by the Court.

The United States has suffered a concrete injury traceable to the Sanctuary Policies because each of those policies interferes with the Government's legally protected interest in enforcing federal law. *See United States v. Missouri*, 114 F.4th 980, 985 (8th Cir. 2024) ("Interference with the federal government's interest in enforcing federal law is sufficient to establish that the Act's implementation injured the United States."); *see also Wyandotte Transp.*

*Co. v. United States*, 389 U.S. 191, 201 (1967) ("[T]he United States may sue to protect its interests."). That injury is judicially redressable because invalidating those policies and enjoining their enforcement would prevent such interference.

Defendants argue, incorrectly, that the Court should dismiss this action because New Jersey's State ITD, which imposes restrictions statewide on New Jersey law enforcement officers' ability to cooperate with federal civil immigration efforts, creates a "ceiling for the types of voluntary cooperation New Jersey officers may provide to federal civil immigration enforcement efforts." Newark Mot. at 7-8. Consequently, Defendants contend that the United States's injuries are traceable to the ITD, not Defendants' Sanctuary Policies. Defendants further argue that even if the Government's challenge to the Sanctuary Policies were successful, the Court could not grant the redress required to establish standing. *Id.* at 13-20; Jersey City Mot. at 14; Paterson Mot. at 8-10. Defendants' argument fails because even if the ITD sets a ceiling, the United States's harms are still traceable to Defendants' Sanctuary Policies because Defendants' Sanctuary Policies are more restrictive than the ITD. For example, unlike the ITD, the Newark, Hoboken, and Jersey City Sanctuary Policies prohibit the honoring of all detainer requests with no exceptions for detainers issued against dangerous individuals, such as those convicted of violent or serious offenses. *Contrast* Compl. ¶ 41, 49, 62 *with* ITD § II(B)(6). As another example, the Newark, Hoboken, and Jersey City Sanctuary Policies preclude "any contract, agreement, or arrangement to detain immigrants in deportation proceedings, including but not limited to Intergovernmental Service Agreements." Compl. ¶ 41, 49, 62. By comparison, the ITD does not prohibit municipal agreements to detain illegal aliens. *See* N.J. Attn'y Gen. Law Enforcement Directive No. 2018-6, https://www.nj.gov/lps/dcj/agguide/directives/ag-directive-2018-6_v2.pdf. In other words, while the ITD sets a "ceiling" on the ability of officers in New

Jersey to assist in immigration enforcement, Newark Mot. at 8, Defendants' Sanctuary Policies lower that ceiling.

The ITD, as Newark and Hoboken point out, prohibits law enforcement officers in New Jersey from participating in immigration enforcement actions or making their facilities available to federal immigration officers. Newark Mot. at 17 (citing ITD § II.B.1.3). But this limitation in the ITD differs from the provisions in Defendants' Sanctuary Policies that preclude Defendants from entering into contracts to detain aliens. Newark and Hoboken also argue that a New Jersey statute continues to overlap with Defendants' Sanctuary Policies and prohibits them from entering into agreements to detain immigrants. *Id.* at 17-18 (citing N.J. Stat. Ann. § 30:4-8.16 (West)). But the Third Circuit struck down that statute, N.J. Stat. Ann. § 30:4-8.16, for violating the Supremacy Clause and the principle of intergovernmental immunity. *See CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 319 (3d Cir. 2025). Newark and Hoboken attempt to distinguish *CoreCivic* because it involved a privately operated detention facility. Newark Mot. at 18. But the Third Circuit's holding in *CoreCivic* does not support a distinction that permits the statute to continue to prohibit municipalities from operating immigration detention facilities. The Third Circuit instead found that the entire statute, which purported to outlaw any "State, local government agency, or private detention facility" from housing immigration detainees, violated the Supremacy Clause and the principle of intergovernmental immunity because it sought to ban "contracting in a market where the federal government is the only available counterparty for services implementing a core federal power." *CoreCivic*, 145 F4th at 329. The federal government is the purchaser of immigration detention services regardless of whether the facility is operated privately or by a municipality. For that reason, the statute, after *CoreCivic*, cannot stand regardless of who would operate the facility.

