<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

THE UNITED STATES OF AMERICA,

    Plaintiff,

    v.

CITY OF NEWARK, *et al.*,

    Defendants.

No. 25cv5081 (EP) (AME)

**OPINION**

**PADIN, District Judge.**

Although the term "sanctuary city" lacks a precise definition, it is commonly used as a moniker for municipalities that limit voluntary assistance with federal civil immigration enforcement beyond what the law requires. Generally speaking, these cities have concluded that such assistance diverts local resources, undermines local law enforcement priorities, and erodes community trust.

Four cities in New Jersey—Newark, Hoboken, Jersey City, and Paterson[1]—have adopted policies along these lines. According to Plaintiff, the United States of America,[2] those policies are unconstitutional.

The Federal Government brings this action against the Cities along with their respective mayors, city councils, and city council presidents.[3] The Complaint alleges that the Cities have all

---

[1] Collectively, the "Cities."

[2] Throughout this Opinion, the Court refers to Plaintiff either as the "United States" or the "Federal Government."

[3] D.E. 1 ("Complaint" or "Compl."). All Defendants are named below. *See infra* Section I.D.

adopted "sanctuary policies"[4] that run afoul of the Supremacy Clause of the United States Constitution[5] because they are preempted by federal law and violate the intergovernmental immunity doctrine.

All Defendants move to dismiss. The Newark and Hoboken Defendants together move to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and (b)(6).[6] The Jersey City and Paterson Defendants separately move to dismiss under Rule 12(b)(6).[7, 8] The Federal Government opposes the Motions to Dismiss in a single consolidated filing.[9] All Defendants reply.[10]

Also pending before the Court are four motions for leave to appear as *amicus curiae*, which have been filed by: (1) the State of New Jersey;[11] (2) sixty-six cities, counties, and elected officials from across the United States;[12] (3) the American Civil Liberties Union of New Jersey, along with

---

[4] Herein, the "Challenged Policies."

[5] U.S. CONST. art. VI, cl. 2 (the "Supremacy Clause").

[6] D.E. 37-1 ("NH Motion" or "NH Mot."). The Court refers to the Newark and Hoboken Defendants together as the NH Defendants. The notice of motion for the NH Motion is filed at D.E. 37. Unless stated otherwise, all references to rules throughout this Opinion are to the Federal Rules of Civil Procedure.

[7] D.E. 38-1 ("JC Motion" or "JC Mot."). The notice of motion for the Jersey City Motion is filed at D.E. 38.

[8] D.E. 39-1 ("P. Motion" or "P. Mot."). The notice of motion for the P. Motion is filed at D.E. 39. The Court refers to the NH Motion, Jersey City Motion, and Paterson Motion collectively as the "Motions to Dismiss." The Court decides the Motions to Dismiss without oral argument. *See* Fed. R. Civ. P. 78; L. Civ. R. 78.1(b).

[9] D.E. 58 ("Opposition" or "Opp'n").

[10] D.Es. 61 ("NH Reply"), 63 ("JC Reply") & 65 ("P. Reply").

[11] D.E. 43.

[12] D.E. 44.

twenty-nine other organizations that represent or advocate on behalf of a wide range of New Jersey communities;[13] and (4) the Federation for American Immigration Reform.[14, 15]

The Federal Government's case has a fundamental flaw—it treats the Challenged Policies as though they operate in isolation. They do not. New Jersey's Immigrant Trust Directive is a statewide directive that, like the Challenged Policies, limits voluntary cooperation with federal civil immigration enforcement beyond what the law requires.[16] The ITD independently binds all law enforcement agencies and officers throughout New Jersey, including the municipal law enforcement agencies and officers that are also subject to the Challenged Policies.

---

[13] D.E. 50.

[14] D.E. 60. The Court refers to the four motions for leave to appear as *amicus curiae* as the "Amicus Motions."

[15] "An *amicus curiae* is not a party to the litigation, but rather assists the court in a particular matter of importance in a case. The Third Circuit has advised that 'permitting persons to appear . . . as friends of the court . . . may be advisable where third parties can contribute to the court's understanding' of the matter in question." *United States v. New Jersey*, No. 20-1364, 2021 WL 252270, at *1 n.1 (D.N.J. Jan. 26, 2021) (quoting *Harris v. Pernsley*, 820 F.2d 592, 603 (3d Cir. 1987)).

Relying on Federal Rule of Appellate Procedure 29—which governs the appearance of *amici* in matters before the United States Courts of Appeals—district courts grant *amicus curiae* status where: "(1) the *amicus* has a 'special interest' in the case; (2) the *amicus*'s interest is not represented competently or at all in the case; (3) the proffered information is timely and useful; and (4) the *amicus* is not partial to a particular outcome in the case." *United States v. Alkaabi*, 223 F. Supp. 2d 583, 592 (D.N.J. 2002) (citation omitted). The decision to grant a motion for leave to appear as *amicus curiae* "is solely within the broad discretion of the district court." *Id.* (citations omitted).

After considering the above criteria—and the fact that the Amicus Motions are unopposed—the Court will **GRANT** the Amicus Motions.

[16] N.J. Off. of the Att'y Gen., Att'y Gen. Law Enf't Directive No. 2018-6 v2.0, *Directive Strengthening Trust Between Law Enforcement and Immigrant Communities* 1 (Sept. 27, 2019), [https://perma.cc/4AEJ-JNXD] (the "ITD").

And importantly, the ITD is not subject to this suit, and in fact, has been challenged before (including by the Federal Government) and upheld, both by this Court and the Third Circuit.

Thus, although not referenced in the Complaint, the ITD is key to determining whether the Federal Government has Article III standing to sue.  As explained below, for any alleged injuries that flow from restrictions common to both the ITD and the Challenged Policies as applied to actors bound by both policies, the Federal Government lacks standing to sue because its injuries would persist even if the Court enjoined the Challenged Policies.  Those injuries therefore are not redressable by this suit.  The Federal Government also lacks standing to sue for any alleged injuries that arise from restrictions found only in the Challenged Policies because it does not identify any concrete injury caused by those provisions.  Because the Federal Government lacks standing to sue, the Court lacks subject matter jurisdiction.  Accordingly, the Court will **GRANT** the Motions to Dismiss and **DISMISS** the Complaint ***without prejudice***.

## I.    BACKGROUND

### A.    The ITD

As New Jersey's chief law enforcement officer, the Attorney General has the power to "adopt guidelines, directives, and policies that bind police departments throughout the State." *N. Jersey Media Grp., Inc. v. Twp. of Lyndhurst*, 229 N.J. 541, 565 (2017) (citations omitted). Pursuant to that authority, in November 2018, New Jersey's then-Attorney General Gurbir Grewal issued the ITD.[17]

As a threshold matter, the Court may consider the ITD even though the Complaint does not mention it.  The ITD is an official directive issued by the New Jersey Attorney General,

---

[17] The ITD was amended in 2019 to add that no law enforcement agency "shall enter into, modify, renew, or extend" an agreement pursuant to 8 U.S.C. § 1357(g), or "exercise any law enforcement authority" under a preexisting agreement.  All references to provisions of the ITD throughout this Opinion refer to the 2019 amended version.

publicly available on an official state website, and cited by the parties as the source of binding obligations imposed on state and local law enforcement agencies and officers throughout New Jersey. The Court may therefore take judicial notice of the ITD's existence and text. *See* Fed. R. Evid. 201(b)(2). But the Court is not limited to taking notice of the ITD's existence. Federal courts may independently determine the content and legal effect of state law, and New Jersey treats Attorney General law enforcement directives like the ITD as binding on police departments statewide and as having the force of law. *See Gallup v. Caldwell*, 120 F.2d 90, 93 (3d Cir. 1941); *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991); *Paff v. Ocean Cnty. Prosecutor's Off.*, 235 N.J. 1, 20–21 (2018). Thus, because the ITD is a legal directive with the force of law, the Court may consider whether the ITD independently obligates municipal law enforcement officers in New Jersey to follow the same restrictions challenged here. The Court does not, however, take judicial notice of disputed factual assertions in the ITD for their truth. *See S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426–27 (3d Cir. 1999).