Where, as here, a party is subject to two allegedly unlawful policies, it has established traceability and redressability where it seeks to overturn the more restrictive policy. *See Reps. Comm. for Freedom of the Press v. Rokita*, 147 F.4th 720, 728 (7th Cir. 2025) (finding standing to challenge statute that imposed "a far broader set of situations" than another existing statute even where there was "some overlap" between the two); *Matsumoto v. Labrador*, 122 F.4th 787, 800–01 (9th Cir. 2024) (finding traceability and redressability in challenge to abortion statute that was more restrictive than other existing abortion statutes). Redress requires the amelioration of only "*an* injury," not "*every* injury," *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). Thus, because the Complaint alleges an injury created by the portions of the Defendants' Sanctuary Policies that impose limitations on cooperation with federal immigration authorities even stricter than the ITD, the Complaint establishes the redress necessary for the United States to possess standing. *See Lozano v. City of Hazleton*, 620 F.3d 170, 192 (3d Cir. 2010) ("Redressability therefore does not require that a court be able to solve all of a plaintiff's woes. Rather, we need only be able to redress, to some extent, the specific injury underlying the suit."), *judgment vacated on other grounds sub nom. City of Hazleton v. Lozano*, 563 U.S. 1030 (2011). Standing exists here because a court decision can provide "a small incremental step" to reduce the harm facing plaintiffs "to some extent." *Massachusetts v. EPA*, 549 U.S. 497, 526 (2007).

The United States would still have standing to challenge Defendants' Sanctuary Policies even if Defendants' Sanctuary Policies were entirely congruent with the ITD, and even if the ITD presents another obstacle precluding the United States from effectively executing the nation's immigration laws. This challenge to Defendants' Sanctuary Policies would grant the United States redress because if this Court were to find that Defendants' Sanctuary Policies are preempted due to conflict with the entire panoply of immigration statutes regulating aliens—a

basis for preemption that the Third Circuit has yet to consider, *see infra* at section II.A.2—or if the Third Circuit sitting *en banc* were to find that the Sanctuary Policies are expressly preempted by 8 U.S.C. §§ 1373 and 1644, that ruling would result in overturning not just Defendants' Sanctuary Policies but the ITD that Defendants claim is nearly identical to their Sanctuary Policies. *See* Newark Mot. at 8. The existence of the ITD, therefore, does not defeat the United States's challenge to the constitutionality of Defendants' Sanctuary Policies. *See Hollis v. Lynch*, 827 F.3d 436, 436, 442 (5th Cir. 2016) (finding redressability where Second Amendment challenge to federal gun statute, if successful, would result in overturning both federal statute and overlapping statute statute), *abrogated on other grounds by United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024); *Maldonado v. Morales*, 556 F.3d 1037, 1043-44 (9th Cir. 2009) (finding redressability where First Amendment challenge to state restrictions on billboard advertising, if successful, would result in overturning overlapping municipal restriction).

In addition, even if a favorable ruling for the United States in this action had no effect on the State of New Jersey's ITD, the United States would still have standing to challenge the Sanctuary Policies of individual cities. Because a plaintiff need not sue every defendant that may cause it harm, *Jones v. Bock*, 549 U.S. 199, 217 (2007), where a regulatory scheme grants authority to multiple government authorities, an injunction against any one of those authorities suffices to establish standing. *See Matsumoto*, 122 F.4th at 801–02. For that reason, the United States has standing to seek an injunction against Defendants' Sanctuary Policies.

### B.     The United States has suffered, and will continue to suffer, imminent injury from the Sanctuary Policies.

The United States has suffered an injury traceable to Defendants. Nevertheless, Defendants argue that the United States has not yet experienced any injury from the portions of the Sanctuary Policies that exceed the ITD. Jersey City Mot. at 13. To the contrary, the

Complaint alleges that, "Defendants' Challenged Policies create serious operational consequences and hinder the ability of the Federal Government to enforce the nation's immigration laws." Compl. ¶ 68. There is no plausible basis to conclude that Defendants will not enforce every provision of their Sanctuary Policies, including those that exceed the scope of the ITD. These allegations, taken as true, plausibly allege a sufficient likelihood that Defendants will continue to act in accordance with their Sanctuary Policies and thus continue to injure the United States. *See Phillips*, 515 F.3d at 231 ("facts alleged must be taken as true and a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits").

Even if the United States had not yet suffered any injury from the provisions of the Defendants' Sanctuary Polices that exceed the ITD, a "plaintiff may challenge the constitutionality of a [law or] regulation before suffering an 'actual' injury arising from enforcement so long as the threatened injury is 'imminent.'" *Greenberg v. Lehocky*, 81 F.4th 376, 384 (3d Cir. 2023) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). A plaintiff pursuing a pre-enforcement challenge satisfies the injury-in-fact requirement where it alleges it intends to do something arguably protected by the Constitution, but arguably barred by the challenged law or policy, and that it faces a credible threat of enforcement under the law or policy. *Schrader v. Dist. Att'y of York County*, 74 F.4th 120, 124-25 (3d Cir. 2023).