The ITD defines the contours of New Jersey law enforcement's assistance (at the state, county, and local levels) with federal civil immigration authorities. The ITD explains it was adopted to preserve trust between immigrant communities and state and local law enforcement while delineating the line between state criminal enforcement and federal civil immigration enforcement. ITD at 1–2. Relevant here, the ITD bars state, county, and local law enforcement officers from stopping, questioning, arresting, searching, or detaining any individual based solely on actual or suspected citizenship or immigration status or actual or suspected violations of federal civil immigration law. *Id.* § II.A.1. Nor can officers inquire about an individual's immigration status unless doing so is "necessary to the ongoing investigation of an indictable offense by that individual . . . *and* relevant to the offense under investigation." *Id.* § II.A.2.

The ITD also limits voluntary assistance to federal immigration authorities when the sole purpose of that assistance is federal civil immigration enforcement. Among other things, law enforcement agencies and officers may not participate in civil immigration enforcement operations, share non-public personally identifying information, grant access to non-public law enforcement resources, provide access to detainee interviews without specified consent procedures, provide release-date notice except in specified circumstances, or prolong detention past the ordinary release time except in specified circumstances. *Id.* § II.B.

The ITD further prohibits state, county, or local law enforcement authorities from entering into, modifying, renewing, or extending agreements to exercise federal immigration authority under Section 287(g) of the Immigration and Nationality Act, 8 U.S.C. § 1357(g), and from exercising authority under any preexisting Section 287(g) agreement. ITD § III.A. The ITD provides a carve-out for law enforcement agencies currently a party to an existing Intergovernmental Service Agreement ("IGSA") with the Federal Government.[18]  *Id.* § III.B. Finally, the ITD states that:

> Nothing in Sections II.A and II.B shall be construed to restrict, prohibit, or in any way prevent a state, county, or local law enforcement agency or official from:
>
> 1. Enforcing the criminal laws of this state.
>
> 2. Complying with all applicable federal, state, and local laws.
>
> 3. Complying with a valid judicial warrant or other court order, or responding to any request authorized by a valid judicial warrant or other court order.

---

[18] An IGSA is an agreement between governmental entities authorizing one entity to provide services to another. For purposes of this action, the contemplated IGSAs are agreements between federal civil immigration authorities and local law enforcement agencies under which the local agencies would house individuals in federal civil immigration custody. *See* U.S. Gov't Accountability Off., *Immigration Detention: Actions Needed to Improve Planning, Documentation, and Oversight of Detention Facility Contracts*, GAO-21-149, at 7 (Jan. 2021) (on file with the Court).

4. Participating with federal authorities in a joint law enforcement taskforce the primary purpose of which is unrelated to federal civil immigration.

5. Requesting proof of identity from an individual during the course of an arrest or when legally justified during an investigative stop or detention.

6. Asking an arrested individual for information necessary to complete the required fields of the LIVESCAN database (or other law enforcement fingerprinting database), including information about the arrestee's place of birth and country of citizenship.

7. Inquiring about a person's place of birth on a correctional facility intake form and making risk-based classification assignments in such facilities.

8. Providing federal immigration authorities with information that is publicly available or readily available to the public in the method the public can obtain it.

9. When required by exigent circumstances, providing federal immigration authorities with aid or assistance, . . . .

10. Sending to, maintaining or receiving from federal immigration authorities information regarding the citizenship or immigration status, lawful or unlawful, of any individual. *See* 8 U.S.C. §§ 1373, 1644.

*Id.* § III.C (footnotes omitted).

## B.    Previous Litigation Involving the ITD

The ITD has been unsuccessfully challenged twice before.

*First*, in 2019, two counties in New Jersey, the oversight board of a county jail, and a local official sued New Jersey over the ITD. *Cnty. of Ocean v. Grewal*, 475 F. Supp. 3d 355 (D.N.J.

7

2020).[19]  Plaintiffs there argued the ITD was preempted by two federal laws—8 U.S.C. §§ 1373 and 1644—two statutes that concern information sharing between the federal government and state and local governments in the enforcement of immigration law.  *Id.* at 362–63.  The Federal Government filed a statement of interest pursuant to 28 U.S.C. §§ 517, 518(b), in which it both supplemented plaintiffs' preemption arguments and independently asserted the ITD violated principles of intergovernmental immunity embodied in the Supremacy Clause.  *Id.* at 384–85.  Then-Chief Judge of this District, the Hon. Freda L. Wolfson, concluded that the challenged provisions of the ITD were neither preempted by federal law nor in violation of the intergovernmental immunity doctrine.[20]  *Id.*  Judge Wolfson therefore dismissed the complaint.  *Id.* at 386.  In 2021, the Third Circuit rejected plaintiffs' appeal and affirmed Judge Wolfson's opinion.  *Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of N.J.*, 8 F.4th 176 (3d Cir. 2021).

*Second*, in 2020, the Federal Government directly sued New Jersey over the ITD.  *See United States v. New Jersey*, No. 20-1364, 2021 WL 252270, at *4 (D.N.J. Jan. 26, 2021).  As in *Ocean County*, the Federal Government argued the ITD was preempted by federal law and violated the intergovernmental immunity doctrine.  *Id.* at *5, *13.  For largely the same reasons as in *Ocean County*, Judge Wolfson again rejected the Federal Government's contentions.  Judge Wolfson determined the Federal Government offered no reason "why th[e] Court should come to a different conclusion" with respect to the express preemption issue, *id.* at *12, and, along similar lines,

---

[19] A court "may take judicial notice of another court's opinion—not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity."  *S. Cross Overseas Agencies*, 181 F.3d at 426 (citations omitted).

[20] The intergovernmental immunity doctrine prohibits state laws that either directly regulate the United States or discriminate against the Federal Government or those with whom it deals.  *See United States v. Washington*, 596 U.S. 832, 838–39 (2022) (citing *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion)).

8

concluded the intergovernmental immunity claims "face[d] the same shortcomings" they did in *Ocean County*, *id.* at \*13–14.  The Federal Government did not seek reconsideration of or appeal Judge Wolfson's decision.

### C.  The Challenged Policies

The Cities, like New Jersey, have adopted policies that curb voluntary assistance with federal civil immigration enforcement.  The Challenged Policies share several core features with the ITD and, in many respects, prohibit the same actors and conduct as the ITD.  However, the overlap is not perfect.  Some Challenged Policies use slightly different wording or apply to municipal employees beyond law enforcement agencies and officers.  Because those similarities and differences matter to the standing analysis that follows, the Court summarizes the Challenged Policies with a focus on where they track the ITD and where they may differ.

#### 1.  *Newark's policies*

The Complaint identifies two allegedly problematic policies in Newark:  (1) Mayor Baraka's June 2017 executive order, City of Newark, Exec. Order No. MEO 17-001 (June 19, 2017), [https://perma.cc/FGG8-QQX8] ("Newark Executive Order" or "Newark EO"); and (2) Newark Police Division General Order No. 19-01, *Subject: Immigration Enforcement* (Feb. 15, 2019), [https://perma.cc/QZ62-QJAP] ("Newark Police Order" or "Newark PO"). Compl. ¶¶ 40–47.

#### a.  Newark Executive Order

Declaring Newark a "fair and welcoming city," the Newark Executive Order provides that Newark and its agents "shall not expend any time, funds, or resources" facilitating federal civil immigration enforcement or participating in civil immigration enforcement operations except where legally required by state or federal law or regulation, New Jersey Attorney General guidelines or directives, or court order.  Newark EO § 2.

In particular, the Newark Executive Order bars Newark's agents from entering agreements that would grant them federal immigration authority (including agreements created under 8 U.S.C. § 1357(g)), entering arrangements to detain immigrants in deportation proceedings (including IGSAs), honoring detainer requests or administrative warrants absent a valid and properly issued judicial criminal warrant, participating or assisting in civil immigration enforcement operations, or permitting U.S. Immigration and Customs Enforcement ("ICE"), Customs and Border Protection ("CBP"), or the U.S. Citizenship and Immigration Service ("USCIS") access to municipal facilities, property, equipment, or databases absent a valid judicial criminal warrant or court order. *Id.* § 2.A–E. The Newark Executive Order also prohibits municipal agents from requesting or investigating an individual's citizenship or immigration status unless required by law, regulation, directive, or court order. *Id.* § 3. Separately, the policy limits the preservation or sharing of confidential personal information except where otherwise required by law, regulation, directive, or court order. *Id.* § 6.

b.   Newark Police Order

The Newark Police Order was developed "in compliance with [the ITD]." Newark PO § I. Like the ITD, the Newark Police Order prohibits municipal law enforcement from stopping, questioning, arresting, searching, or detaining an individual based solely on immigration status or suspected civil immigration violations, or from inquiring into an individual's immigration status unless doing so is necessary to an ongoing investigation of an indictable offense and relevant to the offense under investigation. *Id.* § IV.A. Also like the ITD, the Newark Police Order restricts Newark's law enforcement officers from providing assistance to federal immigration authorities with the following when the sole purpose of the assistance is in furtherance of federal civil immigration enforcement: participating in civil immigration operations, providing non-public personally identifying information, granting non-public access to equipment or property, providing

10

access to detainee interviews without written consent (unless certain requirements are satisfied), giving notice of a detained individual's release date (subject to limited exceptions), and continuing an individual's detention past the ordinary release time (except in enumerated circumstances). *Id.* § IV.B.