There is nothing speculative about Defendants seeking to enforce every aspect of their Sanctuary Policies. Indeed, the mayor of Hoboken has promised to do so: "I want to assure you that the Hoboken Police Department remains committed to the guidance provided by the New Jersey Attorney General: HPD will not cooperate with ICE if they come to our city without warrants signed by a federal judge." Compl. ¶ 65. That promise, and the mere existence of the

Sanctuary Policies, makes the threat of enforcement concrete and imminent. *See United States v. Texas*, 557 F. Supp. 3d 810, 821–22 (W.D. Tex. 2021) (finding United States possessed standing to seek preemption of state executive order that had not yet been enforced because "[b]y its own terms, the Order was 'effective immediately' when it was signed" and "Texas has provided no evidence that it will not enforce the Order in the very near future."); *N.J. Civ. Just. Inst. v. Grewal*, No. CV 19-17518, 2021 WL 1138144, at *4 (D.N.J. Mar. 25, 2021) (finding plaintiff possessed standing to challenge state statute on preemption grounds where "Defendant has not disclaimed an intent to enforce" statute).

For those reasons, the harms to the United States in its ability to locate, detain, and removal illegal aliens are traceable to Defendants' Sanctuary Policies, and enjoining them would redress the United States's injuries. The United States, therefore, has standing to bring this suit.

## II.    The Sanctuary Policies violate the Supremacy Clause.

### A.    The Sanctuary Policies are conflict preempted by the Immigration and Nationality Act.

The Complaint adequately alleges a claim of conflict preemption. State laws cannot "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). Thus, state laws are invalid if they "either frustrate[] the purpose of the national legislation or impair[] the efficiency of th[o]se agencies of the federal government to discharge the duties, for the performance of which they were created." *Davis v. Elmira Sav. Bank*, 161 U.S. 275, 283 (1896).

Pursuant to its "broad, undoubted power over the subject of immigration and the status of aliens," *Arizona*, 567 U.S. at 394, Congress enacted the INA. The INA established a "comprehensive federal statutory scheme for regulation of immigration and naturalization[.]" *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 587 (2011) (citations omitted). To effectuate

that scheme, the INA, among other things, defines categories of aliens who may not be admitted to the United States; makes unlawful entry and reentry federal offenses; specifies which aliens may be removed from the United States and the procedures for such removal; and vests federal immigration officials with significant discretion. *See Arizona*, 567 U.S. at 396.

Because Congress found that "deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers," *Nielsen*, 586 U.S. at 398 (citation omitted), Congress requires federal immigration agents to detain criminal illegal aliens immediately upon their release from State or local custody, pending their removal from the United States. *See, e.g.*, 8 U.S.C. §§ 1226(a), (c), 1231(a). And indeed, as noted above, the Federal Government is subject to civil suits by States should it fail to satisfy this duty. *See supra* Background § II (discussing 8 U.S.C. § 1226(f)).

### 1. The Sanctuary Policies impede congressionally sanctioned and authorized federal immigration law.

As alleged in the Complaint, Compl. ¶¶ 61-81, the challenged Sanctuary Policies stand as an obstacle in several respects to federal immigration officers' ability to detain and remove criminal illegal aliens as required by the panoply of immigration statutes set forth in the INA.

First, the Sanctuary Policies prevent state and local officers from turning aliens over to federal custody when presented with congressionally authorized detainers and administrative warrants even after the alien's state or local custody has ended, extinguishing Defendants' regulatory interest in the alien. *Id.* ¶ 69. The statutory and regulatory framework make clear that Congress intended the detention and removal process to be an expedited procedure. *See, e.g.*, 8 U.S.C. § 1226(a) (expressly authorizing the use of administrative warrants); *id.* § 1226(c) (requiring federal agents to assume custody of an alien immediately upon the alien's release from state or local custody); *id.* § 1231 ("Once an alien is ordered removed, the Attorney General must

remove the alien from the United States within 90 days, and the alien must be detained during the removal period."). But by refusing to turn aliens over to federal custody pursuant to detainers and administrative warrants, Defendants require federal agents independently to track down and rearrest criminal aliens at large—even those involved in serious and violent felonies—when (and if) they learn that the alien has been released from state custody. And, those agents must do so before the alien reoffends or absconds to another jurisdiction. *See* Compl. ¶¶ 41, 49, 56, 62, 70-71. The prohibition on honoring detainers and administrative warrants therefore endangers federal agents, the public, and aliens themselves. And it obstructs and impairs the efficiency of the federal process in a way that is inconsistent with the Congressional design. *See Davis*, 161 U.S. at 283 (explaining that state laws cannot "impair[] the efficiency of th[o]se agencies of the federal government" in the "discharge [of] the[ir] duties").

Moreover, though they purport to require judicial warrants, the Sanctuary Policies themselves obstruct ICE's ability to procure such warrants by cutting ICE off from information—including that derived from access to detainees for investigatory purposes—needed to satisfy the heightened standard for a judicial warrant compared with an administrative warrant. Thus, the Sanctuary Policies simultaneously require a judicial warrant while refusing ICE the very access needed to secure such a warrant. Accordingly, the United States has stated a claim of conflict preemption.