The Newark Police Order states that nothing in Sections IV.A or IV.B should be construed to restrict, prohibit, or prevent Newark's law enforcement officers from, among other things, enforcing New Jersey's criminal laws, complying with federal, state, and local law, executing valid judicial warrants or court orders, participating in task forces with federal authorities that are unrelated to federal civil immigration efforts, providing federal immigration authorities with publicly available information, assisting federal immigration authorities when required by exigent circumstances, and sending, maintaining, or receiving from federal immigration authorities information on an individual's citizenship or immigration status. *Id.* § IV.D.1–4, 8–10 (citing 8 U.S.C. §§ 1373 & 1644).

The Newark Police Order also directs Newark's police department not to enter into, modify, renew, or extend any agreement to exercise federal immigration authority under Section 287(g) of the Immigration and Nationality Act, 8 U.S.C. § 1357(g), unless provided written approval by New Jersey's attorney general or because the agreement "is necessary to address threats to the public safety or welfare of New Jersey residents arising out of a declaration of a state or national emergency." *Id.* § V.A. At the same time, the Newark Police Order states that nothing in Section IV applies to current IGSAs to detain individuals for civil immigration enforcement purposes when they are acting under such an agreement. *Id.* § V.B.

### 2.    *Hoboken's policy*

The Challenged Policy from Hoboken is former Mayor Bhalla's executive order from January 2018, which declared Hoboken a "fair and welcoming city." Compl. ¶¶ 61–65 (citing City

of Hoboken, Exec. Order No. 1, *Executive Order Declaring Hoboken a Fair and Welcoming City* (Jan. 1, 2018), [https://perma.cc/RYE7-L3Q4] ("Hoboken Executive Order" or "Hoboken EO")).

Pursuant to the Hoboken Executive Order, Hoboken and its agents cannot expend time, funds, or resources facilitating federal civil immigration enforcement or participating in civil immigration enforcement operations, unless legally required by state or federal law, regulation, or directive. Hoboken EO § 3. In nearly verbatim language to the Newark Executive Order, the Hoboken Executive Order prohibits Hoboken's agents from entering agreements that grant them federal immigration authority, entering arrangements to detain individuals in deportation proceedings (including IGSAs), honoring immigration detainer requests or administrative warrants absent a valid and properly issued judicial criminal warrant, participating in civil immigration enforcement operations, or permitting ICE, CBP, or USCIS access to municipal facilities, property, equipment, or databases absent a valid judicial criminal warrant. *Id.* § 3.A–E.

Also like the Newark Executive Order, the Hoboken Executive Order separately restricts Hoboken's agents from asking about an individual's citizenship or immigration status unless the inquiry is required by state law, regulation, or directive, or by federal law or regulation. *Id.* § 4. In a similar vein, the Executive Order's privacy section limits maintaining or sharing confidential personal information, including citizenship or immigration status, except where permitted by 8 U.S.C. §§ 1373 or 1644 or required by state law, regulation, or directive, or by federal law or regulation. *Id.* § 7. Against these mandates, the Hoboken Executive Order makes clear it does not restrict a municipal agent from maintaining, requesting, sending, receiving, or exchanging information regarding an individual's citizenship or immigration status with a federal, state, or local government entity as governed by 8 U.S.C. §§ 1373 and 1644. *Id.* § 4.

### 3. Jersey City's policy

The Challenged Policy from Jersey City is the February 2017 executive order "Establishing the City of Jersey City as a Sanctuary City." Compl. ¶¶ 48–51 (citing City of Jersey City, Exec. Order No. 2017-003, *Executive Order Establishing the City of Jersey City as a Sanctuary City* (Feb. 3, 2017), [https://perma.cc/2JBC-CPLY] ("Jersey City Executive Order" or "Jersey City EO")).

Like the Challenged Policies implemented in Newark and Hoboken, the Jersey City Executive Order declares that Jersey City's agents cannot expend time, funds, or resources facilitating federal civil immigration enforcement or participating in civil immigration enforcement operations, unless legally required by state or federal law, regulation, directive, or court order. Jersey City EO § 2. The Executive Order prohibits Jersey City's agents from entering agreements that provide the city or its agents with federal immigration authority, entering arrangements to detain immigrants in deportation proceedings (including IGSAs), honoring immigration detainer requests or administrative warrants absent a valid and properly issued judicial criminal warrant, assisting federal immigration authorities in civil immigration enforcement operations, or permitting ICE, CBP, or USCIS access to municipal facilities, property, equipment, or databases absent a valid judicial criminal warrant. *Id.* § 2.A–E.

The Jersey City Executive Order also restricts Jersey City's agents from asking individuals about their citizenship or immigration status unless required by state or federal law, regulation, directive, or court order. *Id.* § 3. In addition, the Executive Order bars municipal agents from maintaining or sharing confidential personal information—including release-date information—except where otherwise required by law. *Id.* § 6. And, like the aforementioned Challenged Policies, the Jersey City Executive Order states that nothing therein "restrict[s] the maintenance, or communication and exchange between local officials and federal immigration authorities, of

13

information regarding the citizenship or immigration status of an individual, pursuant to [8 U.S.C. §§ 1373 and 1644]." *Id.* § 13.

### 4. Paterson's policy

The Challenged Policy from Paterson is the 2019 policy issued by then-Chief of the Paterson Police Department Troy Oswald, titled "Dealing with the Immigrant Community." Compl. ¶¶ 52–60 (citing Paterson Police Dep't, *Standard Operating Procedures, Dealing with the Immigrant Community* (June 12, 2019), [https://perma.cc/69NW-YEGM] ("Paterson SOP")).

As with the other Challenged Policies, the Paterson SOP largely tracks the ITD. For example, like the Newark Police Order, the Paterson SOP states that its purpose is to maintain procedures "in compliance with" the ITD. Paterson SOP at 1. Consistent with the ITD, the SOP confirms that Paterson's law enforcement officers are responsible for enforcing state criminal laws, not civil immigration violations, except in narrowly defined circumstances. *Id.* The SOP also provides that local law enforcement's assistance with federal immigration authorities beyond what is required by law "risks undermining trust between law enforcement and the public." *Id.*; *see id.* § II.D ("Under federal and state law, local law enforcement agencies are not required to enforce civil administrative warrants or civil detainers issued by federal immigration officers.").

Like the ITD and the Newark Police Order, the Paterson SOP bars Paterson's law enforcement officers from stopping, questioning, arresting, searching, or detaining an individual based solely on actual or suspected citizenship or immigration status or actual or suspected civil immigration violations. *Id.* § III.A.1. It also prohibits officers from inquiring about an individual's immigration status unless the inquiry is necessary to an ongoing investigation of an indictable offense and relevant to the offense under investigation, or necessary to comply with certain laws. *Id.* § III.A.2. Also like the ITD, the SOP limits specified assistance to federal immigration authorities when the sole purpose is federal civil immigration enforcement, including participating

14

in civil immigration operations, providing non-public personally identifying information, granting access to non-public equipment or property, allowing access to detainee interviews without written consent, sharing release-date notice, and prolonging detention past the ordinary release time except in enumerated circumstances. *Id.* § III.B.1–6.

The Paterson SOP requires law enforcement to provide written notice to a detained individual, in a language the individual can understand, when federal civil immigration authorities ask to interview the detainee, receive notice of the detainee's upcoming release, or continue detaining the individual past the ordinary release time. *Id.* § III.B.7.  The Paterson SOP preserves many of the same categories of cooperation preserved by the ITD, including enforcement of state criminal laws, compliance with applicable laws and valid judicial warrants or court orders, participation in task forces unrelated to federal civil immigration enforcement, exigent-circumstance assistance, and the sending, maintaining, or receiving of citizenship or immigration-status information under 8 U.S.C. §§ 1373 and 1644. *Id.* § III.C.1–4 & 8–9.