### 2. *Ocean County* does not preclude this Court from declaring the Sanctuary Policies conflict preempted.

The Third Circuit's ruling in *Ocean County Board of Commissioners v. Attorney General*, 8 F.4th 176 (3d Cir. 2021), does not preclude this Court from finding that Defendants' Sanctuary Policies conflict with, and are therefore preempted by, the immigration regime described above. The Third Circuit in *Ocean County* did not consider the conflict preemption

claim that the United States raises here. First, contrary to Defendants' claims, Newark Mot. at

22, the complaint in *Ocean County* alleged preemption based only on two federal statutes, 8

U.S.C. §§ 1373 and 1644. Compl. ¶¶ 33, 40, *Ocean County Bd. of Comm'nrs v. Attn'y Gen.*, No.

3:19-cv-18083 (D.N.J. filed Sept. 18, 2019), ECF No. 1. The court thus held only that those two

statutes, standing alone, did not preempt the ITD. *See Ocean County*, 8 F.4th at 181 ("The two

federal laws Appellants cite in this case—§§ 1373 and 1644—cannot satisfy the second

prerequisite [for preemption]."). It did not analyze whether the entire "extensive and complex"

statutory scheme for the "governance of immigration and alien status" that regulates individual

aliens present in the United States preempts Defendants' Sanctuary Policies. *See Arizona*, 567

U.S. at 395; Compl. ¶¶ 30-37, 83 (citing fourteen federal statutory immigration provisions

beyond §§ 1373 and 1644).

### B.    The Sanctuary Policies' restrictions on information sharing are expressly preempted by 8 U.S.C. § 1373.

Independent of conflict preemption, the United States has also stated a claim of express

preemption of the Sanctuary Policies' restrictions on information sharing by 8 U.S.C. § 1373(a).

Express preemption occurs when Congress explicitly precludes state or local regulation in a

particular area. *See, e.g.*, *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992)

(Stevens, J., dissenting) (finding express preemption where federal law provided that "[N]o State

. . . shall enact or enforce any law . . . relating to rates, routes, or services of any air carrier").

Section 1373(a)'s preemptive language provides that a "[s]tate . . . or local government

entity or official may not prohibit, or in any way restrict, any government entity or official from

sending to, or receiving from, [federal immigration officials] information regarding the

citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a).

That provision makes clear Congress's intent that States should not stand in the way of the

Federal Government's regulation of aliens, thereby codifying the constitutional principles outlined above. *See also Murphy*, 584 U.S. at 478 (explaining that "it is a mistake to be confused by the way in which a preemption provision is phrased," because "language might appear to operate directly on the States" but in substance merely prevent the States from obstructing federal regulation of private parties); *see id.* (discussing 49 U.S.C. app. § 1305(a)(1) (1988)).

The preemptive effect of Section 1373(a) is not as narrow as Defendants contend. Rather, the statutory text, structure, and purpose of Section 1373 confirm that "information regarding citizenship or immigration status" also covers aliens' contact information and release dates. By its terms, Section 1373(a) applies to any "information *regarding* [an individual's] citizenship or immigration status[.]" 8 U.S.C. § 1373(a) (emphasis added). As the Supreme Court has explained, statutory terms like "regarding" or "related to" have "a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717–18 (2018) (citing authorities).

Reading the term "regarding" to have such a "broadening effect," *Lamar*, 584 U.S. at 717, is especially appropriate in this statutory context. That is because 8 U.S.C. § 1373(c), which establishes federal officials' duty to share information with States, does not include the term in requiring federal officials to provide "the citizenship or immigration status of any individual" to States. Congress's inclusion of "regarding" in Section 1373(a), juxtaposed with its omission of such a term in an otherwise-parallel provision of the same statute, indicates that "Congress intended a difference in meaning." *Loughrin v. United States*, 573 U.S. 351, 358 (2014).

And, while the applicable context of "regarding" is important, proper interpretation of language in a statute considers not only the specific context in which the language is used, but the overall structure of the statute, as well as its history and purpose. *Util. Air Regul. Grp. v.*

*E.P.A.*, 573 U.S. 302, 321 (2014). The legislative history of Section 1373 provides additional insight into the meaning of "regarding" here. *See Arizona*, 567 U.S. at 405 (considering legislative history as part of a conflict-preemption analysis). Congress enacted Section 1373 to ensure that state and local officials can "communicate with [federal immigration authorities] regarding *the presence, whereabouts, or activities of illegal aliens*," not merely their legal classification. H.R. Rep. No. 104-725, at 383 (1996) (emphasis added); *see also* S. Rep. No. 104-249, at 19–20 (1996) ("The acquisition, maintenance, and exchange of immigration-related information by State and local agencies is . . . of considerable assistance to . . . the achieving of the purposes and objectives of the [INA].").