### D.      This Action

On January 20, 2025, President Donald Trump declared "a national emergency exists at the southern border of the United States," and that given this emergency, it was "necessary for the Armed Forces to take all appropriate action to assist the Department of Homeland Security in obtaining full operational control of the southern border."  Proclamation No. 10,886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8327 (Jan. 20, 2025).  In accordance with this proclamation, the Federal Government has sought to enforce federal immigration law throughout the country, including here in New Jersey.  The Federal Government complains that the Challenged Policies "create serious operational consequences and hinder the ability of the Federal Government to enforce the nation's immigration laws."  Compl. ¶ 68.  For example, the Challenged Policies deny federal immigration agents access to individuals

15

in custody, restrict local officers' ability to transfer individuals in custody to federal agents, and bar "otherwise willing local officers from providing mission-critical information" to the Federal Government. *Id.* ¶ 3.

The Complaint provides three specific examples of alleged non-cooperation. All three come from the Essex County Correctional Facility,[21] which the Complaint alleges has "repeatedly refused to cooperate with federal immigration officials to keep dangerous illegal aliens off the streets." *Id.* ¶ 73.

> (a) On April 5, 2025, the Essex County Correctional Facility released an alien from Nigeria arrested for theft and credit card theft, with a prior arrest for theft, despite an ICE detainer lodged against him.
>
> (b) On April 3, 2025, the Essex County Correctional Facility released an alien from Peru arrested for domestic violence, despite an ICE detainer lodged against him.
>
> (c) On March 31, 2025, the Essex County Correctional Facility released two aliens from Brazil who had both been arrested for domestic violence and assault, despite ICE detainers lodged against them.

*Id.*

At its core, the Complaint alleges that Defendants enacted the Challenged Policies to thwart federal immigration enforcement efforts, a plainly unconstitutional endeavor. *See id.* ¶ 4. The Complaint names the following Defendants:

---

[21] The Essex County Correctional Facility is controlled and operated by the Essex County Department of Corrections. *See* U.S. Dep't of Homeland Sec., Off. of Inspector Gen., OIG-19-20, *Issues Requiring Action at the Essex County Correctional Facility in Newark, New Jersey* at 2 (Feb. 13, 2019), [https://perma.cc/3EKB-46QZ]. The Essex County Department of Corrections is operated by Essex County. *See* The Essex County Department of Corrections, *About the Essex County Department of Corrections*, [https://perma.cc/TZ3S-4G2C] (last visited June 18, 2026). Essex County is not a party to this lawsuit, and notably, it is bound by the ITD and none of the Challenged Policies. *See Lyndhurst*, 229 N.J. at 565; N.J. Stat. Ann. § 30:8-19 (providing county sheriffs and county boards of commissioners control over their county's respective jails).

1.      The City of Newark ("Newark"), Newark Mayor Ras Baraka, the Newark City Council, and Newark City Council President C. Lawrence Crump (collectively, the "Newark Defendants");

2.      The City of Hoboken ("Hoboken"), Hoboken Mayor Emily Jabbour,[22] the Hoboken City Council, and Hoboken City Council President Ruben Ramos Jr.[23] (collectively, the "Hoboken Defendants");

3.      The City of Jersey City ("Jersey City"), Jersey City Mayor James Solomon,[24] the Jersey City City Council, and Jersey City City Council President Denise Ridley[25] (collectively, the "Jersey City Defendants"); and

4.      The City of Paterson ("Paterson"), Paterson Mayor André Sayegh, the Paterson City Council, and Paterson City Council President Dr. Lilisa Mimms[26] (collectively, the "Paterson Defendants").

Against these Defendants, the Complaint asserts three counts:

1.  Count I:  Violation of the Supremacy Clause (Preemption).  *Id.* ¶¶ 82–85.

2.  Count II:  Violation of the Supremacy Clause (Unlawful Discrimination Against the Federal Government).  *Id.* ¶¶ 86–90.

3.  Count III:  Violation of the Supremacy Clause (Unlawful Regulation of the Federal Government).  *Id.* ¶¶ 91–95.

---

[22] Pursuant to Rule 25(d), the Court substitutes Mayor Jabbour in for Hoboken's previous mayor and named Defendant, Ravinder Bhalla.

[23] Pursuant to Rule 25(d), the Court substitutes Hoboken City Council President Ramos Jr. in for previous Hoboken City Council President and named Defendant, James Doyle.

[24] Pursuant to Rule 25(d), the Court substitutes Jersey City Mayor Solomon in for Jersey City's previous mayor and named Defendant, Steven Fulop.

[25] Pursuant to Rule 25(d), the Court substitutes Jersey City City Council President Ridley in for previous Jersey City City Council President and named Defendant, Joyce Watterman.

[26] Pursuant to Rule 25(d), the Court substitutes Paterson City Council President Dr. Mimms in for previous Paterson City Council President and named Defendant, Alex Mendez.

## II.      LEGAL STANDARDS

### A.      Rule 12(b)(1)

Under Rule 12(b)(1), a court must grant a motion to dismiss if it lacks subject matter jurisdiction to hear a claim.  When determining whether to dismiss a complaint under Rule 12(b)(1), "[a] district court has to first determine . . . whether a Rule 12(b)(1) motion presents a 'facial' attack or a 'factual' attack on the claim at issue, because that distinction determines how the pleading must be reviewed."  *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 357–58 (3d Cir. 2014) (citing *In re Schering Plough Corp. Intron*, 678 F.3d 235, 243 (3d Cir. 2012)).

A facial attack "is an argument that considers a claim on its face and asserts that it is insufficient to invoke the subject matter jurisdiction of the court because, for example, it does not present a question of federal law, or because there is no indication of a diversity of citizenship among the parties, or because some other jurisdictional defect is present."  *Id.* at 358.  When "reviewing a facial attack, 'the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff.'"  *Id.* (quoting *In re Schering Plough*, 678 F.3d at 243).  On the other hand, "a factual attack . . . is an argument that there is no subject matter jurisdiction because the facts of the case . . . do not support the asserted jurisdiction."  *Id.*  When deciding a factual attack, "the District Court may look beyond the pleadings to ascertain the facts."  *Id.*

"In sum, a facial attack 'contests the sufficiency of the pleadings,'" *id.* (quoting *In re Schering Plough*, 678 F.3d at 243), "'whereas a factual attack concerns the actual failure of a [plaintiff's] claims to comport [factually] with the jurisdictional prerequisites,'" *id.* (quoting *CNA v. United States*, 535 F.3d 132, 139 (3d Cir. 2008)).  It is a plaintiff's burden to prove the Court has subject matter jurisdiction to hear a case.  *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d

18

1406, 1409 (3d Cir. 1991) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).

No party has addressed whether the Motions to Dismiss assert facial or factual attacks. Because Defendants have brought pre-answer motions challenging the Federal Government's standing, the Motions to Dismiss are "by definition" facial attacks. *Const. Party of Pa.*, 757 F.3d at 358. In deciding a facial attack, the Court will "only consider the allegations of the complaint and documents referenced therein . . . in the light most favorable to the plaintiff." *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000) (citations omitted). This does not mean, however, that the Court is limited to the four corners of the Complaint. A court may also "consider public documents, websites, or other sources whose accuracy cannot reasonably be questioned." *Biggins v. U.S. Postal Serv.*, No. 22-6310, 2026 WL 446401, at *2 (D.N.J. Feb. 17, 2026) (citing *Abulkhair v. Comm'r of Soc. Sec.*, 450 F. App'x 117, 119 n.3 (3d Cir. 2011)); *see Fitterer v. Resurgent Cap. Servs. L.P.*, No. 21-19068, 2024 WL 1810027, at *3 (D.N.J. Apr. 25, 2024) (explaining that even when a facial attack is made, courts may consider documents outside the pleadings, including items subject to judicial notice); *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (finding it appropriate to take judicial notice of documents that are records of government agencies). The Court may therefore take judicial notice of certain documents outside the pleadings, such as the ITD, relevant New Jersey statutes, and prior judicial decisions, when deciding the Motions to Dismiss.[27]

---

[27] On June 11, 2026, the Federal Government filed a letter asking the Court to consider Newark Police Department Memorandum 26-01 ("Memo 26-01"), issued on June 8, 2026, which concerned calls for service at Delaney Hall. D.E. 74 ("Government Letter"). The Federal Government characterizes Memo 26-01 as "new information intrinsic to the Complaint," *id.* at 1 n.2, and argues it is the "latest consequence" of the Newark Executive Order, *id.* at 1. Specifically, the Federal Government asserts that Memo 26-01 implements the mandates of the Newark

**B.     Rule 12(b)(6)**

Under Rule 12(b)(6), a court accepts all well-pled facts as true, construes the complaint in the plaintiff's favor, and determines "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (citation modified).