Furthermore, the detention and removal provisions of the INA establish a clear relationship between an alien's release date and his or her immigration status. 8 U.S.C. § 1231(a)(4)(A) (providing that a convicted alien in state criminal custody who is subject to a final removal order may not be removed until "released from imprisonment"). The release date thus dictates when such an alien must be detained and removed from the United States—a matter directly related to (and thus "regarding") the alien's "immigration status." Accordingly, Section 1373(a) expressly preempts the Sanctuary Policies' restrictions on sharing information about a detainee's upcoming release from custody.

Contact information, including current addresses, also directly bears on an alien's immigration status. Aliens must "notify the Attorney General in writing of each change of address and new address within ten days from the date of such change[.]" 8 U.S.C. § 1305. Failure to comply with that provision is itself grounds for mandatory detention and removal, unless excused. 8 U.S.C. § 1306. An alien's current address reveals whether the alien has complied with the notification requirement, which in turn dictates whether the alien is subject to

detention and removal. Contact information, like release-date information, is therefore also directly related to the alien's immigration status.

Against that backdrop, the Sanctuary Policies' restrictions on information sharing are expressly preempted by Section 1373. The Sanctuary Policies of Newark, Jersey City, and Hoboken state that municipal agents and employees are not permitted to maintain and/or share information about individuals' national origin, citizenship, or immigration status unless required by state or federal law or court order. Compl. ¶¶ 42, 50, 51, 55, 64. Accordingly, the United States' express preemption claim is sufficiently pled and should withstand dismissal.

### C.    The Tenth Amendment does not sanction Defendants' conduct.

Defendants characterize their obstruction of federal immigration enforcement as their prerogative under the Tenth Amendment, but that mischaracterizes their own activities and misstate the scope of the Tenth Amendment. Newark Mot. at 27-29; Jersey City Mot. at 17-19, 23-24. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Accordingly, it "prohibits the federal government from compelling the States to enact or administer a federal regulatory program." *New York v. U.S. Dep't of Justice*, 951 F.3d 84, 112 (2d Cir. 2020); *see City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999) (rejecting facial commandeering challenge to 8 U.S.C. § 1373).

Although certain rights are reserved to the States, under the Supremacy Clause, federal law is the "supreme Law of the Land," U.S. Const. art. VI, cl. 2, and "state and local laws that conflict with federal law are 'without effect.'" *New York SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 103 (2d Cir. 2010) (internal citation omitted). A state enactment is invalid if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines*, 312 U.S. at 67, or if it "discriminate[s] against the United States

or those with whom it deals," *South Carolina v. Baker*, 485 U.S. 505, 523 (1988). Thus, it is a well-settled concept underpinning our system of government that state and local governments do not have "an untrammeled right to forbid all voluntary cooperation by [their] officials" with federal immigration authorities. *City of New York*, 179 F.3d at 35.

Defendants' Tenth Amendment arguments hinge on a fundamental mischaracterization of §§ 1373(a) and 1644. Defendants assert that the United States's understanding of §§ 1373(a) and 1644 "would thwart policymakers' ability to extricate their State or municipality from involvement in federal immigration enforcement and impermissibly shift compliance costs to local governments with limited resources by 'conscript[ing] the time and cooperation of local employees,'" Newark Mot. at 28, or "shift the costs of enforcement of federal immigration law to that of local New Jersey police departments," Jersey City Mot. at 18. But the statutes plainly only forbid restricting assistance; they do not mandate any action. 8 U.S.C. §§ 1373(a), 1644.

Defendants cite inapposite case law for their argument that the Federal Government may not compel state action under the Tenth Amendment. *See* Newark Motion at 27-28 (citing *Printz v. United States*, 521 U.S. 898 (1997)); Jersey City Mot. at 18 (same and citing *New York v. United States*, 505 U.S. 144 (1992)). In those cases, the States or their employees were conscripted into enacting or administering federal programs. *See Printz*, 521 U.S. at 917–18. Here, §§ 1373(a) and 1644 do not compel state or local governments to enact or administer a federal program—instead they bar state and local governments from restricting voluntary exchanges of information with federal immigration authorities. *City of New York*, 179 F.3d at 35 (citing *Printz*, 521 U.S. at 917–18). Indeed, the Second Circuit rejected a Tenth Amendment challenge to these provisions because it "asks us to turn the Tenth Amendment's shield against the federal government's using state and local governments to enact and administer federal

programs into a sword allowing states and localities to engage in passive resistance that frustrates federal programs." *City of New York*, 179 F.3d at 35; *see also New York*, 951 F.3d at 113 ("it is doubtful that States have reserved the power to adopt … immigration policies *contrary* to those preferred by the federal government" and set forth in statutes such as § 1373) (internal quotations and citation omitted).