To survive a Rule 12(b)(6) challenge, the plaintiff's claims must be facially plausible, meaning that the well-pled facts "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  The allegations must be "more than labels

---

Executive Order and causes continuing harm by preventing Newark's law enforcement officers from participating in and using resources to facilitate civil immigration enforcement operations. *Id.* at 2–3.  In response, the Newark Defendants ask the Court to strike the Government Letter because, in their view, it mischaracterizes Memo 26-01 and improperly attempts to add new factual allegations to avoid formally amending the Complaint.  D.E. 77 at 1–3.

Although the Court can take judicial notice of Memo 26-01's existence and text, the Federal Government asks the Court to do more than that—it asks the Court to credit its theories about Memo 26-01, including that Memo 26-01 implemented the Newark Executive Order, was issued pursuant to the Newark Executive Order, and critically, is causing the Federal Government harm. *See* Government Letter at 1–3.  The Court cannot make those inferences at this juncture, as they are disputed adjudicative facts, not facts that can be "accurately and readily determined."  Fed. R. Evid. 201(b)(2); *S. Cross Overseas Agencies*, 181 F.3d at 426–27.  Indeed, accepting the Federal Government's use of Memo 26-01 in the Government Letter would require the Court to resolve factual questions about why Memo 26-01 was issued, how it was understood, whether it was implemented pursuant to the Newark Executive Order, whether it was superseded by another policy, and what consequences, if any, it has for the enforcement of federal civil immigration enforcement operations in Newark.  This is far from the "clearest of cases" where a district court should reach outside the pleadings at the motion to dismiss stage. *Victaulic Co. v. Tieman*, 499 F.3d 227, 236 (3d Cir. 2007).  Accordingly, the Court takes notice that Memo 26-01 exists and says what it says, but nothing more.

The Court also agrees with the Newark Defendants that the Government's Letter is an improper attempt to supplement the Complaint.  The Federal Government cannot use a post-briefing letter to add a new factual episode to the Complaint and then establish its standing from that episode.  To the extent that the Federal Government believes that Memo 26-01 is causing it harm, the proper course of action is to seek leave to supplement the Complaint under Rule 15(d).

20

and conclusions, and a formulaic recitation of the elements of a cause of action will not do."
*Twombly*, 550 U.S. at 555. "[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id*.

## III.    DISCUSSION

The Federal Government argues the Challenged Policies violate the Supremacy Clause because they are conflict preempted and expressly preempted by the Immigration and Nationality Act, discriminate against the Federal Government in violation of the intergovernmental immunity doctrine, and unlawfully regulate the Federal Government under that same doctrine. Opp'n at 2.

In addition to disputing the merits of these contentions, all Defendants make a threshold challenge to the Federal Government's standing. "A motion to dismiss for want of standing is . . . properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." *In re Schering Plough*, 678 F.3d at 243 (alteration in original) (quoting *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007)). The Court will therefore construe the Jersey City and Paterson Defendants' standing arguments as brought pursuant to Rule 12(b)(1), despite those Defendants having solely moved to dismiss the Complaint under Rule 12(b)(6). *See Pontes v. Rowan Univ.*, No. 20-2645, 2021 WL 4145119, at *2 (3d Cir. Sept. 13, 2021) (rejecting a district court's analysis of a standing challenge under Rule 12(b)(6) and applying a Rule 12(b)(1) framework on appeal).

"When faced with motions to dismiss under Rule 12(b)(1) and Rule 12(b)(6), a court should first consider the Rule 12(b)(1) motion because 'jurisdiction must be established as a threshold matter.'" *Jean-Baptiste v. U.S. Dep't of Just.*, No. 24-8583, 2025 WL 1367602, at *3 (D.N.J. May 9, 2025) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)), *aff'd*, No. 25-

21

1995, 2025 WL 2255012 (3d Cir. Aug. 7, 2025), *cert. denied*, 223 L. Ed. 2d 518 (Jan. 12, 2026).

The Court will therefore first determine whether the Federal Government has standing to sue,

which, for the reasons explained below, the Court concludes it does not.[28]

### A.    Standing

Article III of the Constitution limits the jurisdiction of federal courts to "cases" and

"controversies." *Lance v. Coffman*, 549 U.S. 437, 439 (2007).  Standing to sue is a "component

of the case-or-controversy requirement." *Id.*  To have standing to sue:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally
> protected interest which is (a) concrete and particularized, and (b) "actual or
> imminent, not 'conjectural' or 'hypothetical.'"  Second, there must be a causal
> connection between the injury and the conduct complained of—the injury has to be
> "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e]
> result [of] the independent action of some third party not before the court."  Third,
> it must be "likely," as opposed to merely "speculative," that the injury will be
> "redressed by a favorable decision."

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (alterations in original) (citations omitted);

*Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

Standing is not "dispensed in gross." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734

(2008) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)).  "The standing requirement applies

to each claim asserted and each form of relief sought." *Salamon v. Knight*, No. 23-2220, 2024 WL

4799800, at *2 (D.N.J. Nov. 14, 2024) (citing *Lutter v. JNESO*, 86 F.4th 111, 124 (3d Cir. 2023)).

It is a plaintiff's burden to establish standing.  *Williamsport Hosp. v. Sec'y, U.S. Dep't of Health

& Hum. Servs.*, 761 F. App'x 91, 95 (3d Cir. 2019) (citing *Finkelman v. N.F.L.*, 810 F.3d 187, 194

(3d Cir. 2016)).  "If [they] fai[l] to make the necessary allegations, [they have] no standing."

---

[28] Having concluded the Federal Government lacks Article III standing, the Court dismisses the
Complaint for lack of subject matter jurisdiction and does not reach Defendants' alternative
arguments for dismissal under Rule 12(b)(6).

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (alteration in original) (quoting *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)).

Defendants assert the Federal Government lacks Article III standing because any injury it suffers flows from the ITD—which is not at issue in this lawsuit, which has twice been unsuccessfully challenged, which is largely coextensive with the Challenged Policies, and which is binding on all law enforcement officers in the State.  NH Mot. at 11–14; JC Mot. at 13–15; P. Mot. at 8–9.  Thus, where the Federal Government's alleged injury flows from conduct restricted in both the ITD and the Challenged Policies, Defendants argue an injunction against only the Challenged Policies would provide the Federal Government no relief.

The Federal Government makes several counters.  It first disputes that the Challenged Policies are coextensive with the ITD and roots its standing to sue on the fact the Challenged Policies are more restrictive.  Opp'n at 9–11.  Next, the Federal Government claims that even if the ITD and the Challenged Policies are coextensive, it still has standing because a favorable decision could call into question *New Jersey* and *Ocean County*, which both upheld the ITD.  *Id.* at 11–12.  Finally, the Federal Government contends that even if this lawsuit does not affect the ITD, it has standing because it need not sue every party that causes it harm.  *Id.* at 12.

The Court concludes the Federal Government lacks Article III standing.  Its standing problems are best understood by dividing the Complaint's allegations into two groups:  (1) alleged injuries arising from actors enforcing restrictions common to both the ITD and the Challenged Policies; and (2) alleged injuries arising from restrictions found only in the Challenged Policies.

As to the first group—harms caused by actors enforcing restrictions in the Challenged Policies that overlap with the ITD's independent restrictions on the same actors—those harms are not redressable in this action.  The ITD independently binds state, county, and local law

enforcement officers, including the law enforcement officers in the Cities subject to the Challenged Policies. Thus, even if the Court enjoined the Challenged Policies, those officers would remain prohibited from taking any action the ITD forbids. Relief against the Challenged Policies would therefore produce no practical change with respect to these injuries. As to the second group— harms caused by restrictions in the Challenged Policies that go beyond the ITD—the Federal Government has failed to allege a concrete injury caused by those incremental restrictions.

### 1. Injuries that flow from the ITD and the Challenged Policies

The Federal Government claims the Challenged Policies interfere with its ability to enforce federal immigration law. Opp'n at 8; Compl. ¶¶ 68–72. For instance, the Challenged Policies prohibit the Cities, as well as their municipal agents, from sharing information on non-citizens with the federal government, participating in civil enforcement of federal immigration laws, entering into any agreement to operate immigration custody facilities, or honoring detainer requests or administrative warrants. Compl. ¶¶ 69–72.