Defendants contend that §§ 1373 and 1644 regulate states rather than individuals and are thus invalid, lacking preemptive force. *See* Newark Mot. at 9 (citing *Ocean County*, 8 F.4th at 181-82); Jersey City Mot. at 16-17 (same). The panel that decided *Ocean County*, however, erred when it found that §§ 1373 and 1644 do not regulate private actors. *Ocean County*, 8 F.4th at 181.[3] Those provisions of the INA do govern the actions of private individuals, namely aliens. Courts have expressly recognized this nuance and declined to disturb the bedrock Supremacy Clause principle that state and local laws that obstruct federal laws "regulat[ing] private actors" are "preempt[ed]." *Murphy*, 584 U.S. at 476–77. As the Supreme Court instructed there, "it is a mistake to be confused by the way in which a preemption provision is phrased," because "language might appear to operate directly on the States" but in substance merely prevents the States from obstructing federal regulation of private parties. *See Murphy*, 584 U.S. at 478. While the *Murphy* Court's understanding of preemption applies to Section 1373, which "imposes restrictions … on private actors"—aliens—by facilitating the enforcement of federal laws against those actors, *see id.* at 477, the result in *Murphy* does not apply. In *Murphy*, the Government sought to legislate in a domain traditionally reserved to the state police power. *Id.* at 458–60

---

[3] The United States recognizes that *Ocean County* remains binding on this court, but this litigation provides a basis to overturn *Ocean County*. *See In re Cent. R. Co. of N.J.*, 485 F.2d 208, 210–11 (3d Cir. 1973) ("decisions made in similar cases by panels of this Court are binding on other panels but are not controlling on the Court En Banc").

(describing the history of state regulation of gambling dating to the nineteenth century). But here, because the Federal Government seeks to regulate private individuals—aliens—and is operating in a realm of Federal rather than state authority, the INA's provisions withstand scrutiny, and Defendants cannot cast aside the provisions' preemptive force.

A comparison to environmental law is instructive. For example, the Supreme Court rejected a Tenth Amendment challenge to a statute that established a nationwide program to protect the environment from surface coal mining operations. *Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 268 (1981). The Court rejected the state's argument that the statute directly regulated the States as states because it established mandatory minimum federal standards even though the statute "obviously curtail[ed] or prohibit[ed] the States' prerogatives to make legislative choices respecting subjects the States may consider important." *Id.* at 290. Immigration laws have far less impact making the Court's reasoning even more persuasive here. Defendants' Tenth Amendment argument also fails because just as the provisions in *Hodel* regulated the environment; here they regulate aliens—not states.

In any event, Defendants' focus is too narrow: "§ 1373 is one provision of a larger statute, the INA, which certainly confers rights and places restrictions on large numbers of private persons." *New York*, 951 F.3d at 114 n.27. Thus, the INA *as a whole* does regulate private actors, by specifying which aliens may enter and on what conditions. *See, e.g.*, 8 U.S.C. § 1101(a)(15) (classes of nonimmigrants who may seek to enter temporarily); *id.* § 1153 (classes of immigrants); *id.* § 1182 (inadmissible aliens); *id.* § 1188 (temporary agricultural workers). Sections 1373 and 1644 relate to information sharing to facilitate immigration policy and are thus just one part of the overall statutory scheme. Those sections are valid preemption statutes, foreclosing Defendants' argument to the contrary.

Defendants' challenge fails for another reason, one that *Ocean County* failed to consider: a court must identify what power is reserved to the States to enact laws or policies "prohibiting their officials and agencies from engaging in even voluntary communications about citizenship and immigration status with federal authorities." *New York*, 951 F.3d at 113. The Second Circuit explained that "[a] court undertaking that inquiry would have to recognize, as the Supreme Court has, that '[c]onsultation between federal and state officials is an important feature of the immigration system' established by the INA." *Id.* at 114 (quoting *Arizona*, 567 U.S. at 411). Indeed, the Supreme Court discussed information sharing provisions of the INA in *Arizona* and concluded that the federal scheme left room for a state policy requiring information sharing. *Id.* But the Second Circuit observed that "[t]he same conclusion may not be so easy to reach … with respect to a State policy prohibiting information sharing." *Id.* Defendants have not explained how the power they seek—prohibiting information sharing—is reserved to the States. Nor did the Third Circuit in *Ocean County*.