Although the Federal Government traces these injuries (and others) back to the Challenged Policies, many can also be traced back to the ITD.[29] For instance, the Federal Government alleges

---

[29] Although not dispositive, Defendants and the State of New Jersey appear to impose too high a bar for the Federal Government to establish traceability. The Third Circuit has not adopted a single standard for establishing causation and has explicitly indicated both but-for and concurrent causation can suffice. *See Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 158 (3d Cir. 2022) (citations omitted).

Defendants seem to suggest the Federal Government cannot establish traceability because the Challenged Policies are not the *sole* cause of its injuries. *See* NH Mot. at 11 ("Because the [ITD] already limits city officers from voluntarily cooperating with federal immigration authorities to the same extent as the Cities' own policies, the United States cannot show that its injuries are traceable to the Cities' policies alone. . . ."); JC Mot. at 14 (arguing that the Federal Government's injuries "are not reasonably traceable to the Jersey City [Executive Order], as opposed to the [ITD]"). But a plaintiff "need not show that the [challenged law] is the sole cause . . . of the threatened injury." *PPL Energyplus, LLC v. Solomon*, No. 11-745, 2011 WL 5007972, at *4 (D.N.J. Oct. 20, 2011) (citing *Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 142 (3d Cir. 2009)). The problem Defendants identify is really one of redressability, not traceability.

injury from the Challenged Policies' prohibition on local law enforcement's voluntary participation in civil immigration enforcement operations. *See* Compl. ¶¶ 41(d), 47, 49(d), 55, 62(d) (respectively, Newark Executive Order § 2(D), Newark Police Order § IV.B.1, Jersey City Executive Order § 2(D), Paterson SOP § III.B.1, and Hoboken Executive Order § 3(D)). But that same injury flows from the ITD, which bars law enforcement agencies and officers from engaging in the same conduct. *See* ITD § II.B.1.

The Federal Government likewise alleges injury based on the Challenged Policies' limitations on municipal law enforcement providing federal civil immigration authorities access to municipal facilities, equipment, databases, property, and other non-public law enforcement resources. Compl. ¶¶ 41(e), 47, 49(e), 55, 62(e) (respectively, Newark Executive Order § 2(E), Newark Police Order § IV.B.3, Jersey City Executive Order § 2(E), Paterson SOP § III.B.3, and Hoboken Executive Order § 3(E)). Again, the ITD contains the same prohibition. *See* ITD § II.B.3.

Another example of a harm allegedly traceable to the Challenged Policies, but for which there is a substantive counterpart in the ITD, is the provision in the Newark Police Order that no officer may stop, question, arrest, search, or detain an individual based solely on immigration status or civil immigration violations. Compl. ¶ 45 (citing Newark Police Order § IV.A.1).[30] The ITD prohibits the same conduct. *See* ITD § II.A.1.

As these examples illustrate, many injuries the Federal Government attributes to the Challenged Policies also flow from corresponding provisions in the ITD. For these injuries, the Federal Government has a redressability problem. Redressability asks whether it is "likely, as

---

[30] The Complaint only references this restriction in the Newark Police Order, although there is an identical provision in the Paterson SOP. *See* Paterson SOP § III.A.1.

opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976)). A plaintiff cannot establish redressability when the requested relief would remove one source of injury, but leave another independent source in place, producing no practical change. *See Fischer v. Governor of N.J.*, 842 F. App'x 741, 750–51 (3d Cir. 2021). In *Fischer*, the Third Circuit explained the plaintiffs could not establish redressability because a favorable decision would eliminate only one cause of their injuries, while leaving in place another, independent cause of the same injuries. *Id.* at 751 & n.11. In reaching that conclusion, the Third Circuit followed other courts that similarly "held that redressability is not satisfied when a plaintiff challenges a statute whose prohibitions are embodied in another law that would remain in effect even if the plaintiff received the relief he sought." *Id.* at 751 n.11; *see also McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 229 (2003) (holding that plaintiffs lacked standing to challenge one provision of a campaign finance statute when a separate provision that plaintiffs could not reach in that lawsuit independently imposed the same injury plaintiffs sought to redress), *rev'd on other grounds*, *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010).

*Fischer*'s reasoning applies here. The ITD is the independent source of the same restrictions that is not subject to suit—the ITD is not one of the Challenged Policies and New Jersey is not a defendant. In fact, the ITD has already been challenged twice and upheld twice. The Federal Government itself previously sought to invalidate the ITD on preemption and intergovernmental immunity grounds, lost, and did not appeal. *See New Jersey*, 2021 WL 252270. To the extent that the Federal Government seeks to use this case as a vehicle to obtain indirectly

26

what it failed to obtain directly in *New Jersey*, it cannot do so.[31]  No judgment here could invalidate the ITD or relieve municipal law enforcement officers of their independent obligation to follow it.

This reality is fatal to the Federal Government's ability to establish redressability for any alleged injuries that flows from actors enforcing restrictions common to both the Challenged Policies and the ITD.  Enjoining the Challenged Policies would not free the Cities' law enforcement officers to do anything the ITD independently forbids.  Thus, for those injuries, a favorable decision would provide no concrete relief.

The Federal Government seeks to sidestep its redressability problem by arguing that a decision invalidating the Challenged Policies could eventually result in overturning the ITD. Opp'n at 12.  The ITD has already been upheld twice:  once by the Third Circuit in *Ocean County* and once by a court in this District in *New Jersey*.  *See supra* Section I.B.  *Ocean County* is binding precedent that this Court cannot disregard; only the Third Circuit sitting en banc, or the Supreme Court, may overrule a precedential Third Circuit decision.  *See United States v. Garner*, 961 F.3d 264, 273 (3d Cir. 2020) (citing *Joyce v. Maersk Line Ltd.*, 876 F.3d 502, 508 (3d Cir. 2017)).  *New Jersey* is different, but no more helpful to the Federal Government.  In *New Jersey*, the Federal Government directly challenged the ITD, lost, and did not appeal or seek reconsideration.  At most, a favorable decision here might provide persuasive authority for the Federal Government to argue elsewhere that *Ocean County* or *New Jersey* should be revisited.  But Article III standing cannot rest on the kind of speculative collateral effect underlying the Federal Government's argument— *i.e.*, that a favorable decision in *this* action could be the catalyst for the Third Circuit to overturn *Ocean County* or for a court in this District to reconsider *New Jersey* in *another* lawsuit.  *See Steel*

---

[31] And any future attempt by the United States to relitigate the ITD's validity would, at minimum, have to confront ordinary preclusion principles.  *See Montana v. United States*, 440 U.S. 147, 152–53 (1979).

*Co.*, 523 U.S. at 107 ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement.").

Indeed, the existence of *Ocean County* and *New Jersey* put this action in a meaningfully different posture from *Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016) and *Maldonado v. Morales*, 556 F.3d 1037 (9th Cir. 2009), the two cases the Federal Government invokes for the proposition that the ITD's existence does not defeat its standing. *See* Opp'n at 12. In both cases, the plaintiffs faced overlapping legal restrictions, but remained free to challenge the parallel restriction in a subsequent proceeding because they never challenged those laws before. *See Hollis*, 827 F.3d at 442; *Maldonado*, 556 F.3d at 1043–44. Redressability therefore was not defeated merely because another law outside the scope of those suits caused the same injury. *See Maldonado*, 556 F.3d at 1044 (explaining that a favorable ruling would likely allow the plaintiff to "surmount" the obstacle presented by the parallel law in a subsequent action). By contrast, the ITD is not an unchallenged parallel restriction. The Federal Government has already attempted to surmount the obstacle of the ITD, and lost. Thus, unlike the plaintiffs in *Maldonado* and *Hollis*, the Federal Government cannot rely on a subsequent challenge to the parallel rule (the ITD) to establish a realistic path to redress its injuries.

The Federal Government responds that the ITD's continued existence does not defeat standing because "a plaintiff need not sue every defendant that may cause it harm," and because, "where a regulatory scheme grants authority to multiple government authorities, an injunction against any one of those authorities suffices to establish standing." Opp'n at 12 (first citing *Jones v. Bock*, 549 U.S. 199, 217 (2007); then citing *Matsumoto v. Labrador*, 122 F.4th 787, 801–02 (9th Cir. 2024)). The Court is not convinced these cases carry the weight the Federal Government places on them.