Defendants' claims rest on general prerogatives to direct state and local resources and protect due process and invoke trust and collaboration between the community and law enforcement. *See* Newark Mot. at 3-4; Paterson Mot. at 4; Jersey City Mot. at 3-4. But the Sanctuary Policies go far beyond these vague platitudes; they prohibit information sharing. And simply accepting Defendants' stated purposes at face value would be "at odds with the approach taken in nearly all [the Court's] Supremacy Clause cases" and "would enable state legislatures to nullify nearly all unwanted federal legislation by simply … articulating some state interest or policy—other than frustration of the federal objective—that would be tangentially furthered by the proposed state law." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 106 (1992) (quoting *Perez v. Campbell*, 402 U.S. 637, 651–52 (1971)); *see also Hughes v. Oklahoma*, 441

U.S. 322, 336 (1979) ("[W]hen considering the purpose of a challenged statute, this Court is not bound by '[t]he name, description or characterization given it by the legislature or the courts of the State,' but will determine for itself the practical impact of the law.").

More than this, the federal government's power over immigration is broad, it has an interest in information sharing across government entities to facilitate immigration policy, and the INA, including §§ 1373 and 1644, does not leave room for the States to prohibit that voluntary cooperation. The United States thus challenges particular local orders that explicitly prohibit and restrict sharing the very information that state and local governments cannot prohibit or restrict. Moreover, Defendants' Tenth Amendment arguments miss the mark because the United States is not directing Defendants to pass any ordinances or to reallocate its resources. The United States challenges only the *legality* of Sanctuary Policies that Defendants enacted. For these reasons, Count One's preemption claim withstands dismissal.

### D.    The Sanctuary Policies unlawfully discriminate against the United States.

Count Two sufficiently pleads that the Sanctuary Policies constitute unlawful discrimination against the United States. The doctrine of intergovernmental immunity prohibits state and local governments from discriminating against the Federal Government—or even just a part of it. *See North Dakota v. United States*, 495 U.S. 423, 434–36 (1990). A state law or local ordinance discriminates against the Federal Government "by singling out the Federal Government for unfavorable treatment." *United States v. Washington*, 596 U.S. 832, 839 (2022). And *any* discriminatory burden on the Federal Government is impermissible. *See Dawson v. Steager*, 586 U.S. 171, 173 (2019). State laws that uniquely *burden* federal activities violate this nondiscrimination rule. And courts presume that such laws are invalid absent clear congressional authorization for that kind of state regulation. *See Washington*, 596 U.S. at 839.

Defendants' Sanctuary Policies unlawfully discriminate against the Federal Government by singling out federal immigration enforcement for unfavorable treatment. The Sanctuary Policies facially target federal immigration officers by denying ICE agents access to detainees, state and local facilities, and information absent a criminal warrant. *See* Compl. ¶¶ 41, 49, 62. These provisions treat federal immigration agents less favorably than the general public and other law enforcement agencies. On their face, the Sanctuary Policies do not prevent state and local agents from sharing the information that ICE seeks, including release dates and contact information, with anyone else—including members of the public and other law enforcement agencies. *Id.*

Defendants contend that because "only" ICE carries out civil immigration enforcement, there is no entity "similarly situated" to ICE, and, absent such a comparator, Defendants are free to discriminate with impunity. Newark Mot. at 30; Paterson Mot. at 15; Jersey City Mot. at 21-22. But the Third Circuit in *CoreCivic* rejected that argument when it struck down, as contrary to the Supremacy Clause, the statute prohibiting state, local, or private facilities in New Jersey from holding immigration detainees. *Because* the federal government alone seeks facilities for immigration detention, any state or local restriction on that process unlawfully regulates the Federal Government. *See CoreCivic*, 145 F.4th at 325 (striking down statute that "directly regulates the federal government by banning contracts *that only the federal government can make*") (emphasis added).

Singling out functions that only the Federal Government performs for differential treatment is evidence of discrimination. *Id.* If, in fact, the only difference justifying the discriminatory treatment is the federal agency's enforcement of a particular federal law, the discrimination is clear. *See also United States v. King County*, 122 F.4th 740, 757–58 (9th Cir.

2024) (rejecting the County's argument that "significant differences" between ICE and others who chartered flights justified the discriminatory treatment of ICE where the difference was ICE's role in carrying out deportations); *United States v. California*, No. 18-cv-721, 2018 WL 5780003, at *6 (E.D. Cal. Nov. 1, 2018) (rejecting California's argument that it could discourage conveyances of federal public lands because those lands, unlike private lands, are preserved for the public's benefit). Here, the Federal Government suffers differential treatment because Defendants grant other law enforcement agencies and the public access to government facilities, detainees, and information on more favorable terms than ICE.

In contrast, when the target of impermissible discrimination is the Federal Government itself, or even just a part of it, the danger is at its peak. *See Washington*, 596 U.S. at 842 (noting the absence of a "ballot-box safeguard" for laws that discriminate solely against the Federal Government); *King County*, 122 F.4th at 757–58 ("[B]urdening federal operations, and *only* federal operations . . . violates the anti-discrimination principle[.]" (citation omitted)). Here too, there is no political check on the unlawful discrimination as long as frustrating ICE's enforcement of federal immigration law remains popular with Defendants' voters. Allowing discrimination of this sort to stand would undercut the Supremacy Clause by enabling municipalities to thwart federal policy so long as that policy was implemented by only one federal agency. *See Washington*, 596 U.S. at 841 (explaining that absent the prohibition on discrimination, nothing prevents a State from imposing unduly high costs on the Federal Government for the benefit of the State's own citizens). The United States therefore has sufficiently pled a claim of discrimination in Count Two.