28

*Jones* addressed whether a prisoner's suit under the Prisoner Litigation Reform Act was defective because the prisoner failed to name every prison official in his initial grievance process that he later sued in federal court. 549 U.S. at 217–19. The Supreme Court rejected a "name all defendants" rule and held that exhaustion is not automatically inadequate merely because a later-named defendant was not identified in the preliminary grievance process. *Id. Jones* did not address Article III standing, prospective relief, or redressability where an independent legal directive outside the suit would continue to cause the same alleged injury. It therefore does not address the standing problem presented here.

*Matsumoto* is closer, but it still does not provide the Federal Government with a path to redressability for the alleged harms that flow from actors enforcing restrictions common to both the Challenged Policies and the ITD. In *Matsumoto*, the plaintiffs challenged a single statute that granted enforcement authority to multiple government officials. 122 F.4th at 801–02. The Ninth Circuit held that the plaintiffs did not need to sue every official with enforcement authority to establish redressability because an injunction against one authorized enforcer would provide at least some incremental relief. *Id.* Thus, *Matsumoto* stands for the proposition that a plaintiff may have standing even if the requested relief does not eliminate every possible source of harm, so long as it reduces the alleged injury.

This case is different. *Matsumoto* involved multiple enforcers of one challenged law, while this action involves municipal policies layered on top of an independent statewide directive that is not challenged here and that will continue to bind municipal law enforcement officers subject to the Challenged Policies regardless of the outcome of this case. *See, e.g.*, *Paff*, 235 N.J. at 20–21. Thus, for alleged injuries arising from conduct covered by both the Challenged Policies and the ITD, an injunction against the Challenged Policies would not reduce the alleged injury at all. It

would not provide even the "small incremental step" discussed in *Matsumoto*, 122 F.4th at 801–02 (quoting *Massachusetts v. EPA*, 549 U.S. 497, 524 (2007)), because the ITD would still prohibit the same conduct.

In sum, for any alleged harms caused by actors enforcing restrictions common to both the ITD and the Challenged Policies, those harms are not redressable in this action. A favorable decision would not free municipal law enforcement officers to do anything the ITD independently forbids. The Federal Government therefore lacks standing to sue for those injuries.

2.      *Injuries that flow only from the Challenged Policies*

The Federal Government also attempts to establish standing based on alleged harms traceable solely to the Challenged Policies, which would be redressable by a favorable decision. To that end, it has identified two instances when the Challenged Policies are purportedly more restrictive than the ITD. Opp'n at 9–10.[32] The Court addresses them in turn.

The first concerns the Challenged Policies' respective provisions regarding the prolonged detention of individuals based on civil immigration detainer requests from federal immigration authorities. The Federal Government asserts that unlike the ITD—which permits civil detainers lodged against persons charged with or convicted of violent or serious offenses, persons recently convicted of indictable crimes, and persons subject to judicially signed final removal orders, ITD § II.B.6—the detainer provisions in the Newark, Hoboken, and Jersey City Challenged Policies contain no such carve-out, and prohibit the honoring of *all* detainer requests, Newark EO § II.C, Jersey City EO § II.C, and Hoboken EO § III.C. Thus, there could be a situation where the ITD

---

[32] Should the Federal Government identify an injury that flows from these incremental differences, it would only have standing to challenge those specific provisions. *See Davis*, 554 U.S. at 733–34 (citation omitted) (noting that standing is not dispensed in gross and so a party's standing to challenge one section of a statute "does not necessarily mean that he also has standing to challenge" another).

would allow local law enforcement to prolong an individual's detention but the Challenged Policies would not.

Initially, the Court notes this example is not applicable to the Paterson SOP, which includes the same civil detainer provision as the ITD. *Compare* Paterson SOP § III.B.6 *with* ITD § II.B.6. And while the Federal Government is correct the Newark Executive Order contains no carve-out, the Newark Police Order does—and in fact, has the same civil detainer provision as the Paterson SOP and the ITD. Newark PO § IV.B.6. Because law enforcement in Newark and Paterson follow identical directives at the state and local level with respect to civil detainer requests, the Federal Government cannot establish an injury traceable to these cities' policies.

There is, however, a gap on paper between the detainer provisions in the Hoboken and Jersey City Executive Orders and the one in the ITD. In the event law enforcement in either city refused to cooperate with a civil detainer request that the ITD would permit it to honor, the Federal Government could suffer an injury traceable to the Hoboken and Jersey City Executive Orders. But the Complaint alleges no such incident. The Federal Government does not allege that any of the Cities held a serious offender and refused a detainer request from the Federal Government. The only examples of alleged non-cooperation in the Complaint implicate the Essex County Correctional Facility, which operated by Essex County.[33] Compl. ¶ 73. That omission is significant because New Jersey law assigns jail functions to counties, not municipalities. *See* N.J. Stat. Ann. §§ 30:8-1 & 30:8-19. Thus, the Complaint does not plausibly allege that the detainer language in the Hoboken or Jersey City Executive Orders has caused any concrete injury to the Federal Government.

---

[33] Thus, to the extent that the Federal Government suffers an injury from the Essex County Correctional Facility's alleged refusal to honor detainer requests, that injury is traceable to Essex County—a non-party—not to Defendants.

31

Not only has the Federal Government failed to allege any injury has occurred, but it has also pleaded no facts that suggest it *might* suffer this harm in the future. Critically, there are no allegations that either Jersey City or Hoboken operate correctional facilities that house dangerous individuals, or for that matter, operate correctional facilities at all. *See* JC Reply at 4 (arguing that Jersey City cannot obstruct federal law enforcement through denial of detainer requests because it is not the entity responsible for honoring them in the first place). In the Court's view, the fact that the only examples of non-compliance with respect to civil detainer requests identified in the Complaint come from a county-operated facility—that is bound by the ITD and not by any of the Challenged Policies—underscores the hypothetical nature of the Federal Government's alleged harm and the fact its injuries are not traceable to the Challenged Policies.

In short, the Federal Government's textual distinction between the detainer provisions of the ITD and the Challenged Policies is not enough to give rise to standing.[34] The Federal Government must plead facts that substantiate its feared harm. Without such facts, the Federal Government cannot establish any injury is "certainly impending," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)), or has a "substantial risk" of materializing, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).

\* \* \*

---

[34] The same is true of any difference between the ITD and the Challenged Policies as to who is bound by them. The ITD binds law enforcement agencies and officers, while some Challenged Policies apply more broadly to municipal employees or agents beyond law enforcement. That broader scope may distinguish those provisions from the ITD for traceability and redressability purposes, but it does not itself establish injury in fact. The Complaint identifies no concrete instance in which any municipal employee (including law enforcement) withheld information, denied access, refused assistance, or otherwise impeded federal immigration enforcement because of a Challenged Policy. Nor does the Complaint allege facts showing that such an injury is certainly impending or substantially likely to occur. Thus, any injury based on the Challenged Policies' broader coverage remains speculative.

The second instance in which the Federal Government asserts the Challenged Policies are more restrictive than the ITD concerns the prohibition on immigration detention agreements, including IGSAs.  The Federal Government argues it has standing to sue because the Newark, Hoboken, and Jersey City Executive Orders bar all agreements to operate facilities to detain immigrants, while the ITD has a carve-out for IGSAs that "currently" exist.  Opp'n at 9–10; ITD § III.B; Newark EO § II.B; Hoboken EO § III.B; Jersey City EO § II.B.[35]

The Court is not persuaded.  For one, a close reading of the policies shows no actual daylight between the ITD's prohibition on entering into new immigration detention agreements and the provisions in the Challenged Policies.  As the Newark and Hoboken Defendants point out, the relevant section in their respective Executive Orders (as well as the one in the Jersey City Executive Order) bars "*[e]nter[ing] into*" any contract, agreement, or arrangement to detain immigrants in deportation proceedings, including IGSAs.  NH Mot. at 17.  That the Challenged Policies do not explicitly mention an exception for currently existing IGSAs is immaterial, as they, like the ITD, do not mandate the withdrawal from any existing contract either.[36]

---

[35] Like with the prior example, the Federal Government identifies no relevant provision from the Paterson SOP that exceeds the ITD.  And although the Newark Police Order mirrors the ITD, only Newark's law enforcement officers are bound by the Newark Police Order, whereas other municipal employees in Newark are bound by the Newark Executive Order.  The Court therefore considers the Newark Executive Order alongside the Hoboken and Jersey City Executive Orders.