### E.    The Sanctuary Policies unlawfully regulate the United States.

The Sanctuary Policies also unlawfully regulate the Federal Government by preventing federal agents from using their Congressionally authorized tools to detain and remove aliens.

Stemming from the Supremacy Clause, the doctrine of intergovernmental immunity prevents state and local governments from regulating the Federal Government. *See Mayo v. United States*, 319 U.S. 441, 445 (1943). Thus, "even in the absence of a specific federal law, federal officers are immune from state interference with acts 'necessary and proper' to the accomplishment of their federal duties." *United States v. Ferrara*, 847 F. Supp. 964, 968 (D.D.C. 1993).

Under those principles, the Sanctuary Policies improperly regulate the Federal Government by requiring ICE agents to procure criminal warrants to access detainees and obtain information when Congress has authorized federal immigration officials to use detainers and administrative warrants for those purposes. Compl. ¶¶ 41(c), 49(c), 53, 62(c). Congress expressly provided that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). And the Supreme Court has acknowledged the role that administrative warrants play in the detention and removal process. *See Arizona*, 567 U.S. at 407–08 (noting that the federal government has discretion to issue warrants, which are executed by federal officers).

Whereas administrative warrants issue on probable cause that the individual is an alien who is subject to removal (which does not necessarily require that the alien committed a criminal offense, *see, e.g.*, 8 U.S.C. §§ 1227(a)(1)(C), (D)), criminal judicial warrants issue on probable cause that a crime has been committed, *see Berger v. State of New York*, 388 U.S. 41, 55 (1967). Congress allows federal agents to detain illegal aliens under the former standard, but Defendants prevent federal agents from doing so unless they satisfy the latter, higher standard. These jurisdictions therefore foreclose federal immigration officials' use of the Congressionally authorized detention method and directly impose a different method, with a different standard, on the Federal Government for effectuating detentions. Defendants have no such power,

however, to prevent federal agents from carrying out their duties "until they satisfy a state officer." *See Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956).

The Sanctuary Policies' denial of ICE officials' access to otherwise public state and local facilities likewise regulates federal functions. Specifically, as alleged in the Complaint, by barring federal officials access to aliens in state or local custody upon their release as provided by federal law, federal immigration officers must either (1) engage in difficult and dangerous efforts to re-arrest aliens who were previously in local custody, which endangers immigration officers, the particular alien, and others who may be nearby; or (2) determine that it is not appropriate to transfer an alien to local custody in the first place, in order to comply with their mission to enforce the immigration laws. Compl. ¶ 70.

The Sanctuary Policies "'require[] ICE to entirely transform its approach to' its sovereign function of transporting and removing noncitizen detainees." *See King County*, 122 F.4th at 756. "Because this impermissibly override[s] the federal government's decision, pursuant to discretion conferred by Congress," as to how to effectuate detentions and removals, the Sanctuary Policies are invalid under the intergovernmental immunity doctrine's regulation prohibition. *Id.* Thus, the United States has sufficiently pled a claim of unlawful regulation.

Defendants attempt to evade the intergovernmental immunity doctrine by claiming that the Third Circuit, in *CoreCivic*, held that a state law directly regulates the federal government only when it restricts the ability of *private* parties to contract with the United States, "but did not suggest that the same principle applies to restrictions on state and local authorities." Newark Mem. at 29. But *CoreCivic* did in fact affirm that latter principle when it found the statute in question, by including private parties in its restrictions, sought "to sidestep" the "'bedrock principle' that *states* may not regulate their federal counterpart." *CoreCivic*, 145 F.4th at 319

(emphasis added). It is precisely that need "to protect each sovereign's governmental operations from undue interference by the other," *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 814 (1989), that applies here, where each sovereign Defendant municipality has attempted to exert undue inference on the operations of the federal sovereign in its enforcement of the INA.

Accordingly, Count Three withstands dismissal.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' motions to dismiss.

Dated: November 18, 2025          Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General

ANTHONY P. NICASTRO
Acting Director
Office of Immigration Litigation

JOHN J.W. INKELES
Chief
Affirmative Litigation Unit

*/s/ Hans H. Chen*
HANS H. CHEN
Deputy Chief, Affirmative Litigation Unit
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
General Litigation and Appeals Section
P.O. Box 878
Washington DC 20044
(202) 305-0190
hans.h.chen@usdoj.gov

*Attorneys for Plaintiff United States of America*