[36] Notably, the Federal Government does not respond to this argument, which the Newark and Hoboken Defendants raised in their opening brief.  *See* NH Mot. at 17.  The Federal Government's failure to respond, "despite [being given] an opportunity to do so[,] constitutes a waiver or abandonment as to those arguments."  *Samra Plastic & Reconstructive Surgery v. United Healthcare Ins. Co.*, 768 F. Supp. 3d 661, 670 n.6 (D.N.J. 2025); *EBIN N.Y., Inc. v. KISS Nail Prods., Inc.*, No. 23-2369, 2024 WL 1328029, at *7 (D.N.J. Mar. 28, 2024) ("Where an issue of fact or law is raised in an opening brief, but it is uncontested in the opposition brief, the issue is considered waived or abandoned by the non-movant." (quoting *Lawlor v. ESPN Scouts, LLC*, No. 10-5886, 2011 WL 675215, at *2 (D.N.J. Feb. 16, 2011))).

But even if there was a substantive difference between the immigration detention agreement provisions in the Newark, Hoboken, and Jersey City Executive Orders and the ITD, the Federal Government still lacks standing because it has not pleaded a concrete injury. There are no allegations that the Federal Government was a party to an existing IGSA with any of the Cities, was negotiating one, would have entered one absent the Challenged Policies, or otherwise lost an available detention arrangement. The Complaint also contains no allegations suggesting that the Federal Government would pursue a detention agreement with Newark, Jersey City, Paterson, or Hoboken, or that any of the Cities operates a facility suitable for immigration detention such that the Challenged Policies are causing it harm. Without such facts, the Federal Government cannot show a concrete and particularized injury that is either actual or sufficiently imminent. *See Clapper*, 568 U.S. at 409.

In any event, even if the Complaint alleged a sufficiently concrete injury arising from the Challenged Policies' IGSA provisions, the Federal Government's theory would still face an independent obstacle: Assembly Bill 5207 ("AB 5207"), codified at N.J. Stat. Ann. §§ 30:4-8.15 to -8.16, separately prohibits state and local entities from making, renewing, or extending any contract to detain people for civil immigration violations.

The Federal Government says that AB 5207 is no longer valid. It argues the Third Circuit's holding in *CoreCivic, Inc. v. Governor of New Jersey* "does not support a distinction that permits [AB 5207] to continue to prohibit municipalities from operating immigration detention facilities." Opp'n at 10 (citing 145 F.4th 315, 329 (3d Cir. 2025)).

The Federal Government's capacious reading of *CoreCivic* is contradicted by the Third Circuit's explicit holding and implicitly belied by the Third Circuit's reasoning. *CoreCivic* invalidated AB 5207 "as applied to CoreCivic," a private immigration detention contractor. *Id.*

34

("Our holding is narrow. We address only a state ban on contracting in a market where the federal government is the only available counterparty for services implementing a core federal power."). *CoreCivic* does not establish that AB 5207 is invalid as applied to the State and local governments in New Jersey.

As explained in *CoreCivic*, there is a "material distinction" between "laws that merely impose an incidental economic burden on the federal government and those that subvert federal operations." *Id.* at 323–24. While the former are permissible, the latter violate the intergovernmental immunity doctrine.[37] *Id.* at 323. Applied to AB 5207, the Third Circuit determined the provision in AB 5207 that banned private parties like CoreCivic from selling immigration detention services was a direct regulation on the Federal Government because "the only entity in the business, so to speak, of [buying private] immigration det[ention] is the federal government." *Id.* at 325 (quoting *United States v. King County*, 122 F.4th 740, 757 (9th Cir. 2024)).

In striking AB 5207 on intergovernmental immunity grounds as applied to CoreCivic, the Third Circuit "align[ed]" itself with the Seventh and Ninth Circuits, which also determined the constitutionality of similar statutes based on principles of intergovernmental immunity. In *GEO Group, Inc. v. Newsom*, the Ninth Circuit struck a law that prevented a private contractor from doing business with the Federal Government because it violated the intergovernmental immunity doctrine. 50 F.4th 745, 757 (9th Cir. 2022) (en banc) ("[W]hen federal law gives discretion to a federal official to hire a contractor to perform federal work, a state cannot override the federal official's decision to do so. That is a level of control over federal operations that the Supremacy

---

[37] As noted *supra* n.20, the doctrine prohibits state laws that either directly regulate the United States or discriminate against the Federal Government or those with whom it deals.

Clause does not tolerate."). On the other hand, the Seventh Circuit in *McHenry County v. Kwame Raoul* upheld an Illinois law that "refused to detain immigrants on federal government's behalf, but which left 'the federal government . . . free to . . . contract with private parties' for detention." *CoreCivic*, 145 F.4th at 327 (quoting 44 F.4th 581, 593 (7th Cir. 2022)).

The upshot from *CoreCivic, GEO Group*, and *McHenry* is that a state directly regulates the federal government when it bars private parties from contracting with the federal government in a market where the federal government is the only buyer of services needed to carry out a core federal function. But a state does not directly regulate the federal government merely by restricting its own state and local entities, so long as the federal government remains free to use its own facilities or contract with private parties. Because the laws at issue in *CoreCivic* and *GEO Group* crossed that line, they violated the intergovernmental immunity doctrine. By contrast, the law in *McHenry* only regulated the conduct of state and local entities, and was therefore upheld. *CoreCivic* held that AB 5207 violated the intergovernmental immunity doctrine as applied to private federal contractors. The Federal Government's reading of *CoreCivic*—that AB 5207's prohibition on state and local actors from entering IGSAs also violates the intergovernmental immunity doctrine—does not follow the Third Circuit's reasoning in *CoreCivic*, and the Court will therefore reject it.

Because the Federal Government has failed to allege that it suffered any injury created by the portions of the Challenged Policies that exceed the ITD—or that any such injury is certainly impending or substantially likely to materialize in the future from those deviations—the Court concludes the Complaint contains no injury solely traceable to the Challenged Policies that a favorable decision in this suit would redress. That means the only concrete injuries identified in the Complaint arise from a non-party entity (the Essex County Correctional Facility) or from legal

36

restrictions this suit cannot redress (the ITD).  In other words, "a favorable judicial decision would not reduce [the Federal Government's] injuries," and therefore, it cannot establish redressability. *Fischer*, 842 F. App'x at 750.

It follows from this conclusion that the numerous cases the Federal Government cites for the proposition that a party can establish traceability and redressability when it seeks to overturn a more restrictive policy are not on point.  *See* Opp'n at 11 (citing *Reps. Comm. for Freedom of the Press v. Rokita*, 147 F.4th 720, 728 (7th Cir. 2025); *Matsumoto*, 122 F.4th at 800–01; *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982); *Lozano v. City of Hazleton*, 620 F.3d 170, 192 (3d Cir. 2010), *judgment vacated on other grounds sub nom. City of Hazleton v. Lozano*, 563 U.S. 1030 (2011); and *Massachusetts v. EPA*, 549 U.S. 497, 526 (2007)).  Put into the terms of *Lozano*, the problem for the Federal Government is the Court cannot redress *any* of the woes identified in the Complaint by invalidating the Challenged Policies.  620 F.3d at 192.

The Federal Government bears the burden of alleging "facts essential to show jurisdiction." *FW/PBS*, 493 U.S. at 231 (citation omitted).  Here, it has not made the requisite showing.  The Court therefore concludes the Federal Government lacks standing to sue.  In turn, this Court lacks subject matter jurisdiction to address the merits of the Federal Government's case.  *ACLU–NJ v. Twp. of Wall*, 246 F.3d 258, 261 (3d Cir. 2001) (citing *Warth v. Seldin*, 422 U.S. 490 (1975)).  Accordingly, this Court will **GRANT** the Motions to Dismiss under Rule 12(b)(1) and **DISMISS** the Complaint ***without prejudice***.[38]

---

[38] "Because the absence of standing leaves the court without subject matter jurisdiction to reach a decision on the merits," the Court does not consider Defendants' alternative Rule 12(b)(6) arguments and dismisses the Complaint without prejudice.  *Cottrell v. Alcon Lab'ys*, 874 F.3d 154, 164 (3d Cir. 2017) (citing *Korvettes, Inc. v. Brous*, 617 F.2d 1021, 1024 (3d Cir. 1980)).

## IV.    CONCLUSION

For the foregoing reasons, the Court will **GRANT** the Motions to Dismiss and **DISMISS**

the Complaint *without prejudice*.  An appropriate Order accompanies this Opinion.


Dated:  June 24, 2026

Evelyn Padin, U.S.D.J.